ELECTRONICALLY FILED

SOUTH BAY LAW FIRM
MICHAEL D. GOOD (SBN 176033)
21535 Hawthorne Blvd., Suite 210
Torrance, California 90503
Telephone:    (310) 373-2075
Facsimile:    (310) 356-3229

[Proposed] Counsel for Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>Renaissance Surgical Arts at Newport Harbor, LLC,<br><br>                Debtor in Possession. | Case No.       8:11-bk-19749-ES<br><br>Chapter 11<br><br>**DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION FOR ORDER**<br><br>**(1) AUTHORIZING USE OF CASH COLLATERAL AND SETTING INTERIM AND FINAL HEARINGS RE: SAME;**<br><br>**(2) AUTHORIZING THE DEBTOR TO INCUR UNSECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364(b)**<br><br>**(3) EXCUSING PERFORMANCE OF OBLIGATIONS ARISING UNDER 11 U.S.C. § 365(d)(3);**<br><br>**(4) ESTABLISHING ADEQUATE ASSURANCE PAYMENTS WITH RESPECT TO UTILITIES;**<br><br>**(5) EXTENDING THE TIME IN WHICH TO FILE SCHEDULES, STATEMENTS, AND LISTS PURSUANT TO FED.R.BANKR.P. 1007(c); AND**<br><br>**(6) LIMITING NOTICE**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF FILED CONCURRENTLY HEREWITH**<br><br>Date:     [To Be Set]<br>Time:    [To Be Set]<br>Place:   Courtroom "5A"<br>          411 W. Fourth Street<br>          Santa Ana, CA |

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

**TABLE OF CONTENTS**

I.     FACTUAL OVERVIEW ................................................................................................4

II.    RENAISSANCE SHOULD BE AUTHORIZED TO USE ANY CASH
       COLLATERAL PURSUANT TO 11 U.S.C. § 363. ..............................................4

       A.     The Adequate Protection Burden. .............................................................6

       B.     Renaissance Has Satisfied Its Adequate Protection Burden. ...............8

              1.     Plaza Bank's Interest is Adequately Protected by Renaissance's
                     Regular Monthly Payments With Respect to the Plaza Note. ....................10

              2.     Plaza Bank is Adequately Protected by the Maintenance and
                     Preservation of Renaissance's Business. .....................................................11

              3.     Plaza Bank's Interest is Adequately Protected by the Proposed
                     Replacement Lien. ......................................................................................13

       C.     Renaissance Should Be Authorized To Use Cash Collateral In Order To
              Promote A Successful Reorganization. .................................................15

       D.     This Court Should Schedule An Interim Hearing On This Motion Prior
              To Granting Final Approval Of Renaissance's Cash Collateral Budget. ........17

III.   RENAISSANCE SHOULD BE AUTHORIZED TO INCUR, SHORT-TERM,
       ADMINISTRATIVE-PRIORITY DEBTOR-IN-POSSESSION FINANCING FROM
       ITS PHYSICIAN MEMBERS. ......................................................................18

IV.    RENAISSANCE SHOULD BE EXCUSED FROM PERFORMANCE OF ITS
       OBLIGATIONS UNDER 11 U.S.C. § 365(D)(3) FOR AN INTERIM 60-DAY
       PERIOD. ..................................................................................................19

V.     RENAISSANCE'S    UTILITY    PROVIDERS    SHOULD    BE    DEEMED
       "ADEQUATELY    ASSURED"    AS    PROPOSED    BY    RENAISSANCE'S
       MANAGEMENT. .......................................................................................20

VI.    THIS COURT SHOULD EXTEND THE PERIOD IN WHICH RENAISSANCE
       MUST FILE ITS SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS. ........21

VII.   THIS COURT SHOULD LIMIT NOTICE PURSUANT TO THE PROCEDURES
       SET FORTH HEREIN FOR ADMINISTRATIVE CONVENIENCE AND COST
       SAVINGS TO RENAISSANCE'S CHAPTER 11 ESTATE. ............................22

VIII.  CONCLUSION .............................................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PRINTED ON
RECYCLED PAPER

ELECTRONICALLY FILED

1  **TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE,**

2  **AND OTHER PARTIES IN INTEREST:**

3       Renaissance Surgical Arts of Newport Harbor, LLC, debtors and debtors-in-

4  possession in these related Chapter 11 proceedings ("Renaissance"), hereby moves this Court, <u>on an</u>

5  <u>emergency basis</u>, for an Order:

6       1.    Authorizing Use Of Cash Collateral and Setting Interim and Final Hearings

7             re: Same;

8       2.    Authorizing The Debtor To Incur Unsecured Post-Petition Financing

9             Pursuant To 11 U.S.C. § 364(b);

10      3.    Excusing Performance Of Obligations Arising Under 11 U.S.C. §

11            365(d)(3);

12      4.    Establishing Adequate Assurance Payments With Respect To Utilities;

13      5.    Extending The Time In Which To File Schedules, Statements, And Lists

14            Pursuant To Fed.R.Bankr.P. 1007(c); and

15      6.    Limiting Notice.

16      **DUE TO THE URGENT NATURE OF THE RELIEF REQUESTED HEREIN,**

17  **RENAISSANCE IS NOT ABLE TO CONFORM TO THE CENTRAL DISTRICT OF**

18  **CALIFORNIA'S NORMAL MOTION PRACTICE AND HAS REQUESTED THAT THIS**

19  **MOTION BE HEARD ON AN EMERGENCY BASIS IN ACCORDANCE WITH**

20  **RENAISSANCE'S BUSINESS NEEDS.**

21      This Motion is made on the basis of the Declaration of Bruce Wallace ("Wallace

22  Declaration") filed concurrently herewith (and incorporated by reference as if set forth herein in

23  full), the points and authorities filed concurrently herewith, and on such other oral or written

24  evidence as this Court elects to consider prior to or at the time of the hearing on this matter.

25      ///

26      ///

27      ///

28

**South Bay Law Firm**
**21535 Hawthorne Blvd. Ste. 210**
**Torrance CA 90503**

PRINTED ON
RECYCLED PAPER

**DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

ELECTRONICALLY FILED

1    **WHEREFORE**, Renaissance prays that this Court enter an order authorizing and

2  granting the relief requested above, and such for such other and further relief as this Court deems

3  just and proper.

4

5  DATED:  August  9, 2011                          **SOUTH BAY LAW FIRM**

6

7                                        By: _____/S/_____

8                                              Michael D. Good
                                            [Proposed]  Counsel  for  Debtor  and  Debtor-in-
                                            Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

ELECTRONICALLY FILED

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1

## MEMORANDUM OF POINTS AND AUTHORITIES

Renaissance Surgical Arts at Newport Harbor, LLC, debtor and debtor-in-possession in this Chapter 11 proceeding ("Renaissance"), hereby submits this Memorandum of Points and Authorities in support of the Debtor's <u>Emergency</u> Motion For Order (1) Authorizing Use Of Cash Collateral and Setting Interim and Final Hearings re: Same; (2) Authorizing The Debtor To Incur Unsecured Post-Petition Financing Pursuant To 11 U.S.C. § 364(b); (3) Excusing Performance Of Obligations Arising Under 11 U.S.C. § 365(d)(3); (4) Establishing Adequate Assurance Payments With Respect To Utilities; and (5) Limiting Notice (the "Motion").

## I.    FACTUAL OVERVIEW.

In the interests of brevity, the facts set forth in the concurrently-filed Declaration of Bruce Wallace (the "Wallace Declaration" or, as cited, "Wallace Decl.") are incorporated herein by this reference as if set forth in full.  In light of the foregoing, Renaissance requests the following relief, on an emergency basis:

## II.    RENAISSANCE SHOULD BE AUTHORIZED TO USE ANY CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363.

The provisions of 11 U.S.C. § 363(c)(2) govern a debtor's use of cash collateral.  Section 363 (c)(2) provides, in pertinent part, as follows:

> The trustee [or debtor in possession] may not use, sell or      lease cash collateral…. unless:
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such      use,   sale, or lease in accordance with the provisions of this section.
>
> 11 U.S.C. § 363(c)(2).

Therefore, a court may authorize a debtor's use of a creditor's cash collateral in the absence of creditor consent.  *See* 11 U.S.C. § 363(e).  A debtor-in-possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363 of the Bankruptcy Code.  *See* 11 U.S.C. § 1107(a).  Section

PRINTED ON
RECYCLED PAPER

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

363(e) of the Bankruptcy Code provides that, upon the request of an entity that has an interest in property proposed to be used by the debtor, the court may prohibit or condition such use "as is necessary to provide adequate protection of such interest."

"Adequate protection" is defined (non-exclusively) by the Bankruptcy Code as:

(1) . . . mak[ing] a cash payment or periodic cash payments to such entity, to the extent that . . . use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

*See* 11 U.S.C. § 361.  The Bankruptcy Code clearly delineates the party which bears the burden of proof on the relevant cash collateral issues:

(1)  the trustee [or debtor in possession] has the burden of proof on the issue

of adequate protection; and

(2)  the entity asserting an interest in property has the burden of proof on the

issue of the validity, priority, or extent of such interest.

*See* 11 U.S.C. § 363(o).  Therefore, this Court may authorize Renaissance's use of any cash collateral of Plaza Bank upon a determination that the asserted interest of Plaza Bank[1] in

---

[1] Renaissance's preliminary lien search indicates that Plaza Bank is not the only party potentially asserting an interest in Renaissance's accounts receivables.  Specifically, Renaissance notes that the following UCC-1 abstracts obtained through Westlaw indicate an asserted interest by the following parties in Renaissance's accounts receivable:

| Secured Party | Instrument Number/State/Recording Date |
|---|---|
| Plaza Bank | 20100713358 DE (03/03/2010) |
|  | 107224461734 CA (03/03/2010) |
| Cardinal Health | 20111536013 CA (04/25/2011) |

Renaissance has not verified these filings, and a review is ongoing.  The abstracts are listed here for purposes of completeness only.  In any event, and based on the estimated value of its

PRINTED ON
RECYCLED PAPER

**DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    the cash collateral will be adequately protected.  *In re McCombs Properties VI, Ltd.*, 88 B.R. 261

2    (Bankr. C.D. Cal. 1988).

3                          A.  **The Adequate Protection Burden.**

4                          In *United Savings v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626 (1988),

5    the United States Supreme Court analyzed and quantified the parameters of the "interest in

6    property," referenced in Section 361, 362(d)(1), and 363(e), which the Bankruptcy Code undertakes

7    to protect, where required, through adequate protection.  This analysis led the Supreme Court in

8    Timbers to the conclusion that the "interest in property" referenced in the above sections of the

9    Bankruptcy Code means, and is limited to, the "value of the Collateral."  *Timbers*, 108 S.Ct. at 630.

10   Under the *Timbers* analysis, therefore, the adequate protection provisions in the Bankruptcy Code

11   protect a secured creditor only from a potential diminution in the value of that creditor's collateral

12   receivables base as of the petition date, Renaissance does not believe Cardinal Health – a medical
     supplies vendor with whom Renaissance has never entered into any security agreement – has any
13   secured claim.

14           In addition to the foregoing, a preliminary review of Renaissance's books and records
     indicates Renaissance conveyed an interest in certain of its receivables to certain private parties in
15   exchange for the advancement of operating capital.  Those transactions are denominated as
     receivables "sales," and are summarized as set forth in the documentation appended as Exhibit "6"
16   to the Wallace Declaration.

17           Based upon a post-petition review of these transactions and upon the advice of
     Renaissance's counsel, Renaissance believes such transactions are not "true sales," but are
18   disguised loan transactions.  In particular, the economic substance of each transaction provided that:
     (i) Renaissance bore the risk of economic loss in the event of inadequate collections; and (ii)
19   Renaissance's was entitled to any amount collected "over 100% of the net collectible value" of such
     receivables.  *See, e.g., In re Commercial Money Ctr., Inc.*, 350 B.R. 465, 484 (B.A.P. 9th Cir. 2006)
20   (collecting cases and discussing criteria for distinguishing between a "true sale" of payment streams
     and disguised financing ("The absence of risk [to the purchasing party] 'seems to result in a finding
21   of a debtor-creditor relationship in most cases.'  *Woodson*, 813 F.2d at 271.  *See also Lendvest,* 119
     B.R. at 200 (transaction was loan where documents placed 'risk of loss' on debtor and not
22   investors); *In re S.O.A.W. Enterprises, Inc.,* 32 B.R. 279, 282 (Bankr.W.D.Tex.1983) (transactions
     were disguised loans rather than sales where investor 'ran no real risk'), *cited with approval in
23   Golden Plan,* 829 F.2d at 709–10; *In re Evergreen Valley Resort, Inc.,* 23 B.R. 659, 661
     (Bankr.D.Me.1982) ('a security interest is indicated if the assignee must account to the assignor for
24   any surplus received from the assignment over the amount of the debt' rather than retaining such
     surplus as one of the benefits of ownership) (citation omitted). *Compare Golden Plan,* 829 F.2d at
25   709 ('assumption of risk [by investors] strongly suggests that [they] were not in a creditor-debtor
     relationship with [the debtor]').").

26           In addition to the allocation of risk described in the "sale" documentation, Renaissance's
     lien search reveals no UCC-1's recorded in favor of any of the parties who purportedly "purchased"
27   accounts receivable.  Nor were the receivables ever conveyed to such parties.

28

PRINTED ON
RECYCLED PAPER

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    during the post-petition period.  *Id.*

2              The "value"-oriented adequate protection analysis adopted by the Supreme Court in

3    the *Timbers* case has been closely adhered to by the courts which have subsequently had occasion to

4    address this issue.  *See e.g., In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass.

5    1990) (so long as the receivables being collected and used by the debtor are being replaced by

6    sufficient new receivables in which the creditor is granted a security interest, the creditor is

7    adequately protected);  *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (secured creditor is

8    not impaired and is not entitled to receive adequate protection payments where value of collateral

9    does not decline); *In re Century Inv. Fund, VII Ltd. Partnership*, 96 B.R. 884, 887 (Bankr. E.D.

10   Wis. 1989) (where value of collateral appears to be stable, secured creditor is not entitled to

11   adequate protection payments); *In re Anderson*, 86 B.R. 877, 889 (Bankr. N.D. Ind. 1988) (secured

12   creditor was required to show a necessity for adequate protection by demonstrating a decline in

13   asset value from the petition date); *In re Kessler*, 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) (under

14   Timbers, movants are not entitled to adequate protection payments, as there was no showing that

15   property was depreciating in value).  In *In re Elmore*, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988), the

16   Honorable Samuel Bufford held that:

17                 [T]he Court finds that the property is not depreciating in value.  In
                 consequence, the Court finds that Lomas [Secured Creditor] is
18               adequately protected by the value of its collateral… The right to
                 receive payments is a simple contract right, that supports only a claim
19               in the bankruptcy case.  There is no other adequate protection to
                 which Lomas is entitled under the Bankruptcy Code.
20

21              *Elmore, supra*, 94 B.R. at 677 (citation omitted).  *Accord, In re Delta Resources,*

22   *Inc.*, 54 F.3d 722, 730 (11th Cir.), *cert. denied*, 64 U.S.L.W. 3348 (1995); *In re Westchase I L.P.*,

23   126 B.R. 692, 694-95 (W.D.N.C. 1991).  Under the strict value-oriented analysis adopted by the

24   Supreme Court in *Timbers* (and adhered to by the well-reasoned cases cited above), the adequate

25   protection inquiry under Section 363(e) is limited to determining whether the debtor's use of a

26   secured creditor's cash collateral will reduce the value of the creditor's collateral base.  If the debtor

27   can establish that the proposed use of the collateral will not cause a decline in the value of the

28

**ELECTRONICALLY FILED**

1    collateral, then court authorization of such use is appropriate.

2    Not infrequently, a secured creditor will contend that it somehow has a right to be

3    paid adequate protection payments, post-petition, even where no decline in the value of the

4    collateral is either occurring or anticipated.  The Supreme Court in *Timbers* expressly rejected this

5    very contention, stating:

6    It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured
     creditor to immediate payment of the principal of his collateral) that
7    this "realization" is to "result" not at once, but only upon completion
     of the reorganization.  It is then that he must be assured "realization
8    … of the indubitable equivalent" of his collateral.

9    *Timbers*, 108 S.Ct. at 633.  The law, then, is clear:  no adequate payments are

10   required unless there is a decline post-petition in the value of the secured creditor's collateral which

11   actually impairs the creditor's secured claim.  As set forth in detail below, and as evidenced by the

12   Wallace Declaration, Renaissance's proposal to use any cash collateral of Plaza Bank provides

13   adequate protection to Plaza Bank.

14   **B.  Renaissance Has Satisfied Its Adequate Protection Burden.**

15   As evidenced by Exhibits "1" through "5" to the Wallace Declaration, the Plaza Note

16   is a term loan, intended to finance the completion of tenant improvements.  It is not an operational

17   borrowing facility designed to facilitate ongoing daily operations.  Two practical consequences flow

18   from this.

19   First, the collateral structure securing the Plaza Note is focused primarily on

20   Renaissance's "enterprise value" (back-stopped by the personal guarantees of Members), rather

21   than on Renaissance's accounts receivable base (which was non-existent at the time Plaza Bank

22   entered into its lending arrangement with Renaissance).  Though Plaza Bank asserts a validly-

23   perfected, first-priority lien in Renaissance's accounts receivable and other intangibles, repayment

24   of Renaissance's obligations to Plaza was secured primarily by what the Plaza Agreement defines

25   as "Securities Collateral" (i.e., pledged equity interests in Renaissance) (*see* e.g., "SECTION 6.

26   Special Covenants with respect to Securities Collateral" at Exhibit "1"), further augmented by

27   personal guarantees obtained by Plaza Bank in connection with its loan (*see* e.g., Exhibit "4").

28

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

**DEBTOR'S OMNIBUS EMERGENCY MOTION**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    Thus, Plaza's primary "security" for its loan was the Company's "going forward" viability, back-

2    stopped by the personal guarantees of the Members – and not accounts receivable or cash, which

3    would not be generated by Renaissance's operations for nearly seven months after the Plaza Note

4    was executed and funded.

5    　　　　Second, Plaza's existing Note and Security Agreement are simply inadequate to

6    permit Renaissance to conduct the business operations necessary to preserve and augment the Plaza

7    Collateral.    Wallace Decl. at ¶13.    Without the credit facility necessary for proper business

8    operations, Renaissance has been rendered effectively unable to conduct properly-financed business

9    operations – and, as such, management has been unable to focus its efforts on aggressive

10    receivables collections.  *Id.*  Moving forward, Renaissance requires a "working line" of receivables-

11    based credit which will permit it to stabilize business operations, focus on collections, retire its

12    existing base of uncollected receivables, replace those older receivables with newer (and much

13    faster-paying) receivables, and position itself for business growth.  *Id.*

14    　　　　Renaissance presently has a base of uncollected receivables which are booked at

15    approximately $3.2 million, but which are of highly uncertain value due to (i) their age; and (ii) the

16    potential for payment negotiations by Medicare or other insurers for "out-of-network" claims; and

17    (iii) the need to audit Renaissance's prior billings subsequent to the replacement of Renaissance's

18    prior out-sourced billing and collections service (*see* Wallace Decl. at ¶14; *see also* discussion at

19    Wallace Decl. at ¶17).   Though the realization of some cash from these health care receivables is

20    anticipated, based on Renaissance's most recent month of operations (July) and on its projected

21    operations for August, Renaissance's management believes its "normalized," collectible receivables

22    base (i.e., the receivables base that Renaissance would have were it financing and collecting

23    receivables utilizing an operating line of credit) should be approximately $500,000.  Wallace Decl.

24    at ¶14.  In the absence of immediate access to a viable receivables-based credit facility, and utilizing

25    this more recent operating data, Renaissance believes it is appropriate to seek the use of Plaza

26    Bank's cash collateral with the extension of a "2-for-1" replacement lien – i.e., Plaza is willing to

27    extend a replacement lien of $2 against Plaza Bank's newly-generated receivables and cash for

28

ELECTRONICALLY FILED

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    every $1 of cash expended by Renaissance, up to $1 million.  Wallace Decl. at ¶17.

2        As described below, Plaza Bank's interest is adequately protected by: (i) regular

3    monthly payments under the Plaza Note, commencing September 4, 2011; (ii) Renaissance's

4    ongoing business operations, sufficient to maintain Plaza's receivables base at levels above those in

5    existence at the commencement of the Plaza Note; and (iii) a replacement lien on cash, accounts

6    receivable, and proceeds acquired and/or generated with any cash collateral with a value equal to

7    the amount of any cash collateral expended by Renaissance.

8        1.   Plaza Bank's Interest is Adequately Protected by Renaissance's Regular

9            Monthly Payments With Respect to the Plaza Note.

10       Cash payments to the holder of a secured claim are a statutorily-recognized form of

11   "adequate protection," and are typically offered *only* to the extent necessary to compensate for any

12   "decrease in the value of such [holder's] interest in such property."  *See* 11 U.S.C. § 361(1).  Here,

13   Renaissance is prepared to, and has budgeted for, regular monthly payments in the full amount

14   required under Plaza's Note, commencing September 4, 2011.  Such regular monthly payments

15   made under the terms of the agreement represent a contractually-agreed payment for the use of

16   collateral and for the risk of its loss and should, alone, constitute sufficient "adequate protection."

17   *See*, *e.g.*, *In re Las Vegas Monorail Co.*, 429 B.R. 317, 340-41 (Bankr. D. Nev. 2010) (discussing

18   provisions of adequate protection order under which debtor would comply with trustee indenture

19   agreement, and finding that performance under the indenture would "both adequately protects the

20   [indenture] Trustee's interest in the deposit accounts and the estate's interest in smooth operations").

21       Renaissance believes this approach to adequate protection is appropriate because, as

22   Mr. Wallace indicates, it avoids the accrual of arrearages under the Plaza note while the Company

23   seeks to establish a "go-forward" working line of credit secured by the Company's receivables.

24   Moreover, because the Plaza Note is guaranteed by many of the Center's physician-members,

25   regular monthly payments under the Plaza Note minimize any exposure those members may face in

26   connection with their guarantees.  *See* Wallace Decl. at ¶17 (discussing Renaissance's need to

27   secure cooperation of guarantor-physicians).  The Company believes that this, in turn, indirectly

28

PRINTED ON
RECYCLED PAPER

**DEBTOR'S OMNIBUS EMERGENCY MOTION**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

1  furthers the Center's business operations.

2        2.   Plaza Bank is Adequately Protected by the Maintenance and Preservation of

3             Renaissance's Business.

4        Just as importantly as Renaissance's performance under the Plaza Note, the

5  continued operation of Renaissance's business is an independent source of "adequate protection."

6  As discussed by Judge Markell in *Las Vegas Monorail*, 429 B.R. at 341:

7
8        [Debtor's] use of the cash it generates in its operations is itself a form
         of adequate protection. This is because [Debtor's] continued
9        investment in, and operation of, the monorail will increase, or at least
         maintain, the collateral's value.  A shuttered monorail will not
10       generate any revenue, but every additional rider on the monorail will
         generate additional cash for distribution to the noteholders, after
11       [Debtor] pays reasonable expenses. The Trustee has offered no
         evidence that monorail ridership is decreasing, as it would have
12       needed to obtain additional adequate protection of its prepetition
         interests.  This follows from the Supreme Court's decision *in United*
13       *Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484
         U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).  In that case, the
14       Court held that when collateral was not diminishing in value, the mere
         passage of time did not warrant adequate protection. See *id.* at 382,
15       108 S.Ct. 626;  *In re Integrated Health Services, Inc.*, 260 B.R. 71, 74
         (Bankr.D.Del.2001) (denying adequate protection or stay relief
16       because the creditor failed to provide sufficient evidence showing that
         the value of the collateral was declining);  *In re Elmira Litho, Inc.*,
17       174 B.R. 892, 902 (Bankr.S.D.N.Y.1994);  *In re Continental Airlines,*
         *Inc.*, 134 B.R. 536, 544 (Bankr.D.Del.1991) (citing *Timbers* for the
18       proposition that: "An undersecured creditor is only entitled to
         adequate protection payments if its collateral is declining in value.").
19       Rather, the Debtor's expenditures keep the monorail running and
         preserve the Trustee's expectation in net revenues as their primary
20       collateral.

21       Judge Markell additionally relied on earlier cases finding that the operation of the

22  debtor's business is itself a sufficient form of adequate protection.  *Id.* at 341-42 (citing *Federal*

23  *Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship.* 153 B.R. 204, 214 (N.D.Ill.1993)

24  ("[T]he required adequate protection of Rents is satisfied to the extent the Debtor reinvests the rents

25  in the operation and maintenance of the property because the value of the secured creditor's interest

26  in its collateral will thereby be increased."); *In re 499 W. Warren Street Assocs., Ltd. P'ship*, 142

27  B.R. 53, 58 (Bankr.N.D.N.Y.1992) (allowing the use of cash collateral to maintain property);

28

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1  *McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop. VI, Ltd.)*, 88 B.R. 261, 267

2  (Bankr.C.D.Cal.1988) (holding that rents could be spent to make repairs or renovations that would

3  increase rent flow even without equity cushion); *In re Stein*, 19 B.R. 458, 460

4  (Bankr.E.D.Pa.1982)).

5          Here, both the timing and the terms of the Plaza Note evidence Plaza's intent to look

6  primarily to the equity of the enterprise, rather than to Renaissance's (then-non-existent) accounts

7  receivable base, as its primary source of collateral.  As a result, the use of such receivables for

8  ongoing business operations is not only appropriate; it is vital if Plaza Bank's primary security – the

9  enterprise itself – is to be preserved.  As noted in the Wallace Declaration (and as explained in

10  further detail below), the Company's continued operation furthers this goal in the following ways:

11      • As old, uncollected receivables are converted to cash, fresh, higher-quality

12          receivables are generated.  Accrued receivables for July (traditionally, a "low

13          billing" month for the ASC industry) totaled $549,000. Wallace Decl. at ¶17.

14      • As described in the Wallace Declaration, Renaissance anticipates improved

15          collection rates following the replacement of its prior outsourced billing services

16          provider.  Wallace Decl. at ¶ 24.

17      • Further, the recent acquisition of its Medicare PTAN and very recent accession

18          into the Monarch network as an "in-network" provider helps Renaissance in two

19          ways:  First, these steps further reduce Renaissance's receivables-to-cash cycle

20          (further augmenting growth of Renaissance's cash balances).  Second, they

21          facilitate further referrals from "in-network" surgeons and physicians, thereby

22          strengthening Renaissance's receivables growth momentum (and augmenting the

23          receivables base which collateralizes Plaza Bank's debt).  Wallace Decl. at ¶¶ 25-

24          27.

25      • Finally, as Renaissance stabilizes its operations with the use of cash collateral

26          (and with other post-petition financing, as described below), it is better able to

27          obtain a revolving line of credit more closely tied to its existing receivables base,

28

PRINTED ON
RECYCLED PAPER

**ELECTRONICALLY FILED**

1    and more directly related to the ongoing growth of its business.

2    Even a temporary cessation of Renaissance's ability to operate its business, caused

3    by any lack of access to cash collateral, will result in a substantial diminution of Plaza Bank's

4    collateral, as surgeons will be forced to turn to other facilities to treat their patients.  Wallace Decl.

5    at ¶17.  Moreover, Renaissance's long-term viability will be jeopardized, as its ability to maintain

6    licensure and accreditation and contract with network and other providers will be at risk.  *Id.*  By

7    contrast, maintenance of Renaissance's ongoing operations will preserve the value of Plaza Bank's

8    interest in any cash collateral as nearly as possible against any risk to that value, thus providing

9    adequate protection.

10    3.    Plaza Bank's Interest is Adequately Protected by the Proposed Replacement

11    Lien.

12    Though contractual payments under the Plaza Note and the continued operation of

13    Renaissance's business are themselves arguably sufficient "adequate protection" for Plaza Bank

14    under these circumstances, under Renaissance's cash collateral proposal, Plaza Bank's interest in

15    any cash collateral will be further adequately protected from diminution in value through a

16    replacement lien granted to Plaza Bank.

17    In light of the uncertain value of Renaissance's uncollected receivables, Renaissance

18    believes the grant of a 2-for-1 replacement lien on cash, accounts receivable, and proceeds acquired

19    and/or generated with any cash collateral is appropriate, up to an aggregate value of an

20    encumbrance of $1 million on aggregate cash and receivables.  For example, if Renaissance uses

21    $100,000 of cash collateral which then results in medical receivables of $200,000, Plaza Bank will

22    be granted a lien in those receivables.  *See*, *e.g.*, *Las Vegas Monorail*, 343-344 (imposing

23    replacement liens on the debtor's use of net project revenues and deposit account proceeds as

24    adequate protection for the debtor's use of cash collateral in its ongoing operations).

25    Renaissance understands that under *Timbers*, the function of adequate protection is

26    only to preserve and not to increase the value of the collateral subject to a secured creditor's interest

27    (where value is measured as of the date of the petition).  Consequently, any *additional* value created

28

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

through Renaissance's use of the cash collateral, whether in the form of accounts receivable or cash, is arguably not subject to a replacement lien, but will instead constitute an asset of the estate to which all creditors will ultimately be able to look for payment. *See Ledgemere*, *supra*, 116 B.R. at 343 (so long as the receivables being collected and used by the debtor are being replaced by sufficient new receivables in which the creditor is granted a security interest, the creditor is adequately protected).

Here, however, the value of Renaissance's existing receivables base is highly uncertain. As a result, it is presently very difficult to ascertain the precise receivables value which must be protected. Accordingly, and using July's accrued billings of $549,000 as a starting point, Renaissance's management proposes to allocate the risk of lost value, and determine adequate protection, as follows:

- Renaissance's projected receivables "run rate" (i.e., the receivables base Renaissance ought to be maintaining under ordinary operating conditions, and given its present level of monthly billings) should be approximately $500,000.

- Though the value of Renaissance's receivables base is highly uncertain, it is not worthless – under *Timbers*, Plaza Bank should be compensated for the risk of any diminution in whatever residual value may remain in its existing collateral base. It is Renaissance's and XRoads' preliminary assessment that a 2-for-1 replacement lien insures against any potential loss of value inherent in the use of such aged receivables (which are likely not recoverable at 100% of face value) for the present operation of Renaissance's business.

- Because the value of Renaissance's existing receivables base is uncertain, the 2-for-1 replacement lien encumbering cash, accounts receivable, and proceeds acquired and/or generated with any cash collateral should be "capped" at a specified dollar amount. Based on Renaissance's immediately projected operations, and assuming a receivables "run rate" of $500,000, Renaissance and XRoads believe preliminarily this "cap" should be set at $1 million.

**South Bay Law Firm**
**21535 Hawthorne Blvd. Ste. 210**
**Torrance CA 90503**

PRINTED ON
RECYCLED PAPER

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    Renaissance is prepared, in the context of a further preliminary hearing and if this

2  Court is so inclined, to revisit both the value of aged receivables which Plaza Bank claims as

3  collateral, and the extent of any replacement lien which should be extended under these

4  circumstances.   For the moment, however, Renaissance believes the projections of its business

5  operations as set forth in the Budget will lead to increased cash balances and an improved,

6  "refreshed," receivables base.   As set forth in the Wallace Declaration, the business assumptions

7  underlying the operations projected in the Budget are very conservative and will remain subject to

8  this Court's review on an interim basis, pending approval of a final Budget.   Accordingly,

9  Renaissance believes the Budget establishes that the proposed replacement lien being granted to

10  Plaza Bank will, over the course of Renaissance's post-petition operations, adequately protect Plaza

11  Bank's alleged interest.

12    **C. <u>Renaissance Should Be Authorized To Use Cash Collateral In Order To</u>**

13    **<u>Promote A Successful Reorganization</u>.**

14    In *In re O'Conner*, 808 F.2d 1393 (10th Cir. 1987), the Tenth Circuit Court of

15  Appeals recognized that the ultimate goal of Chapter 11 proceedings is to enhance the prospects of

16  reorganization.   In this regard, the Tenth Circuit stated as follows:

17    [T]he Debtors' efforts are not only to be encouraged, but also their
efforts during the administration of the proceeding are to be measured
18    in light of that quest.  Because the ultimate benefit to be achieved by a
successful reorganization inures to all the creditors of the estate, a fair
19    opportunity must be given to the Debtors to achieve that end. … In
order to encourage the Debtor's efforts in the formative period prior
20    to the proposal of a reorganization, the court must be flexible in
applying the adequate protection standard.
21

22    *Id.* at 1397-98 (emphasis added); *Accord, In re Dynaco Corp.*, 162 B.R. 389, 395

23  (Bankr. D.N.H. 1993) ("[T]he court will generally permit the business operations to continue, at

24  least to the point of plan formulation, if the debtors make a solid evidentiary showing to support

25  their projections…");  *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) ("At the

26  beginning of the reorganization process the Court must work with less evidence than might be

27  desirable and should resolve issues in favor of the reorganization where the evidence is

28

PRINTED ON
RECYCLED PAPER

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

conflicting."). Here, a determination to grant to Renaissance use of any cash collateral will help promote a successful reorganization, as it will allow Renaissance to continue, uninterrupted, its normal operations. Renaissance's efforts to successfully reorganize its financial affairs, in turn, will be to the ultimate benefit of Plaza Bank, by preserving and enhancing the value of its asserted secured interest. In *Cann & Saul*, *supra*, the court found the debtor's prospects for a successful reorganization to be a major factor in determination of adequate protection:

> It is far more significant in the weight of considerations as to whether a creditor is "adequately protected" to analyze debtor's prospects for a successful reorganization in Chapter 11. If these prospects are strong… then the measure of the secured creditor's adequate protection is the probability that the debtor will be able to propose an effective plan.

76 B.R. at 485 (emphasis added). In *Cann & Saul*, the debtor (a steel manufacturer that had been in business for almost a century) had been losing money each year for a period of at least four years prior to the filing of its Chapter 11 petition. However, the court found that the debtor had strong potential for reorganization, given such factors as the debtor's production of high quality product, the debtor's stability and good public image, and the debtor's acceptance of changes necessary for maintaining its labor force. *Id.* at 487-88.

Similarly here, Renaissance has a strong potential for a successful reorganization. As described in the Wallace Declaration, despite its very brief business history, Renaissance has rapidly established itself as a "go-to" facility within the Orange County surgical community, and has been well-received by doctors and patients alike. Wallace Decl. at ¶¶ 26-28. Though "on-line" for less than a year, Renaissance's business has been successful, has a good public image, and possesses a rapidly growing customer base. Renaissance has met critical "business execution" hurdles (e.g., Medicare certification and very recent, ahead-of-schedule accession into one of Orange County's largest insurance networks) necessary to ensure continued growth. Renaissance's management has extensive experience in Renaissance's industry and has made, and is committed to continuing to make, changes necessary to enhance the reorganization of Renaissance. Wallace

PRINTED ON
RECYCLED PAPER

ELECTRONICALLY FILED

1   Decl. at ¶¶ 17; 22-23.  Further, Renaissance has employed XRoads Solutions Group, LLC to assist

2   in Renaissance's efforts to recognize its financial affairs.  Wallace Decl. at ¶17.  Renaissance's

3   efforts to reorganize, therefore, will contribute to the adequate protection of Plaza Bank's interests,

4   and support authorizing Renaissance's use of any cash collateral.

5              If Renaissance is denied use of cash collateral, in all likelihood it will be forced to

6   cease operations.  Such a cessation of operations, even temporarily, would cause irreparable damage

7   to its business in the form of physician defections, employee attrition, lost revenues, loss of

8   certification, and loss of goodwill.  If Renaissance were permanently prohibited from using cash

9   collateral, it would be forced to close operations, and its assets would need to be liquidated, yielding

10  proceeds totaling a fraction of what Renaissance could generate by continuing operations and

11  reorganizing its financial affairs.  Wallace Decl. at ¶17.  Rather than force Renaissance and its

12  creditors to such a result at this early stage of the case, the Court should permit Renaissance to use

13  any cash collateral in order to preserve its ability to reorganize.  *See In re George Ruggiere*

14  *Chrysler-Plymouth, Inc.* 727 F.2d 1017, 1019 (11th Cir. 1984) ("Without the availability of cash to

15  meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring

16  rehabilitation over economic failure would be frustrated."); *Dynaco*, 162 B.R. at 396 (finding that

17  the alternative to the debtor's use of cash collateral – forced termination of its businesses – would

18  doom any reorganization and any chance to maximize values for all creditors).

19          **D.  This Court Should Schedule An Interim Hearing On This Motion Prior To**

20          **Granting Final Approval Of Renaissance's Cash Collateral Budget.**

21              By this Motion, Renaissance is requesting that the Court schedule a further,

22  preliminary hearing within 15 or 30 days, depending on the Court's preference and prior to seeking

23  final approval of Renaissance's cash collateral budget pursuant to Fed.R.Bankr.P. 4001.  Though

24  Renaissance's management believes the preliminary cash collateral Budget reflects a conservative

25  estimate of the Center's financial operations and is confident in the revenue and expense projections

26  set forth in the Budget, Renaissance further believes it is appropriate for this Court to review the

27  Center's operating results on an interim basis, and to approve a final cash collateral budget once

28

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

**DEBTOR'S OMNIBUS EMERGENCY MOTION**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1  XRoads has completed its review of the Center's pre-petition operations and has established

2  additional weekly post-petition operational results.  Wallace Decl. at ¶17.  Renaissance reserves the

3  right: (i) to amend the Budget; and (ii) to seek, at the final hearing on this Motion, use of cash

4  collateral different from that set forth herein.  *Id.*

5  ### III.  <u>RENAISSANCE SHOULD BE AUTHORIZED TO INCUR, SHORT-TERM,</u>

6  <u>ADMINISTRATIVE-PRIORITY   DEBTOR-IN-POSSESSION   FINANCING</u>

7  <u>FROM ITS PHYSICIAN MEMBERS</u>.

8  Section 364(b) of the Bankruptcy Code provides that:

9  The court, after notice and a hearing, may authorize the trustee to
10  obtain unsecured credit or to incur unsecured debt other than under
   subsection (a) of this section, allowable under section 503(b)(1) of
11  this title as an administrative expense.

12  11 U.S.C.A.  §  364(b).   As indicated by Renaissance's submitted Budget,

13  Renaissance has an emergent need for very short-term "bridge" financing during the first weeks of

14  this Chapter 11 case while it continues to operate and explore what management believes are a

15  variety of post-petition financing alternatives.  Wallace Decl. at ¶18.  To this end, the Doctors'

16  Group, comprised of physicians who are also Renaissance members, has offered to extend to the

17  Debtors such financing.  *Id*.

18  The Doctors' Group is comprised of physicians who, in addition to being Members,

19  already have lent a significant amount to the Debtors.  Wallace Decl. at ¶19.  Despite their potential

20  exposure with respect to these prior loans, however, the Doctors' Group has responded to

21  Renaissance's request for a further, post-petition facility of up to $600,000 in additional, immediate

22  credit (the "Doctors' Bridge Facility") on the following general terms:

23

24

| 7ˇ§ə #      | 3£żióƁʉĐŁ1#                                                                                                          |
|-------------|----------------------------------------------------------------------------------------------------------------------|
| Amount:     | $50,000 each up to $600,000 total.<br>If Renaissance is oversubscribed, each participant's commitments will be reduced pro rata. |
| Facility:   | Revolving credit facility to be held in trust by a trustee.                                                           |
| Term:       | 180 days with optional 60 day extensions not to exceed 360 days.                                                     |

PRINTED ON
RECYCLED PAPER

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

| 7˘ěæ # | 3f̃ŝ̃ŏ̃Ɖ̃Ɖ̃1̃# |
|---|---|
| Interest Rate on Drawn Funds: | 10% per annum during first 180 days<br>+1% per annum, for each additional 60 day extension.<br>Interest will be paid quarterly.  RSANH can elect to pay interest in kind (by adding to the principal balance) in any particular period subject to a 2.5% premium (i.e. 12.5% per annum, if during the first 180 days). |
| Interest Rate on Un-Drawn Funds: | 2% per annum. |
| Ranking: | Administrative Priority. |

An exemplar of the Promissory Notes executed by Renaissance's management in connection with the Doctors' Bridge Facility is appended to the Wallace Declaration at Exhibit "8." As of the date of this filing, the Doctors' Group has responded with as much as $106,500 in commitments to this facility.  Wallace Decl. at ¶20.  Renaissance presently holds received funds in a segregated account, pending this Court's approval of the same.  *Id*.  Renaissance's analysis of the impact to its cash balances resulting from the Doctors' Group's capital infusion into the Debtors' business operations is set forth in the Budget attached as Exhibit "7" to the Wallace Declaration.

Renaissance's management does not believe immediate, short-term financing under terms comparable to those offered by the Doctors' Group is available in any commercial market, and in particular, not in the asset-based or "DIP" lending market.  Wallace Decl. at ¶21.  In light of these factors, Renaissance believes it is impossible to obtain the financing necessary to operate its business on terms more favorable than those contemplated by the Doctors' Bridge Facility.  *Id*. Therefore, Renaissance requests that this Court approve the administrative-priority post-petition credit represented by the Doctors' Bridge Facility under the terms and conditions set forth herein, and in the respective Promissory Notes appended to the Wallace Declaration.

**IV. RENAISSANCE SHOULD BE EXCUSED FROM PERFORMANCE OF ITS OBLIGATIONS UNDER 11 U.S.C. § 365(d)(3) FOR AN INTERIM 60-DAY PERIOD.**

Bankruptcy Code section 365(d)(3) provides, in pertinent part:

The trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of

ELECTRONICALLY FILED

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. . . .

11 U.S.C.A. § 365.  In this case, Renaissance's tenuous cash position during the beginning weeks of the case provides "good cause" for the statutory extension.  As set forth in the Budget, Renaissance intends to resume regular monthly lease payments pursuant to the lease effective October 2, 2011, after its business has stabilized and is on a better cash footing.  Meanwhile, and as further set forth in the Budget, Renaissance will grow its cash balances to satisfy the first 60 days' of administrative rent subsequent to the October 2 "timely performance" deadline.

## V.    RENAISSANCE'S UTILITY PROVIDERS SHOULD BE DEEMED "ADEQUATELY ASSURED" AS PROPOSED BY RENAISSANCE'S MANAGEMENT.

Uninterrupted utility services are essential to Renaissance's ongoing operations and, therefore, to the success of its reorganization.  Renaissance simply cannot function without utility services.  Wallace Decl. at ¶31.   Should the utility companies refuse or discontinue service, even for a brief period, Renaissance's business would be severely disrupted.  It is therefore critical that utility services continue uninterrupted.  *Id.*

Renaissance presently draws electricity and gas from, and maintains security deposits with, the following utility providers:

| Utility Provider | Ave. Monthly Consumption |
| --- | --- |
| Southern California Edison | $13,000 |
| Southern California Gas | $1,667 |

Wallace Decl. at ¶30.  Section 366 of the Bankruptcy Code requires the chapter 11 trustee (or debtor-in- possession) to provide its utilities with adequate assurance of payment within 30 days after the Petition Date in order to prevent any interruption of service.  11 U.S.C. Section

PRINTED ON
RECYCLED PAPER

- 20 -

DEBTOR'S OMNIBUS EMERGENCY MOTION

ELECTRONICALLY FILED

1   366(c)(2).  Such assurance can consist of "(i) a cash deposit; (ii) a letter of credit; (iii) a certificate

2   of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of

3   security that is mutually agreed on between the utility and the debtor or the trustee."  11 U.S.C.

4   Section 366(c)(1)(A).  Based on the above, the Debtor proposes "adequate assurance" payments of

5   $13,000 to Southern California Edison and $2,000 to Southern California Gas.  These amounts will

6   be payable in increments of $2,000 per month, with payments to commence within 30 days.

7   Wallace Decl. at ¶ 31.  The amounts proposed represent the average of Renaissance's monthly

8   utility usage.  Combined with Renaissance's existing security deposit with Southern California

9   Edison ($6,695) and Southern California Gas ($1,580), such additional deposits should constitute

10   more than adequate assurance of Renaissance's continued payment. Wallace Decl. at ¶ 31.  In order

11   to maintain uninterrupted utility service essential to its continued operations, the Debtor respectfully

12   requests the Court enter its Order establishing the above-mentioned payments as adequate insurance

13   for the utilities.

14   **VI.**   **THIS COURT SHOULD EXTEND THE PERIOD IN WHICH**

15   **RENAISSANCE MUST FILE ITS SCHEDULES AND STATEMENT OF**

16   **FINANCIAL AFFAIRS.**

17   Federal Rule of Bankruptcy Procedure 1007 provides that in an involuntary case,

18   "the debtor shall file, within seven days after entry of the order for relief, a list containing the name

19   and address of each entity included or to be included on Schedules D, E, F, G, and H as prescribed

20   by the Official Forms."  Fed. R. Bankr. P. 1007(a)(2).  Further, "the list in subdivision (a)(2), and

21   the schedules, statements, and other documents required by subdivision (b)(1) shall be filed by the

22   debtor within 14 days of the entry of the order for relief."  Fed. R. Bankr. P. 1007(c).  Finally, a "list

23   [of the debtor's 20 largest creditors] shall be filed by the debtor within 2 days after entry of the

24   order for relief under § 303(h) of the Code.  Fed. R. Bankr. P. 1007(d).

25   Where additional time to comply with this directive is required:

26       any extension of time to file schedules, statements, and other
        documents required under this rule may be granted only on motion for

27       cause shown and on notice to the United States trustee, any committee
        elected under § 705 or appointed under § 1102 of the Code, trustee,

28       examiner, or other party as the court may direct. Notice of an

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    extension shall be given to the United States trustee and to any committee, trustee, or other party as the court may direct.

2    Fed. R. Bankr. P. 1007(c).  Here, Renaissance has submitted its list of 20 largest

3    general unsecured creditors, and is therefore in compliance with Fed.R.Bankr.P 1007(d).   As

4    indicated by the Wallace Declaration, however, Renaissance will require more than 14 days in

5    which to prepare and submit the balance of schedules, statements, and lists required by this Rule.

6    Pre-petition, Renaissance's books and records were maintained by an outside CPA

7    firm, at the direction of Renaissance's Board of Managers.  Wallace Decl. at ¶17.  In connection

8    with efforts to obtain a loan for Renaissance in June, Mr. Wallace discovered Renaissance's

9    historical financial records to be significant disarray.  *Id.*

10    XRoads Solutions, LLC, retained by Renaissance for the purpose of assisting

11    Renaissance's reorganization efforts, advises that completion of this process, and verification of

12    accurate schedules and statements for Renaissance, will take approximately 30 days.  Accordingly,

13    and pursuant to this Court's Local Rule 1007-1(e), Renaissance respectfully requests an extension

14    of the time in which to comply with the requirements of Fed.R.Bankr.P. 1007, for the "cause"

15    demonstrated herein.

16    **VII.    THIS COURT SHOULD LIMIT NOTICE PURSUANT TO THE**

17    **PROCEDURES SET FORTH HEREIN FOR ADMINISTRATIVE**

18    **CONVENIENCE AND COST SAVINGS TO RENAISSANCE'S CHAPTER 11**

19    **ESTATE.**

20    Renaissance has an estimated 300 creditors and over 40 members.[2]  Renaissance

21    anticipates that the United States Trustee will appoint an Official Committee of Creditors Holding

22    Unsecured Claims ("Committee").  Additionally, it is anticipated that any Committee appointed will

23    employ counsel to represent them.

24    Renaissance anticipates that many of the motions and applications to be presented to

25    the Court will involve matters which ordinarily fall within the parameters of notices required to be

26    ───────────────────────

27    [2] Renaissance's employees are supplied through Renaissance Surgical Arts Management at Newport Harbor, LLC.

28

PRINTED ON
RECYCLED PAPER

**DEBTOR'S OMNIBUS EMERGENCY MOTION**

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1   given to all creditors and equity security holders, but which will not directly affect or impact the

2   majority of creditors or equity security holders.  Renaissance believes notice to all such parties

3   would be overly burdensome and costly to the estate.

4          Renaissance believes that, with respect to such matters, limiting notice to the Office

5   of the United States Trustee; to the Committee or its counsel (should counsel be employed); or, if

6   no Committee is formed, to the Debtors' 20 largest unsecured creditors, to the Debtors' secured

7   creditors, and/or their counsel of record; and to all parties who request special notice in the Debtors'

8   Chapter 11 case, would provide adequate and proper notice to affected creditors and to other

9   interested parties.  Additionally, Renaissance will provide notice to any party who might be directly

10  impacted by a particular motion brought by Renaissance.

11         Renaissance believes adoption of this notice procedure is necessary and appropriate.

12  Such notice procedure would relieve Renaissance of the significant burden of periodic "mass

13  mailings," and would reduce substantially Renaissance's postage and reproduction costs, thereby

14  benefiting the Chapter 11 estate.  In addition, any party in interest who is sufficiently interested in

15  the matters above described may, by written request for special notice, receive all notices of such

16  proceedings.

17         Notwithstanding the Court's granting of the requested relief, Renaissance will

18  provide notice to all creditors and equity security holders of the following matters:

19      1.  The time fixed for filing objections to and the hearing to consider approval of a

20          disclosure statement;

21      2.  The time fixed for filing objections to and the hearing to consider confirmation of

22          a plan;

23      3.  The time fixed for filing objections to and hearing to consider the proposed sale

24          of all or substantially all assets of the estate;

25      4.  Notices with respect to claims bar dates; and

26      5.  The time fixed for filing objections to and hearing on the dismissal of the case.

27      ///

28

PRINTED ON
RECYCLED PAPER

**DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

**ELECTRONICALLY FILED**

## VIII.  <u>CONCLUSION</u>

Based upon the foregoing, Renaissance respectfully requests that this Court enter its Order authorizing the emergency relief requested herein, and granting such other and further relief as this Court deems just and proper.

DATED:  August 9, 2011                                          **SOUTH BAY LAW FIRM**


By: _____/S/_____
                                                      Michael D. Good
                                                      [Proposed]  Counsel  for  Debtor  and  Debtor-in-
                                                      Possession

**DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

| In re: Renaissance Surgical Arts at Newport Harbor, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 8:11-bk-19749-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document described **DEBTOR'S OMNIBUS EMERGENCY MOTION FOR ORDER (1) AUTHORIZING USE OF CASH COLLATERAL AND SETTING INTERIM AND FINAL HEARINGS RE: SAME; (2) AUTHORIZING THE DEBTOR TO INCUR UNSECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364(b) (3) EXCUSING PERFORMANCE OF OBLIGATIONS ARISING UNDER 11 U.S.C. § 365(d)(3); (4) ESTABLISHING ADEQUATE ASSURANCE PAYMENTS WITH RESPECT TO UTILITIES; (5) EXTENDING THE TIME IN WHICH TO FILE SCHEDULES, STATEMENTS, AND LISTS PURSUANT TO FED.R.BANKR.P. 1007(c); AND (6) LIMITING NOTICE; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF FILED CONCURRENTLY HEREWITH** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 9, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Steven Casselberry    scasselberry@mrllp.com, fbaig@mrllp.com;jjacobs@mrllp.com
- Caroline Djang    cdjang@rutan.com
- Mark S Faulkner    mfaulkner@mrllp.com, fbaig@mrllp.com;jjacobs@mrllp.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Michael D Good    mgood@southbaylawfirm.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Thomas E Shuck    malvarado@pmcos.com, malvarado@pmcos.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- William J Wall    wwall@wall-law.com, goceguera@wall-law.com

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On August 9, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Erithe A. Smith
United States Bankruptcy Court - Central District of California
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                **F 9013-3.1**

| In re: Renaissance Surgical Arts at Newport Harbor, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER  8:11-bk-19749-ES |

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 9, 2011 | Michael D. Good | /S/ |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                            **F 9013-3.1**