ELECTRONICALLY FILED

SOUTH BAY LAW FIRM
MICHAEL D. GOOD (SBN 176033)
21535 Hawthorne Blvd., Suite 210
Torrance, California 90503
Telephone:    (310) 373-2075
Facsimile:    (310) 356-3229

[Proposed] Counsel for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>Renaissance Surgical Arts at Newport Harbor, LLC,<br><br>Debtor in Possession. | Case No.        8:11-bk-19749-ES<br><br>Chapter 11<br><br>**DECLARATION OF BRUCE WALLACE IN SUPPORT OF DEBTOR'S OMNIBUS EMERGENCY MOTION FOR ORDER**<br><br>**(1) AUTHORIZING USE OF CASH COLLATERAL AND SETTING INTERIM AND FINAL HEARINGS RE: SAME;**<br><br>**(2) AUTHORIZING THE DEBTOR TO INCUR UNSECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364(b)**<br><br>**(3) EXCUSING PERFORMANCE OF OBLIGATIONS ARISING UNDER 11 U.S.C. § 365(d)(3);**<br><br>**(4) ESTABLISHING ADEQUATE ASSURANCE PAYMENTS WITH RESPECT TO UTILITIES;**<br><br>**(5) EXTENDING THE TIME IN WHICH TO FILE SCHEDULES, STATEMENTS, AND LISTS PURSUANT TO FED.R.BANKR.P. 1007(c); AND**<br><br>**(6) LIMITING NOTICE**<br><br>Date:        [To Be Set]<br>Time:        [To Be Set]<br>Place:        Courtroom "5A"<br>            411 W. Fourth Street<br>            Santa Ana, CA |

*South Bay Law Firm*
*21535 Hawthorne Blvd. Ste. 210*
*Torrance CA 90503*

PRINTED ON
RECYCLED PAPER

ELECTRONICALLY FILED

**DECLARATION OF BRUCE WALLACE**

I, BRUCE WALLACE, hereby declare:

1.      I am the Managing Member of Renaissance Surgical Arts Management at Newport Harbor, LLC, ("Management Company") itself the Manager of Renaissance Surgical Arts at Newport Harbor, LLC ("Renaissance"), the debtor and debtor-in-possession in the above-referenced Chapter 11 case.  I am also the CEO, Developer, Manager and Chairperson of the Board of Managers for Renaissance, the debtor and debtor-in-possession and hold the largest equity interest as a Member.  I submit this declaration in support of Renaissance's "Omnibus Emergency Motion For Order (1) Authorizing Use Of Cash Collateral and Setting Interim and Final Hearings re: Same; (2) Authorizing The Debtor To Incur Unsecured Post-Petition Financing Pursuant To 11 U.S.C. § 364(b); (3) Excusing Performance Of Obligations Arising Under 11 U.S.C. § 365(d)(3); (4) Establishing Adequate Assurance Payments With Respect To Utilities; and (5) Limiting Notice." Each of the facts contained in this declaration are based on my personal knowledge and if called as witness, I could and would testify competently thereto.

2.      In my capacity as Renaissance's Manager and as Chairperson of Renaissance's managing Board of Managers, I am responsible for the day-to-day operations of Renaissance's Ambulatory Surgery Facility (the "Renaissance"), as well as the financial accounting and record-keeping attendant thereto.  Consequently, I am involved directly in all significant aspects of Renaissance's respective financial and business affairs.  In connection with the same, Renaissance's books and records are presently maintained by me, or by individuals operating under my direct supervision.  In my capacity as one of the custodians of the books and records of Renaissance, and as a result of the maintenance of such books and records by me and by others operating under my direct supervision, I am thoroughly and personally familiar with Renaissance's business operations and its financial affairs.  Based upon my qualification as custodian of records of Renaissance and except where otherwise noted, each of the facts contained in this declaration are based on my personal knowledge and if called as witness, I could and would testify competently thereto.

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

**DECLARATION OF BRUCE WALLACE IN SUPPORT OF DEBTOR'S OMNIBUS EMERGENCY MOTION**

ELECTRONICALLY FILED

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

3.    Description of Prior Experience with Ambulatory Surgery Center ("ASC") Development.    Prior to my present position, I was the founder and Chief Executive Officer for a Healthcare Development Company.  I have been involved in the healthcare industry for 29 years. During that period, I have held wide-ranging responsibilities, including quality control, manufacturing, R&D, FDA, technical writing, design, project development, interface engineering, field service and technical sales, in-servicing and installation on imaging modalities, lasers, video minimally invasive surgery, anesthesia and cardiac monitoring, and medical software, among other areas.

4.    I have been exclusively focused on the ASC market since 1994 when I became a partner in a distribution and equipment sales firm that specialized in ASC's.  Shortly thereafter, I developed and founded an ASC company that provided services for ambulatory surgery centers with an emphasis on medical equipment, licensure, outsourced services and facility design.  My businesses have had a strong medical equipment sales component. I have negotiated national contracts with most of the equipment companies that supply the outpatient market both in the US and abroad.  During this time I have also wholesaled medical equipment, and refurbished and purchased distressed assets and used medical equipment from outpatient and inpatient Centers.  My knowledge of medical equipment values has been the basis for many acquisitions.

5.    I was also the co-founder of another ASC national development company and served as its CEO.    I also acquired and co-operated the largest private licensure and accreditation firm in the U.S.  I have provided turnkey services for healthcare site development.  My company has developed centers and provided varied services and goods throughout the United States, including California, Oregon, Florida, Georgia, New York, Ohio, Pennsylvania, Maryland, Missouri, Alaska, Wisconsin, Texas, North Carolina, North and South Dakota, Wyoming, Idaho, and Arkansas.

6.    My areas of ASC development expertise include (i) site acquisition; (ii) feasibility and business analysis (payer and procedure mix, project cost breakdown, break-even/cash flow); (iii) project management; (iv) space design, equipment procurement and placement, contracting, physician recruitment; and (v) business development.

- 3 -

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

7.    I have been a member of the Freestanding 100 ASC, FASA, ASCA, CASA, and lobbies in Washington D.C. and Sacramento for the ASC Industry. I served as the treasurer for a Cancer Foundation and as a member of the Board.  I am currently pursuing my CASC certification for administration of Ambulatory Surgery centers.

8.    <u>Company Overview</u>.  Renaissance was formed in or about 2007 for the purpose of developing an Ambulatory Surgery Facility ("ASF" or "Center").  Located on Newport Boulevard in Costa Mesa, CA, 3/4 of a mile from Hoag Hospital, the Center has generated considerable press and investment interest from area surgeons and payers.  The reason for this interest is simple:  It has been designed from the ground up to offer a standard of care approaching a hospital, but with none of the required departments and cost.  Rather than an "old-style" surgical facility, it is a Center by doctors, for doctors.  As set forth in Renaissance's syndication materials, Renaissance's mission is "to provide a majority Physician-owned ASF which is professionally managed by the minority partner, providing needed services to our community and benefitting everyone involved."  Specific features of the Center include:

a.    State-of-the-art infection control and minimal turn over times.

b.    Equipment chosen by the surgeon.  An important selling point of the facility is its utilization of equipment individually selected by the physicians (not by a materials manager), at costs that normally could never be obtained by any individual center. The Center is furnished and operated with the individual surgeon in mind.

c.    The highest accreditation and licensure, including The Joint Commission (formerly known as JCAHO), IMQ, AAAHC (planned) and Medicare licensure and accreditation.

d.    Preferred scheduling for Member surgeons.

e.    A "Hot Office" arrangement available for pre-op, post-op and consults so surgeons can literally have a "cutting edge" ASF at their fingertips and see patients within minutes of each other.  The Center's business proposition is

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    for surgeons to pay only for the minutes they utilize the "hot office."

2    Consequently, the "Hot Office" maximizes efficiency and return for both

3    surgeon and Center.  To further promote efficiency and ease of use, the "Hot

4    Office" will feature EMR (electronic medical records) tie-ins to the surgeons'

5    office locations.

6        9.    <u>Development and Pre-Petition Operating History</u>.  Unfortunately, enthusiasm for

7    Renaissance's ASF concept was matched by a very challenging economy for new business start-

8    ups.  Many banks withdrew or significantly curtailed real estate and commercial lending during the

9    2008-2010 period. This was especially true in the ASC lending marketplace.  Over the years,

10    several boutique lenders that had provided the majority of the capital for ASC development across

11    the United States (e.g., Copelco, DVI, Citibank, CIT, Mar Cap, Tigris, GE Medical Capital, Wells

12    Fargo, Alliance, Indy Bank, Phillips, American Express Healthcare Lending and Toshiba Finance)

13    left the market, some permanently. Without access to institutional capital and in the middle of

14    construction, Renaissance was left with a number of development and funding challenges that had

15    to be addressed just to get Renaissance to the operational "starting gate."  Among them:

16        a.    <u>Lack of Readily Available Commercial Lending</u>.  In late 2007, Renaissance

17    intended to raise its initial development capital from physician investors with

18    debt coverage (loan and leases) sufficient to cover construction costs,

19    development costs, start-up expense, equipment costs and working capital.

20    Debt was to be structured on a *pro rata* guarantee basis for the Surgeon

21    Members in accordance with their equity ownership.  For example, a 1%

22    owner in the facility would have purchased 1% of the equity through the

23    syndication and then guarantee approximately 1% of the debt incurred

24    requiring such guarantee.   The initial capital budget fluctuated in concert

25    with an evolving plan of the Members as surgical specialties were added.  To

26    obtain the desired result of further increasing Renaissance's revenue through

27    these new specialties the capital budget expanded with a larger net positive

28

- 5 -    DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    for the investment.

2    b.    <u>Initial Capital and Subsequent Funding</u>.  Renaissance had to raise its initial

3    development capital from physician contributions.  Initial capital totaled

4    approximately $1.8 million.  Thereafter, in or about 2009, Renaissance raised

5    a further round of capital through a series of unsecured loans syndicated

6    amongst private parties (the "Broza Loans").  The Broza Loans totaled

7    approximately $6.5 million, have an interest rate of 12% per annum and a

8    final maturity of 6 to 36 months, and provide for an assignment to the lender

9    of approximately 4% interest in Renaissance.  Renaissance obtained an

10    additional approximately $500,000 in further unsecured loans and

11    approximately $825,000 in syndication from Member physicians.  Through

12    myself and a related entity, I personally made an additional approximately

13    $2.8 million in unsecured loans to Renaissance.  Finally, in 2010,

14    Renaissance entered into lending arrangements with Plaza Bank, a California

15    corporation ("Plaza Bank"), in which Renaissance borrowed $3.65 million in

16    order to complete construction.  Subsequently, an additional approximately

17    $800,000 was raised in syndication efforts with the physicians and the

18    Members/affiliates made additional loans to Renaissance of approximately

19    $2.75 million.  Aside from equipment financing arranged with Wells Fargo,

20    Stearns Bank, and US Bank and secured by equipment at the premises, the

21    Plaza Bank debt (discussed further below) is Renaissance's only secured

22    indebtedness.

23    c.    <u>Landlord Disputes and Cost Overruns</u>.    The physical build-out of

24    Renaissance's Center has been complicated by a thorny relationship with its

25    landlord's agent, Joe Brown.  Mr. Brown, who acquired the land and

26    developed the space now rented by Renaissance, also serves as agent for the

27    Debtor's lessor, Pacific Medical Plaza, L.P. ("Pacific").    Subsequent to

28

PRINTED ON
RECYCLED PAPER

**DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

leasing space to Renaissance, Mr. Brown obtained membership interests in Renaissance and a seat on Renaissance's Board of Managers.  Finally, Mr. Brown acted as disbursing agent and "gatekeeper" under the Broza Loans.  I believe these multiple roles resulted in financial harm to Renaissance's Members and creditors.  Such multiple roles and potential damages stemming from them include:

(1)     Potential conflicts of interest involving Mr. Brown's multiple roles as agent for Renaissance's landlord, member of Renaissance's Board of Managers, and construction owner for purposes of Renaissance's "build-out."  These multiple roles affected, among other things, negotiation of Renaissance's lease, the control, accounting, and disbursement of Renaissance's construction funding and TI allowance, litigation with contractors, design changes to Renaissance's "build-out," additional delay and cost due to all of the foregoing, and direct interaction with Renaissance's proposed lenders and prospective physician investors.

(2)     Potential conflicts of interest involving Mr. Brown's dual relationship as member of Renaissance's Board of Managers and his relationship with the parties ultimately responsible for funding the Broza Loans.  These dual roles affected, among other things, the aggregation of additional Renaissance membership interests, disbursements under the Broza Loans in connection with Renaissance's build-out, and Renaissance's subsequent lending relationship with Plaza Bank.

It is my intention to cooperate with a Creditors' Committee appointed in Renaissance's case for the purpose of conducting appropriate, cost-effective forensics and discovery in furtherance of ascertaining and quantifying the potential harm to Renaissance's creditors arising from these multiple roles,

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    and pursuing appropriate claims on the estate's behalf.

2        d.    <u>Operating Cash Shortages</u>.  As a result of the foregoing, Renaissance was left

3    with little financed operating capital and was instead forced almost from its

4    inception to look to its billings as a primary means of supporting itself.

5    Because it is typical in the initial stages of any ASF start-up to incur much

6    longer receivable-to-cash conversion rates than is customary once the ASF

7    completes its Medicare certification and becomes an "in-network" provider

8    for medical insurers, procurement of a working capital line has been a

9    financial priority of Renaissance's management for some time.  For the

10   reasons set forth below, Renaissance has been unable to do so, and the Center

11   has struggled for cash throughout most of its 10-month operating history.

12       10.    Despite significant challenges and its "bootstraps" beginning, the Center was

13   developed successfully and came on-line in September 2010.  Renaissance's initial operating results

14   have been very positive.  Most importantly, Renaissance's time and monetary investment has borne

15   fruit:  It has already gained national notoriety for its industry-leading and innovative design and

16   processes, developed a solid footing with many of its surgeon Members, obtained critical

17   certification from Medicare, received approval as an "in-network" provider for one of Orange

18   County's largest healthcare insurers, and is rapidly positioning itself as a "go-to" ASF in the Orange

19   County surgical community.

20       11.    <u>Renaissance's Loan and Security Agreement With Plaza Bank</u>.  In or about February

21   2010, Renaissance executed that Promissory Note ("Plaza Note") and Security Agreement ("Plaza

22   Security Agreement") and ancillary documents (including certain "Subordination and Standstill

23   Agreements" with respect to Renaissance's unsecured lenders and that "Guaranty and Suretyship

24   Agreement" with certain of Renaissance's Members) in favor of Plaza Bank.  True and complete

25   copies of the Plaza Note, the Plaza Security Agreement, and ancillary loan documents are attached,

26   collectively, hereto as Exhibits "1"-"5".

27       12.    The Plaza loan was a term loan, extended to Renaissance nearly seven months before

28

PRINTED ON
RECYCLED PAPER

**DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

the Center became operational, and was intended to retire the Broza Loans and complete tenant improvements.  At the time of the loan, Renaissance's management contemplated that Plaza Bank would eventually extend a revolving credit facility, necessary to the effective operations of any ASC.  As mentioned above, I believe that Mr. Brown's dual relationship, both as a member of Renaissance's Board of Managers and with the parties ultimately responsible for funding the Broza Loans, adversely impacted (i) disbursements under Plaza's term loan; and (ii) Renaissance's ability to obtain such revolving credit facilities from Plaza Bank or from any other lender.

13.     Under the existing Plaza loan, Renaissance is unable to borrow against its existing receivables.  Moreover, because Renaissance's receivables are encumbered by the Plaza debt, Renaissance has been unable to obtain a revolving credit facility by which to finance its ongoing business operations.  Plaza's existing Note and Security Agreement are simply inadequate to permit Renaissance to conduct the business operations necessary to preserve and augment the Plaza Collateral.  Without the credit facility necessary for proper business operations, Renaissance has been rendered effectively unable to conduct properly-financed business operations – and, as such, management has been unable to focus its efforts on aggressive receivables collections.  Instead, Renaissance was compelled to finance its operating capital needs by conveying interests in certain of its receivables to certain private parties in exchange for the advancement of operating capital.  Those transactions are denominated as receivables "sales," and are summarized as set forth in the documentation appended as Exhibit "6".  I am informed and believe that, in fact, such transactions are more accurately characterized as "loans" rather than as "true sales."  In any event, moving forward, Renaissance requires a "working line" of receivables-based credit which will permit it to stabilize business operations, focus on collections, retire its existing base of uncollected receivables, replace those older receivables with newer (and much faster-paying) receivables, and position itself for business growth.

14.     Renaissance presently has a base of uncollected receivables with a "face value" of approximately $3.2 million, but which are of highly uncertain value and collectability due to (i) their age; and (ii) the potential for payment negotiations by Medicare or other insurers for "out-of-

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS EMERGENCY MOTION

1   network" claims. Though the realization of some cash from these health care receivables is

2   anticipated, based on Renaissance's most recent month of operations (July 2011) and on its

3   projected operations for August, Renaissance's management believes its "normalized," collectible

4   receivables base (i.e., the receivables base that Renaissance would maintain were it financing and

5   collecting receivables in the ordinary course of its business) should be approximately $500,000.

6       15.   <u>Involuntary Chapter 11 Filing</u>.  I am informed and believe that Renaissance's

7   involuntary Chapter 11 filing was initiated to preclude the attempted termination of Renaissance's

8   lease, when Renaissance was unable to make its $308,367 quarterly lease payment on July 1, and

9   thereafter received a 3-day Notice to Pay Rent or Quit at the instance of Mr. Brown, acting for

10  Pacific.  After deliberation amongst the membership, Renaissance has determined to consent to this

11  Court's entry of an Order for Relief, thereby converting this case to a voluntary one under Chapter

12  11.  Renaissance's "Consent to Order for Relief" was filed on July 27, 2011.

13      16.   <u>Renaissance's Cash Collateral Budget and Proposed Use of Cash Collateral</u>.

14  Renaissance's initial, 13-week operating budget ("Budget") is appended hereto as Exhibit "7."

15  Under the use of cash collateral proposed herein, Renaissance will be authorized to make each

16  month, through and including October 30, 2011, expenditures of any cash collateral of the Bank not

17  to exceed 115% of the aggregate amount of expenditures for each month contained in the Budget.

18  Any expenditure in excess of that amount will require the written approval of Plaza Bank or further

19  order of the Court after appropriate notice.  Budget savings in any month may be carried over and

20  used by Renaissance in subsequent months (i.e., to account for changes in the timing of

21  expenditures by Renaissance).

22      17.   Post-petition, Renaissance has made significant changes to its cash management

23  systems and controls.  The Budget, prepared on an interim basis based upon those changes, is

24  supported by the following assumptions and discussion:

25          a.   <u>Renaissance's Pre-Petition Billing and Collections</u>.  Renaissance's cash flow

26              difficulties, summarized above, were brought to a head in May 2011, when it

27              was discovered that Renaissance's outsourced billing service provider had

28

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1   not been billing during an approximate 60 day window, and had been only

2   sporadically billed throughout months prior to that.   Regrettably, further

3   investigation revealed that (i) Renaissance's billing service provider had not

4   billed new matters or made any collection efforts on current accounts

5   receivable for 4-6 weeks during their contracted period; and (ii) compromised

6   or written off entirely large amounts of claims without Renaissance's

7   knowledge or authorization.   As a result, Renaissance's accrued revenues

8   (which are reflected through billings) dropped dramatically from the previous

9   6 month average of approximately $780,000 per month to approximately

10   $348,000 in May.  In the absence of collection activity, collections likewise

11   dropped precipitously, placing the Center in a cash flow crisis.    Upon

12   investigating and learning of these billing and collection problems,

13   Renaissance immediately replaced its outsourced billing with an experienced,

14   in-house, out-of-network biller and collector.  Renaissance has reserved all of

15   its rights with respect to the former billing provider.

16   b.   <u>Impact of Changes to Renaissance's Billing and Collections</u>.   I believe

17   Renaissance's decision to replace its outsourced billing and collection

18   provider with an "in-house" team benefits Renaissance in two very

19   significant ways:   First, it maximizes the realization rate of receivables

20   generated by the Center.   Second, aggressive billing and collections

21   management dramatically improves the receivables-to-cash cycle.  Just as

22   importantly, however, Renaissance's recent procurement of its Medicare

23   PTAN number and accession into the Monarch network are vital to quicker

24   turn-around times between receivables generation and cash. Selective in-

25   network payers will also raise revenues per "click" by minimizing the amount

26   of flat rate "CAP" payments which are excessively low payers.  Conversion

27   to in-network effectively increases our anticipated revenue per "click" on

28

PRINTED ON
RECYCLED PAPER

**DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1   these by a factor of over 5 times for business we are already doing. Since

2   outsourced billing was only billing a couple of days per month and was

3   holding claims till than it is intuitive that immediate billing will reduce pay

4   cycles. A cursory review has identified that for the time period studied, the

5   billing company averaged 21 days from date the surgery was performed till it

6   was actually billed.  Also, in-network contracts will reduce the pay cycle to

7   the contract rate.

8   c.   Renaissance's Pre-Petition Books and Records.  Renaissance, at the direction

9   of its Board of Managers, maintained its books and records pre-petition

10  through an outside CPA firm, which ostensibly was to provide Renaissance's

11  management with periodic reporting.  In connection with efforts to obtain a

12  loan for Renaissance in June, I discovered that Renaissance's books and

13  records were in complete disarray.  I am informed and believe that of

14  approximately 5 boxes of materials provided to the CPA in September 2010,

15  only 3 boxes were recoverable.  As a result, during the post-petition "gap"

16  period occasioned by the involuntary filing which occurred very shortly after

17  this discovery, I have had to construct Renaissance's Budget from (i) medical

18  billing records (subject to audit, as discussed above); (ii) vendor invoices;

19  and (iii) my personal knowledge of and familiarity with the Center's day-to-

20  day operations and industry norms.  In addition, I immediately interviewed a

21  number of turnaround and workout professionals, ultimately selecting

22  XRoads Solutions Group, LLC ("XRoads") to act as Renaissance's Chief

23  Restructuring Officer and supporting staff.  In addition to serving in a

24  financial management capacity going forward, I anticipate XRoads will

25  further provide forensic support and verification for Renaissance's financial

26  projections.

27  d.   Renaissance's Efforts to Reduce Operating Expenses.  With the completion

28

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS EMERGENCY MOTION

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

of its build-out, procurement of the necessary Licensure and Accreditations, receipt of its PTAN number and accession into the first of its targeted payer contracts, Renaissance is able to focus on aggressively reducing its operating expenses and further improving its cash flow.  To this end, and as set forth in Renaissance's Budget, Renaissance has slashed its operating costs – many of which were "legacy" expenses remaining from the build-out, and which will be restructured in connection with Renaissance's Chapter 11 Plan. Renaissance's management will focus on reducing labor costs through an improved staffing plan using more extenders for patient coverage, and by retaining different anesthesia coverage. Renaissance's management will also focus on reducing material costs by negotiating more favorable pricing available in the marketplace, and by reducing PAR levels and waste. These two areas will reduce costs significantly since they are the two largest variables in operational costs each month. All vender service contracts are likewise being reviewed for reductions.

e.  <u>Proposed Interim Review Pending Final Approval of Renaissance's Cash Collateral Budget</u>.  Renaissance's accrued (i.e., billed) revenues for July 2011 totaled $549,000.   In order to provide the best estimate of projected operations possible, I have made the following budget adjustments:

(1)  Renaissance's anticipated cash receipts for the 13-week period reflected in the Budget have been estimated conservatively, and have been further discounted by approximately 20% to reflect any further adjustments revealed by Renaissance's ongoing audit of prior billings.

(2)  In addition to the expense reduction measures outlined above, the Budget reflects a 10% over-statement of expenses.

(3)  The Budget reflects an aggregate $100,000 reserve for surgeon supplies.

**ELECTRONICALLY FILED**

**South Bay Law Firm**
**21535 Hawthorne Blvd. Ste. 210**
**Torrance CA 90503**

(4)     The Budget includes 3 months' worth of rents (i.e., nearly $300,000) payable to Pacific Medical Plaza in October, in connection with performance of post-petition rental obligations under to Section 365(d)(3). Renaissance seeks interim relief from the payment of such obligations while business operations are stabilized and further healthcare receivables are collected. Renaissance reserves the right to seek an interim extension of the first two post-petition rent payments into November and following months.

(5)     The Budget includes allowances for professional fees, in addition to fees for a healthcare ombudsman, which I understand will be appointed by the US Trustee pursuant to Bankruptcy Code 331.

Though I believe Renaissance's preliminary cash collateral Budget reflects a conservative estimate of the Center's financial operations and am confident in the revenue and expense projections set forth in that Budget, I further believe it is appropriate for this Court to review the Center's operating results on an interim (i.e., 15-30 day basis), and to approve a final cash collateral Budget once Renaissance's management has completed its review of the Center's pre-petition operations and has established additional weekly post-petition operational results. Renaissance reserves the right: (i) to amend the Budget; and (ii) to seek, at the final hearing on this Motion, use of cash collateral different from that set forth herein.

f.     <u>Service of Plaza Bank's Debt</u>. Despite its cash flow difficulties, Renaissance has remained current with respect to its obligations to Plaza Bank from September 2010 through May 2011 – in part, as a direct result of the private party financing transactions described above. Renaissance has provided in its cash collateral projections for the continued service of Plaza's debt pursuant to the Plaza Note, subject to XRoads' verification and this Court's approval

- 14 -     DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

of a final Budget.  As noted above, Renaissance's existing, uncollected receivables base is of highly uncertain value and collectability.  Based on Renaissance's most recent month of operations (July 2011) and on its projected operations for August, Renaissance's management believes its "normalized," collectible receivables base (i.e., the receivables base that Renaissance would have were it financing and collecting receivables in the ordinary course of its business) should be approximately $500,000.  Renaissance proposes that as and for adequate protection for Renaissance's use of Plaza Bank's cash collateral, Plaza Bank will be granted a "2-for-1" post-petition replacement lien on accounts receivable and cash – i.e., Plaza is willing to extend a replacement lien of $2 against cash, accounts receivable, and proceeds acquired and/or generated with any cash collateral for every $1 of Plaza Bank's cash collateral expended by Renaissance, up to $1 million in aggregate cash and receivables.

g.    Renaissance's Need for Cash Collateral Use.  Even a temporary cessation of Renaissance's ability to operate its business, caused by any lack of access to cash collateral, will result in a substantial diminution of Plaza Bank's collateral, as surgeons will be forced to turn to other facilities to treat their patients.  Moreover, Renaissance's long-term viability will be jeopardized, as its ability to maintain licensure and accreditation and contract with network and other providers will be at risk.    By contrast, maintenance of Renaissance's ongoing operations will preserve the value of Plaza Bank's interest in any cash collateral as nearly as possible against any risk to that value.

h.    Renaissance's Financed Equipment.  In April and June 2010, Renaissance entered into a series of Promissory Notes and Security Agreements in favor of Wells Fargo Equipment Finance, Inc. ("Wells Fargo") in connection with

ELECTRONICALLY FILED

the purchase of medical equipment for the Center.  The outstanding principal amount with respect to Renaissance's obligations to Wells Fargo is approximately $5.4 million.   The loans bear interest at 6% and have maturities between 36 and 60 months.  I am informed and believe that Wells Fargo values such equipment at approximately $2.4 million.   Though the monthly depreciation and interest (i.e., the measure of Wells Fargo's potential the loss of any value in its collateral) are far less than the payments under Wells Fargo's loan documents, Renaissance's preliminary Budget provides for full monthly payments to Wells Fargo of $134,585.

i.    Renaissance's Need to Secure the Cooperation of Guarantor-Physicians. Renaissance's adequate protection proposal with respect to Plaza Bank – and its proposed monthly payment with respect to Wells Fargo – is made in light of the fact that Renaissance needs to secure the cooperation of non-debtor guarantor-physicians.  Each of these physicians has individually guaranteed Renaissance's obligations to Plaza Bank and to Wells Fargo.  Each of these physicians is also a Member of Renaissance.   In addition to personally guaranteeing Renaissance's loans, each of the guarantors further provides Renaissance with significant patient referrals to Renaissance, thereby contributing directly to Renaissance's monthly income.  Finally, several of these physicians have advanced funding in the form of a post-petition loan (described further below) to assist Renaissance with its immediate operational cash flow needs.   Without the further support and business-generation efforts of these physicians on behalf of the Center, the Center's business will be jeopardized.  If necessary, Renaissance is prepared to seek a preliminary injunction to protect such guarantors from collection efforts and litigation in furtherance of its reorganization efforts.  Therefore, I believe it is in the best interests of the Center to provide as much "adequate protection"

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS EMERGENCY MOTION

**ELECTRONICALLY FILED**

1    for Plaza Bank and for Wells Fargo as is financially prudent.

2    18.    <u>Renaissance's Need for Post-Petition Financing</u>.    As indicated by Renaissance's

3    submitted Budget, Renaissance has an emergent need for very short-term "bridge" financing during

4    the first 7-8 weeks of this Chapter 11 case while it continues to operate and explore what

5    management believes are a variety of post-petition financing alternatives.    A number of physicians

6    who are also Renaissance Members (the "Doctors' Group") has offered to extend to the Debtors

7    such financing.

8    19.    The Doctors' Group is comprised of physicians who already have lent a significant

9    amount to the Debtors.    Despite their potential exposure with respect to these prior loans, however,

10    the Doctors' Group has responded to Renaissance's request for a further, post-petition facility of up

11    to $600,000 in additional, immediate credit (the "Doctors' Bridge Facility") on the following

12    general terms:

| Term | Provision |
|---|---|
| Amount: | $50,000 each up to $600,000 total. If Renaissance is oversubscribed, each participant's commitments will be reduced pro rata. |
| Facility: | Revolving credit facility to be held in trust by a trustee. |
| Term: | 180 days with optional 60 day extensions not to exceed 360 days. |
| Interest Rate on Drawn Funds: | 10% per annum during first 180 days +1% per annum, for each additional 60 day extension. Interest will be paid quarterly.  RSANH can elect to pay interest in kind (by adding to the principal balance) in any particular period subject to a 2.5% premium (i.e. 12.5% per annum, if during the first 180 days). |
| Interest Rate on Un-Drawn Funds: | 2% per annum. |
| Ranking: | Administrative Priority. |

20.    An exemplar of the Promissory Notes executed by Renaissance's management in

connection with the Doctors' Bridge Facility is appended to the Wallace Declaration at Exhibit "8."

As of the date of this filing, the Doctors' Group has responded with $106,500 in commitments to

this facility.    Renaissance presently holds funds received in connection with this facility in a

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

**DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    segregated account, pending this Court's approval of the same.  Renaissance's analysis of the

2    impact to its cash balances resulting from the Doctors' Group's infusion of capital into the Debtors'

3    business operations is set forth in the Budget attached as Exhibit "7" hereto.

4        21.    I do not believe immediate, short-term financing under terms comparable to those

5    offered by the Doctors' Group is available in any commercial market, and in particular, not in the

6    asset-based or "DIP" lending market.  In light of these factors, I believe it is impossible to obtain

7    the financing necessary to operate its business on terms more favorable than those contemplated by

8    the Doctors' Bridge Facility.

9        22.    <u>Renaissance's Post-Petition Operations</u>.  Presently, Renaissance is conducting post-

10    petition operations as follows:

11        a.    <u>Renaissance's Cash Management System</u>.    Renaissance, with XRoads'

12            assistance, has transitioned its prior cash management system to appropriate

13            Debtor-in-Possession operating accounts and is conducting post-petition

14            operations as required by US Trustee Guidelines.

15        (1)    <u>Cash Payments</u> – Cash payments for treatments at the Center are

16            made in advance by the treating surgeon, who receives payment from

17            the patient.    Renaissance is unique in this approach to cash

18            collections.  I am informed and believe that presently, the Center has

19            120 cases booked from July 18 through September 18.  Based upon

20            my review of the Center's books and records, I believe the average

21            cash per case is approximately $1,000.   Based on this average, I

22            estimate that cash payments per month will be $120,000 advancing to

23            $150,000 by week thirteen of the Budget.

24        (2)    <u>Medicare</u> – Based on my review of Renaissance's books and from

25            inception, I estimate that Medicare-covered patients presently account

26            for approximately 13% of the total case load at the Center. This

27            historical number would have been higher in dollar volume if

28

ELECTRONICALLY FILED

**South Bay Law Firm**
**21535 Hawthorne Blvd. Ste. 210**
**Torrance CA 90503**

1  Renaissance had access to a working capital line to support supply

2  and implant costs while we were waiting for our PTAN number so we

3  could collect.  In the future, while Medicare cases will most likely

4  double from organic growth and due to new physician referrals,

5  overall it will represent a lower percentage due to the relative increase

6  in PPO, in-network and HMO from both IPA and independently

7  contracted payers.  In my experience with ASC development, this

8  overall low percentage to total case volume is expected for this

9  demographic, and is economically desirable.  Therefore, while

10  Renaissance did not turn away Medicare cases, it did not try and mine

11  its physician partners during this start-up period.  Medicare

12  reimbursements are made according to national fee schedule.  Billing

13  takes place electronically.  Once billed, reimbursement takes

14  approximately 10 business days thereafter.  Proper CPT coding is

15  important feature of the system; consequently (as explained above),

16  any medical provider's billing and collections team is an integral part

17  of its anticipated business success.  I am informed and believe that

18  Renaissance generated approximately $165,505 in Medicare

19  receivables from March 2011 to June 2011.  I am further informed

20  and believe an additional $132,217 in claims, accrued between

21  September 2010 and March 2011, are subject to a Medicare revision

22  of the active date for Renaissance and we anticipate receipt of those

23  payments after the 13 week period set forth in the Budget.  On a

24  "going forward" basis, and based on my review of Renaissance's

25  books and records and on my experience with prior ASC

26  developments, I estimate the Renaissance should anticipate an

27  average Medicare reimbursement over the 13 week period of the

28

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS EMERGENCY MOTION

**ELECTRONICALLY FILED**

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

1    Budget of $42,000 per month. New providers and increased organic

2    growth should increase this number substantially.

3    (3)    Network Providers – Payments for services rendered by "in-network"

4    providers are made pursuant to contract, typically less than 30 days.

5    Payment rates typically track the Medicare CPT code, with a

6    multiplier attached.  Where the patient is responsible for a portion of

7    the payment, the patient portion is collected 3 business days before

8    the procedure is performed.    "Out-of-network" payments are

9    substantially greater than "in-network" payments, but – as described

10    herein – such payments can often be delayed during the early stages

11    of an ASC's operations due to the lack of a Medicare PTAN and other

12    insurance company stratagems.    Based upon my review of

13    Renaissance's books and records, I believe as many as 50% of the

14    outstanding claims made to network providers have not been paid, but

15    – with the receipt of a Medicare PTAN, new in-house billing practices

16    and in-house collections – will be paid.  I expect to collect these

17    receivables as illustrated in the 13 week budget.

18    (4)    Workers' Compensation – Workers' Compensation-related

19    receivables are paid pursuant to a California State fee schedule.

20    Based on my own review of Renaissance's books and records,

21    payments on Workers' Compensation-related receivables should have

22    generally been under 45 days.  I believe approximately half have been

23    under 30 days.  Of the remaining balance, most of the receivables are

24    older than 150 days due to improper billing practices and information

25    supplied to the payers. Workers' Compensation-related receivables

26    pay a multiplier of 1.20 of the Hospital Outpatient Department

27    Medicare's Approved Procedure Code or ("APC" Code).  Presently,

28

PRINTED ON
RECYCLED PAPER

- 20 -

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

Renaissance has approximately $137,000 in such receivables but I believe that number is overstated, and from a cursory review of 12,000 so I would estimate it such receivables to be at approximately $125,000.

23.    Renaissance's receivables-to-cash cycle is directly impacted by its billing-to-collection cycle.

a.    Receivables-to-Cash Cycle.    Renaissance's receivables-to-cash cycle typically proceeds from initiation of a case to collection as follows:

(1)    Patient Intake.    Renaissance will typically receive a scheduled surgical procedure via fax, internet, or phone.    Renaissance's administrative personnel will verify benefits, correct coding, and the supplies and equipment needed for the procedure.    Upon completion of these tasks, the case will be scheduled and Renaissance will collect the co-pay and/or cash amount (i.e., the "patient responsibility") in advance of the surgery.

(2)    Bill Processing.    Once a surgery is performed, Renaissance will receive and assemble laboratory results, nursing notes, supply costs, and physician dictation (i.e., transcription).    These materials are sent to Renaissance's in-house billing department for review and for correctness.    Because of the importance of proper coding to reimbursement and the assembling of supply and laboratory results, the review process using materials obtained from all of these sources takes approximately 2-3 days before a claim is generated.    Upon completion of Renaissance's review, each claim is submitted to the reimbursing insurer through an electronic clearinghouse (known colloquially as "GHN"), which then verifies that the claim is "clean" or meets that particular payer's profile and template for that particular

surgical procedure with documentation, and routes each claim to the appropriate insurer. Renaissance's collection staff checks weekly with insurers regarding the status of specific claims, with each inquiry recorded electronically in the event an audit of collection practice on any specific claim is required.

(3)    Payment. Once approved, payments are remitted to Renaissance – either electronically (for Medicare payments), or by mail directly to Renaissance (for other insurers). With Renaissance's migration to "in-network" status with Monarch and other insurers, payments may be wired directly to Renaissance's bank. Typical turn-around from billing to collection for Renaissance – and in my experience – is:

| Insurer | Billing Cycle |
|---|---|
| Workers' Compensation | 45 days |
| Contracted ("In-Network") Insurers | 30 days |
| Out-of-Network Insurers | 45-60 days (historically); 30 days (from May 2011 forward) |
| Cash | 3 business days before date of service |
| Co-Pays | 3 business days before date of service |

24.    Since transitioning from an "outsourced" billing model to one administered "in-house" as set forth in the discussion above, Renaissance has experienced an immediate improvement in the rate of reimbursement on its existing accounts receivable. Renaissance has also "de-bugged" its billing software and is auditing the former billing service provider's performance with a view to recouping lost monies, uncollected deductibles and patient portions, and submitting renewed claims for miscoded, never-billed procedures. Based upon my review of these records, I believe Renaissance can recoup as much as $500,000 in such funds. With our new billing practice on co-pays and deductible calculations we should conservatively see a 15% increase in our current

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS EMERGENCY MOTION

**ELECTRONICALLY FILED**

1  patient base revenues.  Moreover, Renaissance is now in a position to provide its lenders and other

2  interested parties with billing reports weekly.

3      25.    <u>Business Development and Growth Strategy</u>.  Renaissance's business strategy is

4  centered on management's ability to attract and retain Center memberships and referrals from

5  respected surgeons with broad network affiliations.  Surgeons joining the Center do so with patient

6  populations who are insurance-covered in varying percentages by PPO's, HMO's, IPA, Personal

7  Injury, Medicare, and Workers' Compensation.  In addition, some percentage of each surgeon's

8  patients is not insurance-covered and pays in cash, in advance.  Though a Medicare PTAN number

9  is technically required to collect only from Medicare following a patient procedure, it is common

10  practice for many PPO's, IPA's, and HMO's to require a provider's Medicare PTAN number before

11  reimbursing a covered procedure.  Moreover, a Medicare PTAN number is absolutely needed to

12  contract with PPO's, HMO's, and IPA's, and to go "in-network" with these providers.

13      26.    The Center's PTAN was received June 7, and is set forth at Exhibit "9."  Thus, I

14  believe Renaissance is now well-positioned to accelerate reimbursements on existing receivables

15  and to contract effectively with network providers (as discussed in further detail immediately

16  below).

17      27.    Renaissance views its network relationship strategy as critical to its long-term

18  financial success.  This is because of the dramatic increases in access to current surgeon patient

19  bases for insurance cases that surgeons could not perform due to the non-contracted status of the

20  Center.  The lack of HMO and IPA contracting also previously created a barrier to using the Center

21  since these cases could not be brought there.  Orange County has a very large IPA and HMO

22  population.  Contracting will allow many of the physicians, who would like to utilize the Center but

23  who could not come here before for this reason, to utilize the Center.  Most Orange County Surgery

24  Centers enjoy a large number of surgeons who are not Members utilizing their Center rather than a

25  Hospital because of Physician and patient convenience, lower cost, scheduling and a higher

26  standard of care for outpatient cases.  Additionally, payment cycles on "in-network" cases are

27  approximately half of that for "out-of-network."  From inception, one of Renaissance's central

28

**South Bay Law Firm**
**21535 Hawthorne Blvd. Ste. 210**
**Torrance CA 90503**

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

business objectives was to recruit surgeons within the Monarch network.  Based on my experience in ASF development within the Orange County market and upon information and belief, of IPA's, Monarch controls the largest patient population in Orange County.  To date, Renaissance's business development and growth strategy has been successful:

    a.    Of the 37 surgeons affiliated with the Center, approximately 11 are Monarch network providers and 19 would like to join.

    b.    As noted above, Renaissance is only very recently in receipt of its Medicare PTAN, thereby making it eligible to begin contracting with major insurance networks.

    c.    Renaissance has been approved for accession into the Monarch IPA ("Monarch") effective July 20, 2011, as set forth at Exhibit "10".

28.    In addition to Monarch, Renaissance is in the process of contracting with the following other providers:  Blue Cross, Blue Shield, Aetna, United Health Care, ADOC, Prospect, and TriCare.  Based on my knowledge of these contracting efforts, I estimate it will require an additional 60-90 days until Renaissance is "live" with its other, targeted "network" relationships.  Presently, it is Renaissance's intent to stay "out-of-network" with other providers, since the increased reimbursement levels for other providers justify the delayed reimbursement cycle in these cases.

29.    <u>Renaissance's Need to Approve Post-Petition Payment of Pre-Petition Employee Wages</u>.  During the "gap period" which existed from July 11 through August 2 in this involuntary Chapter 11 case, Renaissance made payments to its employees representing pre-petition wages during the ordinary course of its business operations.  Renaissance will seek authorization of such payments and the exemption of such payments from recovery pursuant to Section 549 within 30 days.

30.    <u>Renaissance's Need to Deem Utility Providers "Adequately Assured."</u>  I am advised that pursuant to 11 U.S.C. § 366, a utility may refuse to provide service in the absence of "adequate assurance of payment" within 20 days of the Order for Relief in the Renaissance's case,

PRINTED ON
RECYCLED PAPER

DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS <u>EMERGENCY</u> MOTION

**ELECTRONICALLY FILED**

but that the Court may modify the amount of adequate assurance.  Renaissance presently draws

electricity and gas from the following utility providers:

| Utility Provider | Ave. Monthly Amount |
|---|---|
| Southern California Edison | $13,000 |
| Southern California Gas | $1,667 |

31.    Uninterrupted utility services are essential to Renaissance's ongoing operations and,

therefore, to the success of its reorganization.  Renaissance simply cannot function without utility

services.  Should the utility companies refuse or discontinue service, even for a brief period,

Renaissance's business would be severely disrupted.  It is therefore critical that utility services

continue uninterrupted.  I understand this Court may not consider Renaissance's lack of pre-petition

defaults with respect to any utility payment in ordering such "adequate assurance;" however, I

believe that Renaissance's Budget cash position and the restrictions imposed by Renaissance's cash

collateral proposal justifies this Court's Order (i) determining the aggregate amount of assurance

payment required to be $15,000 for the utility providers (i.e., $13,000 for Southern California

Edison and $2,000 for Southern California Gas), payable in increments of $2,000 per month and

commencing within 30 days.  The amounts proposed represent the average of Renaissance's

monthly utility usage.  Combined with Renaissance's existing security deposit with Southern

California Edison ($6,695) and Southern California Gas ($1,580), I believe such additional deposits

constitute more than adequate assurance of Renaissance's continued payment.

///

///

///

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

**DECLARATION OF BRUCE WALLACE IN SUPPORT OF
DEBTOR'S OMNIBUS EMERGENCY MOTION**

**ELECTRONICALLY FILED**

1

2          I declare under penalty of perjury under the laws of the United States that the

3   foregoing is true and correct. Executed this ___ day of _August_, 2011 at Costa Mesa, California.

4

5

6

7

8                                                    Bruce Wallace

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

South Bay Law Firm
21535 Hawthorne Blvd. Ste. 210
Torrance CA 90503

PRINTED ON
RECYCLED PAPER

- 26 -      DECLARATION OF BRUCE WALLACE IN SUPPORT OF
            DEBTOR'S OMNIBUS EMERGENCY MOTION

**ELECTRONICALLY FILED**

# Exhibit "1"

ELECTRONICALLY FILED

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "**Agreement**") is dated as of February __, 2010 and entered into by and among RENAISSANCE SURGICAL ARTS AT NEWPORT HARBOR, LLC, a Delaware limited liability company ("**Grantor**") and PLAZA BANK, a California corporation ("**Secured Party**").

## RECITALS

A.      Pursuant to the Promissory Note dated as of February ___, 2010 (said Promissory Note, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time, being the "**Note**") executed by Grantor, Lender has made certain commitments, subject to the terms and conditions set forth in the Note, to make a loan ("**Loan**") to Grantor.

B.      It is a condition precedent to the Loan by Lender that Grantor shall have granted the security interests and undertaken the obligations contemplated by this Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements set forth herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Grantor hereby agrees with Secured Party as follows:

**SECTION 1.   Grant of Security.**

Grantor hereby assigns to Secured Party, and hereby grants, assigns, transfers, conveys and sets over unto Secured Party, and grants to Secured Party a security interest in, all of Grantor's right, title and interest in and to the following personal property of Grantor, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located (the "**Collateral**"):

(a)      all Accounts (specifically including without limitation, accounts receivable including health care insurance receivables) and Deposit Accounts, together with all amounts on deposit from time to time in such accounts;

(b)      all Instruments;

(c)      all Investment Property;

(d)      all Records;

(e)      all General Intangibles;

(f)      all Inventory;

(g)      all Securities;

(h)      all Chattel Paper;

ELECTRONICALLY FILED

        (i)      without any duplication, any and all other assets and other personal property of Grantor(excluding equipment and fixtures);

        (j)      all Proceeds and Accessions with respect to any of the foregoing Collateral and all substitutions and replacements thereof.

Each category of Collateral set forth above shall have the meaning set forth in the UCC, it being the intention of Grantor that the description of the Collateral set forth above be construed to include the broadest possible range of assets.

## SECTION 2.  Security for Obligations.

This Agreement secures, and the Collateral is collateral security for, the prompt payment in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all Secured Obligations of Grantor. "**Secured Obligations**" means:  all obligations and liabilities of every nature of Grantor now or hereafter existing under or arising out of or in connection with the Loan and the Note, in each case together with all extensions or renewals thereof, whether for principal, interest, reimbursement of amounts drawn under letters of credit, fees, expenses, indemnities or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Secured Party as a preference, fraudulent transfer or otherwise, and all obligations of every nature of Grantor now or hereafter existing under this Agreement (including, without limitation, interest and other amounts that, but for the filing of a petition in bankruptcy with respect to Grantor, would accrue on such obligations, whether or not a claim is allowed against Grantor for such amounts in the related bankruptcy proceeding).

## SECTION 3.  Representations and Warranties.

Grantor represents and warrants as follows:

        (a)      **Jurisdiction of Organization**. Grantor's name is as set forth above is as it appears in official filings in the state of its organization.  Grantor is a limited liability company in good standing in the State of Delaware and authorized to transact business in the State of California.

        (b)      **Due Authorization, etc**. Grantor is duly formed, validly existing and in good standing and subsisting under the law of its jurisdiction of organization and has full entity power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement have been duly authorized by all necessary entity action. This Agreement constitutes a legally valid and binding obligation of Grantor, enforceable against Grantor in accordance with its terms, except as enforcement hereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles.

-2-

(c)    **No Conflict**. The execution, delivery and performance of this Agreement by Grantor will not violate the organizational documents of Grantor, any provision of law applicable to Grantor or any order, judgment or decree of any court or other governmental agency binding on Grantor.

(d)    **Security Interests**. The security interests in the Collateral granted hereunder constitute valid security interests in the Collateral, securing payment of the Secured Obligations.

**SECTION 4.  Further Assurances.**

(a)    **Generally.**   Grantor agrees that from time to time, at the expense of Grantor, Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Secured Party may request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Grantor will: (a) (i) execute (if necessary) and file such financing or continuation statements, or amendments thereto, (ii) execute and deliver, and cause to be executed and delivered, agreements establishing that Secured Party has control of Deposit Accounts and, Investment Property of Grantor, (iii) deliver to Secured Party all certificates or Instruments representing or evidencing Investment Property, accompanied by duly executed endorsements or instruments of transfer or assignment in blank, all in form and substance satisfactory to Secured Party and (iv) deliver such other instruments or notices, in each case, as may be necessary or desirable, or as Secured Party may request, in order to perfect and preserve the security interests granted or purported to be granted hereby; (b) furnish to Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Secured Party may reasonably request, all in reasonable detail; (c) at Secured Party's request, appear in and defend any action or proceeding that may affect  Grantor's title to or Secured Party's security interest in all or any part of the Collateral; and (d) use commercially reasonable efforts to obtain any necessary consents of third parties to the creation and perfection of a security interest in favor of Secured Party with respect to any Collateral. Grantor hereby authorizes Secured Party to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral.

(b)    **Securities Collateral.**  Without limiting the generality of the foregoing Section 4(a), Grantor agrees that (i) all certificates or Instruments representing or evidencing the Securities Collateral shall be delivered to and held by or on behalf of Secured Party pursuant hereto and shall be in suitable form for transfer by delivery or, as applicable, shall be accompanied by Grantor's endorsement, where necessary, or duly executed instruments of transfer or assignments in blank, all in form and substance satisfactory to Secured Party and (ii) it will, upon obtaining any additional Equity Interests or Indebtedness, promptly (and in any event within five business days) deliver to Secured Party a Pledge supplement, duly executed by Grantor, in respect of such additional Pledged Equity or Pledged Debt; provided, that the failure of Grantor to execute a Pledge supplement with respect to any additional Pledged Equity or Pledged Debt shall not impair the security interest of Secured Party therein or otherwise adversely affect the rights and remedies of Secured Party hereunder with respect thereto.

#95935.7

**SECTION 5.  <u>Certain Covenants of Grantor</u>.**

Grantor shall:

(a)    not use or permit any Collateral to be used unlawfully or in violation of any provision of this Agreement or any applicable statute, regulation or ordinance or any policy of insurance covering the Collateral;

(b)    not make or permit any change in Grantor's name without Secured Party's prior written consent which shall not be unreasonably withheld but which shall require at least 30 days' prior written notice to Secured Party;

(c)    not make or permit any change in Grantor's jurisdiction of organization without Secured Party's prior written consent which shall not be unreasonably withheld but which shall require at least 30 days' prior written notice to Secured;

(d)    pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, services, materials and supplies) against, the Collateral (i) except to the extent the validity thereof is being contested in good faith; <u>provided</u> that Grantor shall in any event pay such taxes, assessments, charges, levies or claims not later than five days prior to the date of any proposed sale under any judgment, writ or warrant of attachment entered or filed against Grantor or any of the Collateral as a result of the failure to make such payment, and (ii) except for those claims set forth on <u>Schedule A</u> attached hereto;

(e)    permit representatives of Secured Party at any time during normal business hours to inspect and make abstracts from Records of the Collateral, and Grantor agrees to render to Secured Party, at Grantor's cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto; and

(f)    not obtain or guaranty any additional financing without the prior written consent of Secured Party except equipment financing in connection with, and secured solely by, the equipment used in Debtor's business.

**SECTION 6.  <u>Special Covenants with respect to Securities Collateral</u>.**

(a)    **Form of Securities Collateral**.  Secured Party shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Equity for certificates or instruments of smaller or larger denominations.  The terms of any partnership or limited liability company agreement governing Equity Interests included in the Securities Collateral shall expressly provide that such interest is a security governed by Article 8 of the UCC.

(b)    **Covenants**.  Grantor shall (i) not permit any issuer of Securities Collateral to merge or consolidate unless all the outstanding Equity Interests of the surviving or resulting Person are, upon such merger or consolidation pledged hereunder, and no cash, securities or other property is distributed in respect of the outstanding Equity Interests of any other constituent corporation; (ii) cause each issuer of Pledged Equity not to issue equity interests in addition to or

-4-

in substitution for the Pledged Equity issued by such issuer, except to Grantor; (iii) immediately upon its acquisition (directly or indirectly) of any Equity Interests, including additional Equity Interests in each issuer of Pledged Equity; (iv) immediately upon issuance of any and all Instruments or other evidences of additional Indebtedness from time to time owed to Grantor by any obligor on the Pledged Debt, comply with Section 4; (v) promptly deliver to Secured Party all written notices received by it with respect to the Securities Collateral; (vi) at its expense (A) perform and comply in all material respects with all terms and provisions of any agreement related to the Securities Collateral required to be performed or complied with by it, (B) maintain all such agreements in full force and effect and (C) enforce all such agreements in accordance with their terms; and (vii), at the request of Secured Party, promptly execute and deliver to Secured Party an agreement providing for control by Secured Party of all Securities Collateral as directed by Secured Party.

(c)    **Voting and Distributions**.  So long as no Event of Default shall have occurred and be continuing, (i) Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not prohibited by the terms of this Agreement; provided that Grantor shall not exercise or refrain from exercising any such right if Secured Party shall have notified Grantor that, in Secured Party's judgment, such action would have a material adverse effect on the value of the Securities Collateral or any part thereof; and (ii) Grantor shall be entitled to receive and retain any and all dividends, other distributions, principal and interest paid in respect of the Securities Collateral.

Upon the occurrence and during the continuation of an Event of Default, (x) upon written notice from Secured Party to Grantor, all rights of Grantor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease, and all such rights shall thereupon become vested in Secured Party who shall thereupon have the sole right to exercise such voting and other consensual rights; (y) all rights of Grantor to receive the dividends, other distributions, principal and interest payments which it would otherwise be authorized to receive and retain pursuant hereto shall cease, and all such rights shall thereupon become vested in Secured Party who shall thereupon have the sole right to receive and hold as Collateral such dividends, other distributions, principal and interest payments; and (z) all dividends, principal, interest payments and other distributions which are received by Grantor contrary to the provisions of clause (y) above shall be received in trust for the benefit of Secured Party, shall be segregated from other funds of Grantor and shall forthwith be paid over to Secured Party as Collateral in the same form as so received (with any necessary endorsements).

In order to permit Secured Party to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder, (I) Grantor shall promptly execute and deliver (or cause to be executed and delivered) to Secured Party all such proxies, dividend payment orders and other instruments as Secured Party may from time to time reasonably request, and (II) without limiting the effect of clause (I) above, Grantor hereby grants to Secured Party an irrevocable proxy to vote the Pledged Equity and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Equity would be entitled (including giving or withholding written consents of holders of Equity Interests, calling special meetings of holders of Equity Interests and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged

#95935.7

Equity on the record books of the issuer thereof) by any other Person (including the issuer of the Pledged Equity or any officer or agent thereof), upon the occurrence of an Event of Default and which proxy shall only terminate upon the payment in full of the Secured Obligations, the cure of such Event of Default or waiver thereof as evidenced by a writing executed by Secured Party.

**SECTION 7.   Secured Party Appointed Attorney-in-Fact.**

Grantor hereby irrevocably appoints Secured Party as Grantor's attorney-in-fact, with full authority in the place and stead of Grantor and in the name of Grantor, Secured Party or otherwise, from time to time in Secured Party's discretion to take any action and to execute any instrument that Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation: (a) upon the occurrence and during the continuance of an Event of Default, to obtain and adjust insurance required to be maintained by Grantor; (b) upon the occurrence and during the continuance of an Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; (c) upon the occurrence and during the continuance of an Event of Default, to receive, endorse and collect any drafts or other Instruments and other documents in connection with clauses (a) and (b) above; (d) upon the occurrence and during the continuance of an Event of Default, to file any claims or take any action or institute any proceedings that Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce or protect the rights of Secured Party with respect to any of the Collateral; (e) to pay or discharge liens (other than liens permitted under this Agreement or the Note) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by Secured Party in its sole discretion, any such payments made by Secured Party to become obligations of Grantor to Secured Party, due and payable immediately without demand; (f) upon the occurrence and during the continuance of an Event of Default, to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts and other documents relating to the Collateral; and (g) upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Secured Party were the absolute owner thereof for all purposes, and to do, at Secured Party's option and Grantor' expense, at any time or from time to time, all acts and things that Secured Party deems necessary to protect, preserve or realize upon the Collateral and Secured Party's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as Grantor might do.

**SECTION 8.   Secured Party May Perform.**

If Grantor fails to perform any agreement contained herein, Secured Party may itself perform, or cause performance of, such agreement, and the expenses of Secured Party incurred in connection therewith shall be payable by Grantor under Section 12(b) hereof Standard of Care.

## SECTION 9.    <u>Standard of Care</u>.

The powers conferred on Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Secured Party shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Secured Party accords its own property.

## SECTION 10.    <u>Remedies</u>.

(a)    **Generally**. If any Event of Default shall have occurred and be continuing, Secured Party may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral), and also may (i) require Grantor to, and Grantor hereby agrees that it will at its expense and upon request of Secured Party forthwith, assemble all or part of the Collateral as directed by Secured Party and make it available to Secured Party at a place to be designated by Secured Party that is reasonably convenient to both parties, (ii) enter onto the property where any Collateral is located and take possession thereof with or without judicial process, (iii) prior to the disposition of the Collateral, store, process, or otherwise prepare the Collateral for disposition in any manner to the extent Secured Party deems appropriate, (iv) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Secured Party's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Secured Party may deem commercially reasonable, (v) provide instructions directing the disposition of funds in Deposit Accounts and (vi) provide entitlement orders with respect to Investment Property constituting a part of the Collateral and, without notice to Grantor, transfer to or register in the name of Secured Party or any of its nominees any or all of the Collateral constituting Investment Property. Secured Party may be the purchaser of any or all of the Collateral at any such sale and Secured Party, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Secured Party at such sale. Grantor hereby waives any claims against Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree. If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantor shall be liable for the deficiency and the fees of any attorneys employed by Secured Party to collect such deficiency. Grantor further agrees that a breach of any of the covenants contained in this Section 10 will cause irreparable injury to Secured Party, that Secured Party has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against Grantor, and Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for

#95935.7

**EXHIBITS - 34**

ELECTRONICALLY FILED

a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities.

(b)  **Securities Collateral**.  (i) Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Securities Collateral conducted without prior registration or qualification of such Securities Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Securities Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Grantor acknowledges that any such private placement may be at prices and on terms less favorable than those obtainable through a sale without such restrictions (including an offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances and the registration rights granted to Secured Party by Grantor pursuant hereto, Grantor agrees that any such private placement shall not be deemed, in and of itself, to be commercially unreasonable and that Secured Party shall have no obligation to delay the sale of any Securities Collateral for the period of time necessary to permit the issuer thereof to register it for a form of sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If Secured Party determines to exercise its right to sell any or all of the Securities Collateral, upon written request, Grantor shall and shall cause each issuer of any Securities Collateral to be sold hereunder from time to time to furnish to Secured Party all such information as Secured Party may request in order to determine the amount of Securities Collateral that may be sold by Secured Party in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(ii)  If Secured Party shall determine to exercise its right to sell all or any of the Securities Collateral pursuant to this Section, Grantor agrees that, upon request of Secured Party (which request may be made by Secured Party in its sole discretion), Grantor will, at its own expense (A) execute and deliver, and cause each issuer of the Securities Collateral contemplated to be sold and the directors and officers thereof to execute and deliver, all such instruments and documents, and do or cause to be done all such other acts and things, as may be necessary or, in the opinion of Secured Party, advisable to register such Securities Collateral under the provisions of the Securities Act and to cause the registration statement relating thereto to become effective and to remain effective for such period as prospectuses are required by law to be furnished, and to make all amendments and supplements thereto and to the related prospectus which, in the opinion of Secured Party, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto; (B) use its best efforts to qualify the Securities Collateral under all applicable state securities or "Blue Sky" laws and to obtain all necessary governmental approvals for the sale of the Securities Collateral, as requested by Secured Party; (C) cause each such issuer to make available to its security holders, as soon as practicable, an earnings statement which will satisfy the provisions of Section 11(a) of the Securities Act; (D) do or cause to be done all such other acts and things as may be necessary to make such sale of the Securities Collateral or any part thereof valid and binding and in compliance with applicable law; and (E) bear all costs and expenses, including reasonable attorneys' fees, of carrying out its obligations under this Section.

ELECTRONICALLY FILED

(iii)    In the event of any registered offering described herein, Grantor agrees to indemnify and hold harmless Secured Party and each of its directors, officers, employees and agents from and against any loss, fee, cost, expense, damage, liability or claim, joint or several, to which any such Persons may become subject or for which any of them may be liable, under the Securities Act or otherwise, insofar as such losses, fees, costs, expenses, damages, liabilities or claims (or any litigation commenced or threatened in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any preliminary prospectus, registration statement, prospectus or other such document published or filed in connection with such registered offering, or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse Secured Party and such other Persons for any legal or other expenses reasonably incurred by Secured Party and such other Persons in connection with any litigation, of any nature whatsoever, commenced or threatened in respect thereof (including any and all fees, costs and expenses whatsoever reasonably incurred by Secured Party and such other Persons and counsel for Secured Party and such other Persons in investigating, preparing for, defending against or providing evidence, producing documents or taking any other action in respect of, any such commenced or threatened litigation or any claims asserted).  This indemnity shall be in addition to any liability which Grantor may otherwise have and shall extend upon the same terms and conditions to each Person, if any, that controls Secured Party or such Persons within the meaning of the Securities Act.

## SECTION 11.    <u>Application of Proceeds.</u>

Except as expressly provided elsewhere in this Agreement, all proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in the following order of priority:

FIRST: To the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to Secured Party and its agents and counsel, and all other expenses, liabilities and advances made or incurred by Secured Party in connection therewith, and all amounts for which Secured Party is entitled to indemnification hereunder and all advances made by Secured Party hereunder for the account of Grantor, and to the payment of all costs and expenses paid or incurred by Secured Party in connection with the exercise of any right or remedy hereunder;

SECOND: To the payment of all other Secured Obligations (for the ratable benefit of the holders thereof) and, as to obligations arising under the Note, as provided in the Note; and

THIRD: To the payment to or upon the order of Grantor, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

ELECTRONICALLY FILED

**SECTION 12.   Indemnity and Expenses.**

(a)     Grantor agrees to indemnify, defend and hold harmless Secured Party from and against any and all claims, losses and liabilities in any way relating to, growing out of or resulting from this Agreement and the transactions contemplated hereby (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses or liabilities result solely from Secured Party's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(b)     Grantor agrees to pay to Secured Party upon demand the amount of any and all costs and expenses, including the fees and expenses of counsel and of any experts and agents, that Secured Party may incur in connection with the custody or preservation of the Collateral, the exercise of rights or remedies hereunder or the failure by Grantor to perform or observe any of the provisions hereof.

(c)     The obligations of Grantor in this Section 12 shall survive the termination of this Agreement and the discharge of Grantor' other obligations under this Agreement, the Note and the other Loan Documents.

**SECTION 13.   Amendments; etc.**

No amendment, modification, termination or waiver of any provision of this Agreement, and no consent to any departure by Grantor therefrom, shall in any event be effective unless the same shall be in writing and signed by Secured Party and, in the case of any such amendment or modification, by Grantor. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

**SECTION 14.   Notices.**

Any notice or other communication herein required or permitted to be given shall be in writing and may be personally served or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service, upon receipt of telefacsimile, or three business days after depositing it in the United states mail with postage prepaid and properly addressed; provided that notices to Secured Party shall not be effective until received. For the purposes hereof, the address of each party hereto, shall be set forth opposite party's name on the signature pages hereof or such other address as shall be designated by such party in a written notice delivered to the other parties hereto.

**SECTION 15.   Failure or Indulgence Not Waiver; Remedies Cumulative.**

No failure or delay on the part of Secured Party in the exercise of any power, right or privilege hereunder shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude any other or further exercise thereof or of any other power, right or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

#95935.7

**SECTION 16.    Severability.**

In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in, any other jurisdiction, shall not in any way be affected or impaired thereby.

**SECTION 17.    Headings.**

Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**SECTION 18.    Governing Law; Rules of Construction.**

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, EXCEPT TO THE EXTENT THAT THE UCC PROVIDES THAT THE PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF CALIFORNIA.

**SECTION 19.    Consent to Jurisdiction and Service of Process.**

ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST GRANTOR ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OBLIGATIONS HEREUNDER, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF CALIFORNIA. BY EXECUTING AND DELIVERING THIS AGREEMENT, GRANTOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (I) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (II) WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS*; (III) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO GRANTOR AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 14 HEREOF; (IV) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (III) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER GRANTOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; (V) AGREES THAT SECURED PARTY RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION; AND (VI) AGREES THAT THE PROVISIONS OF THIS SECTION 19 RELATING TO JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE TO THE FULLEST EXTENT PERMISSIBLE UNDER THE LAWS OF THE STATE OF CALIFORNIA OR OTHERWISE.

ELECTRONICALLY FILED

**SECTION 20.   Waiver of Jury Trial.**

GRANTOR AND SECURED PARTY HEREBY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.

**SECTION 21.   Counterparts.**

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

**SECTION 22.   Definitions.**

(a)     Each capitalized term utilized in this Agreement that is not defined in this Agreement, but that is defined in the UCC, including the categories of Collateral listed in Section 1 hereof shall have the meaning set forth in Articles 1, 8 or 9 of the UCC.

(b)     In addition, the following terms used in this Agreement shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 1 hereof.

"**Equity Interests**" means all shares of stock, partnership interests, interests in joint ventures, limited liability company interests and all other equity interests in a Person, whether such stock or interests are classified as Investment Property or General Intangibles under the UCC.

"**Event of Default**" means any Event of Default as defined in the Note.

"**Lender**" has the meaning set forth in the Recitals hereto.

"**Loan Documents**" means the Note and any guaranty, pledge, security agreement, deed of trust, and any other instruments, documents and agreements executed by or on behalf of Grantor or any guarantor and delivered to Lender in connection with the Note.

"**Note**" has the meaning set forth in the Recitals of this Agreement.

"**Pledged Debt**" means the Indebtedness from time to time owed to Grantor, the instruments and certificates evidencing such Indebtedness and all interest, cash or other property

-12-

ELECTRONICALLY FILED

received, receivable or otherwise distributed in respect of or exchanged therefor, including those owned on the date hereof.

"**Pledged Equity**" means all Equity Interests now or hereafter owned by Grantor, including all securities convertible into, and rights, warrants, options and other rights to purchase or otherwise acquire, any of the foregoing, including those owned on the date hereof and set forth on Schedule 3 annexed hereto, the certificates or other instruments representing any of the foregoing and any interest of Grantor in the entries on the books of any securities intermediary pertaining thereto and all distributions, dividends and other property received, receivable or otherwise distributed in respect of or exchanged therefor.

"**Secured Obligations**" has the meaning set forth in Section 2 hereof.

"**Securities Collateral**" means the Pledged Equity, the Pledged Debt and any other Investment Property in which Grantor has an interest.

"**UCC**" means the Uniform Commercial Code, as it exists on the date of this Agreement or as it may hereafter be amended, in the State of California.

*[Remainder of page intentionally left blank]*

ELECTRONICALLY FILED

IN WITNESS WHEREOF, Grantor and Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written.

Address:

1640 Newport Boulevard
Costa Mesa, CA 92627

**GRANTOR:**

RENAISSANCE SURGICAL ARTS AT NEWPORT HARBOR, LLC, a Delaware limited liability company

By:_____
Name:_____
Its_____


Address:

19900 MacArthur Boulevard, Ste. 110
Irvine, CA 92612

**SECURED PARTY:**

PLAZA BANK, a California corporation

By:_____
Name:_____
Its:_____

-14-

#95935.7

**EXHIBITS - 41**

ELECTRONICALLY FILED

SCHEDULE A


Claims

See Attached

EXHIBITS - 42

**ELECTRONICALLY FILED**

SCHEDULE B

**EXHIBITS - 43**

ELECTRONICALLY FILED

# Exhibit "2"

**ELECTRONICALLY FILED**

# PROMISSORY NOTE

$3,650,000.00                                                    February __, 2010

     **FOR VALUE RECEIVED**, RENAISSANCE SURGICAL ARTS AT NEWPORT HARBOR, LLC, a Delaware limited liability company, as maker, having an office at 1640 Newport Boulevard, Costa Mesa, California 92627 (**"Borrower"**), promises to pay PLAZA BANK, a California corporation, as lender (**"Lender"**), or order, at Lender's offices at 19900 MacArthur Boulevard, Suite 110, Irvine, California 92612-8430 or at such other place as Lender designates in writing, the principal sum of THREE MILLION SIX HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($3,650,000.00) (the **"Loan"**) or so much thereof as may be advanced hereunder, payable in lawful money of the United States of America, with interest thereon as set forth herein form the date of this Promissory Note (this **"Note"**) through and including the Maturity Date.  The Loan is being advanced in accordance with the disbursement schedule attached hereto as **Schedule I.**

     This Note is secured by, among other things, that certain Guaranty dated as of the date hereof ("**Guaranty**") and made by the guarantors name therein (the "**Guarantors**") for the benefit of Lender, and that certain Security Agreement, dated as of the date hereof by Borrower, as grantor, in favor of Lender, as secured party (the **"Security Agreement"**).

SECTION 1.  <u>DEFINITIONS</u>.

     Section 1.1  <u>Certain Definitions</u>.  Any capitalized term not defined herein but defined in the Security Agreement shall have the same meaning herein as set forth in the Security Agreement.  In addition, the following terms used in this Note shall have the following meanings:

     (a)  **"Accrued Interest"** means interest which has accrued on the outstanding principal amount of the Loan from time to time at the Applicable Interest Rate and which has not been paid.

     (b)  **"Applicable Interest Rate"** means eight and one-half percent (8-1/2%) per annum, unless the Default Rate is in effect, in which case it shall mean the Default Rate.  Interest shall be compounded monthly, as applicable.

     (c)  **"Borrower"** has the meaning set forth in the introductory paragraph of this Note.

     (d)  **"Debt"** means all amounts, including without limitation the Loan amount and interest thereon, payable pursuant to the Note and all other Loan Documents.

1

(e)    **"Default Interest"** means Accrued Interest accruing from and after the occurrence of an Event of Default.

(f)    **"Default Rate"** means fourteen percent (14%) per annum, compounded monthly (which for purposes of this Note shall mean on the first day of each calendar month).

(g)    **"Event of Default"** has the meaning set forth in **Section 4** of this Note.

(h)    **"Interest Reserve"** has the meaning set forth in **Section 2.5** of this Note.

(i)    **"Lender"** has the meaning set forth in the introductory paragraph of this Note.

(j)    **"Loan"** has the meaning set forth in the introductory paragraph of this Note.

(k)    **"Loan Documents"** means this Note, the Security Agreement, the Guaranty and all other documents evidencing or securing the Debt.

(l)    **"Loan Party"** means Borrower, Guarantors and all other parties liable for performance of any of the non-Lender obligations under the Loan Documents.

(m)    **"Maturity Date"** shall mean the first to occur of (i) February 28, 2013, and (ii) the date on which the Debt becomes due and payable pursuant to the provisions of this Note and or the Security Agreement.

(n)    **"Note"** has the meaning set forth in the second introductory paragraph of this Note.

(o)    **"Payment Date"** has the meaning set forth in **Section 2.2** of this Note.

(p)    **"Security Agreement"** has the meaning set forth in the introductory paragraph of this Note.

SECTION 2.    <u>INTEREST, PAYMENT AND INTEREST RESERVE</u>.

Section 2.1    <u>Accrual of Interest</u>.  Interest shall accrue on the outstanding amount of the Loan from time to time and on any unpaid Accrued Interest at the Applicable Interest Rate from the date hereof until the entire Debt is paid in full.

Section 2.2    <u>Payment of Interest</u>.  Accrued Interest shall be payable by Borrower monthly in arrears (i.e. interest for March, 2010 is due and payable on April 1, 2010) from the proceeds in the Interest Reserve, commencing on the first day of the first full calendar month following the date of this Note and continuing on the first day of each and every successive

2

**EXHIBITS - 46**

month thereafter (each, a **"Payment Date"**) through and including the Payment Date immediately prior to the Maturity Date.  Notwithstanding the foregoing, interest to accrue from the date of first disbursement of principal hereunder through February 28, 2010, both inclusive, shall be paid upon the first disbursement of the proceeds of this Note.  Interest (including without limitation any interest due hereunder at the Default Rate) on unpaid principal shall be computed on the basis of a 360 day year using the actual number of days elapsed in any such year as follows:  the interest rate shall be multiplied by the outstanding principal balance of this Note; the resulting product shall be divided by 360, with the resulting quotient multiplied by the number of days elapsed for the period for which interest is payable.  All payments required to be made herein, shall be made in lawful money of the United States of America.

If any monthly payment due hereunder is not made on or before the 10th day after the date such payment is due, a late payment charge equal to 5% of the delinquent payment shall be due and payable and the interest rate hereunder shall increase to the Default Rate on the entire outstanding principal sum until such monthly payment and all accrued interest is paid.  If the final balloon payment of all outstanding principal and all accrued and unpaid interest and all other sums then due and payable under this Note, and the other Loan Documents is not made on the Maturity Date, a late payment charge equal to 5% of the delinquent payment shall be due and payable and the interest rate hereunder shall increase to the Default Rate on the entire outstanding principal sum and all accrued and unpaid interest thereon effective on the Maturity Date until all outstanding  principal and all accrued and unpaid interest and all other sums then due and payable under this Note and the other Loan Documents are paid in full including, but not limited to, the payment of such increased interest and the late payment charge.  No grace period is provided for the payment of principal and interest due on the Maturity Date.

Whenever a late charge is due under this Note, Borrower acknowledges:  that its failure to timely make the delinquent payment will cause Lender to incur additional expenses and the loss of the use of funds; that it is extremely difficult and impractical to determine such additional expenses and loss of use of funds;  that the late charge represents a fair and reasonable estimate, taking in to account all circumstances existing on the date of this Note, of the additional expenses and the loss of use of funds Lender will incur by reason of such late payment; and that the late charge is in addition to, and not in lieu of, any interest payable at the Default Rate.  Whenever the interest rate hereunder shall increase to the Default Rate, Borrower also acknowledges:  that a delinquent payment or the occurrence of any event of default will materially increase Lender's risk and/or cause Lender to incur additional expenses in servicing and processing the indebtedness evidence by this Note and its loss of the use of the money due; that it is extremely difficult and impractical to determine such additional expenses and loss of use of the money due; that the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Borrower will incur by reason of an occurrence of an event of default and the additional compensation Lender is entitled to received for the increased risks of any nonpayment associated therewith.  The provisions of this paragraph, and the immediately preceding paragraph, are intended to govern only the determination of damages in the event of a breach in the performance of Borrower to make timely payments hereunder or cure an event of default thereunder.  Nothing in this Note shall be construed as in any way giving Borrower the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise.  The right of Lender

to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of Lender to collect such delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents executed by Borrower in favor of Lender with respect to the subject matter hereof, or to declare a default hereunder or under any of the Loan Documents.

Section 2.3    <u>Amortization</u>.    Commencing with the monthly interest payment due October 1, 2010, Borrower shall make monthly payments of principal on each Payment Date in an amount based upon the then current outstanding principal, the then current Applicable Interest Rate and an amortization schedule of seven (7) years all as determined and calculated by Lender.

Section 2.4    <u>Payment at Maturity</u>.    On the Maturity Date, Borrower shall pay to Lender the entire Debt including the outstanding principal sum of the Loan, all unpaid Accrued Interest and all other amounts due under the Loan Documents. Borrower acknowledges that the monthly installments required by the terms of this Note will not amortize the principal sum of the indebtedness by the Maturity Date, resulting in a "balloon payment" on the Maturity Date of the then unpaid principal sum and accrued and unpaid interest thereon.    Lender has made no agreement to refinance such balloon payment.

Section 2.5    <u>Interest Reserve</u>.    Lender shall retain from the proceeds of the Loan an amount equal to One Hundred Fifty-Five Thousand and No/100 Dollars ($155,000.00) (the **"Interest Reserve"**), which shall, on behalf of the Borrower, be used to pay interest on the Loan, <u>provided, however</u>, that the Interest Reserve shall, for all purposes of the Loan, be deemed to have been advanced by the Lender on account of the Loan.  To the extent there are inadequate funds in the Interest Reserve to make payments of interest under the Loan as required hereby, upon notice from Lender Borrower shall immediately replenish the Interest Reserve with an amount adequate to pay interest hereunder for the remainder of the Loan term as determined by Lender. From and after an Event of Default, Lender may apply funds in the Interest Reserve to any portion of the Debt in such order of priority as Lender shall determine in its sole and absolute discretion.

Section 2.6    <u>Account Balance</u>    Borrower acknowledges and agrees that the interest rate and other terms and conditions specified in the Note are conditioned upon Borrower and Guarantors collectively, at all times from and after that date which is ninety (90) days after the date hereof, until the Note is repaid in full, maintaining in one or more deposit accounts established and maintained with Lender on terms and conditions acceptable to Lender ("**Deposit Accounts**") the sum of not less than $1,000,000.00 ("**Required Compensating Balance**"). If at any time Borrower fails to maintain and/or cause Guarantors to maintain the Required Compensating Balance in the Deposit Accounts with Lender, Borrower acknowledges and agrees that Borrower shall pay Lender (in addition to all other amounts otherwise payable under the Note or other Loan Documents) compensating balance fee(s) equal to $15,000.00 per month during the continuance of any such default by Borrower , without any further notice by Lender to Borrower.  Borrower agrees to execute, and cause each applicable Guarantor to execute, any and all ordinary or appropriate documentation requested by the Lender from time to time in order to establish and maintain the Deposit Accounts.

95965.7

**EXHIBITS - 48**

SECTION 3.  PAYMENT.

Section 3.1    Application of Payments.  Except as otherwise expressly provided herein, all payments made hereunder prior to an Event of Default shall be applied, first, to the payment of any late charges and other sums due form Borrower to Lender under the Loan Documents, second, to Accrued Interest, third, to interest then due at the Applicable Interest Rate, and, last, to the outstanding principal.

Section 3.2    Prepayment.  Borrower is permitted to prepay any portion of the Debt at any time prior to the Maturity Date, provided, however, that Borrower pays all Accrued Interest that remains unpaid and all other amounts then due and payable at the time of such prepayment.

SECTION 4.  EVENTS OF DEFAULT.

Section 4.1    Events of Default.  Any one or more of the events or conditions herein below set forth shall constitute an **"Event of Default"** hereunder (without, except as expressly set forth below, any notice, cure or grace period):

(a)    Borrower fails to pay any amount due, as and when required under this Note or any other Loan Document, and the failure continues for a period of ten (10) days (inclusive of the first day such payment was due), except that no grace or cure period shall apply to payment of any amounts due on the Maturity Date.

(b)    Borrower shall fail to pay the entire Debt or any portion thereof on the Maturity Date.

(c)    Any other event of default or breach occurs hereunder including, without limitation, any breach or violation of the provisions of **Section 5** hereof.

(d)    If, without the prior written consent of Lender, which shall not unreasonably be withheld or delayed, any direct or indirect ownership interest in Borrower is transferred, sold, encumbered or conveyed which is, in the aggregate (when combined with all then current and prior transfers (such prior transfers only including those from and after the date hereof)), in excess of twenty-five percent (25%) of the direct and indirect interests in Borrower. Notwithstanding the foregoing, sales of additional previously untransferred interests in Borrower to medical providers shall not be included in the foregoing calculations or require the consent of Lender but shall require prior delivery of written notification to Lender.

(e)    If Borrower files, cooperates in the filing, or has filed against it any bankruptcy, insolvency, assignment for the benefit of creditors or similar proceeding or Borrower admits its inability to pay its debts as they become due.

(f)    If any representation or warranty of Borrower or any guarantor, made herein or any other Loan Documents, or in any certificate, report financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made; or

95965.7

(g)    There occurs any other default or event of default by Borrower, any Guarantor or any other non Lender party under any of the other Loan Documents.

Section 4.2    <u>Acceleration and Remedies</u>.  If an Event of Default occurs, Lender may declare all or any portion of the Debt to be immediately due and payable and exercise any of the remedies set forth in any of the Loan Documents and under applicable law; provided that if any of the events referred to **Section 4.1(e)** hereof shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

Section 4.3    <u>Enforcement Costs</u>.  Borrower shall reimburse Lender for any and all costs and expenses, including attorneys' fees and costs, incurred by Lender in taking any action to collect otherwise enforce this Note against Borrower or any other person who is or may become liable hereon.  All such costs and expenses shall be repayable to Lender on demand, with interest at the Default Rate form the date incurred by Lender to the date paid.

Section 4.4    <u>Remedies Cumulative</u>.  No remedy or right of the Lender hereunder, under any of the Loan Documents or otherwise available under applicable law or in equity, shall be exclusive of any other right or remedy.  Each such remedy or right shall be in addition to every other remedy or right now or hereafter existing under applicable law or in equity.  Every remedy or right may be exercised concurrently or independently and when and as often as may be deemed necessary or appropriate by Lender in its sole and absolute discretion.

Section 4.5.    <u>Lender's Discretion in Applying Payments</u>.  From and after the occurrence of any Event of Default, Lender may apply any amounts paid hereunder or recovered pursuant to the Loan Documents to any portion of the Debt in such order of priority as Lender shall determine in its sole and absolute discretion.

SECTION 5.    <u>WAIVERS/REPRESENTATIONS AND WARRANTIES/COVENANTS</u>.

(a)    Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind except for notices expressly and specifically required to be given by Lender under the terms of the Loan Documents.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or the other Loan Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the Debt, under this Note, or the other Loan Documents.

(b)    Borrower represents, warrants and covenants that (i) the indebtedness evidenced by this Note is being obtained for the purpose of acquiring and carrying on a business or commercial enterprise, (ii) all proceeds of such indebtedness will be used solely in connection with such business or commercial enterprise, and (iii) the proceeds of such indebtedness will not be used for the purchase of registered equity securities within the purview of Regulation "U" issued by the Board of Governors  at the Federal Reserve System.

6

(c)     Borrower represents, warrants, and covenants for so long as the Note remains unpaid in full, Borrower shall not do any of the following:  (a) engage in any business or activity other than those set forth in its Certificate of Formation and Operating Agreement; (b) do any act which would make it impossible to carry on the ordinary business of Borrower; (c) borrow money or incur any indebtedness or assume or guaranty any indebtedness of any other entity other than normal trade accounts and lease obligations incurred in the ordinary course of business; (d) dissolve or liquidate, in whole or in part; (e) consolidate or merge with or into any other entity or convey or transfer or lease its property and assets substantially as an entirety to any entity; (f) institute proceedings to be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceeding against it, or file a petition seeking or consenting to reorganization or relief under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Borrower or a substantial part of property of Borrower, or make any assignment for the benefit of creditors, or admit in writing its inability to pay its debts generally as they become due, or take company action in furtherance of any such action; or (g) amend the Articles of Organization of Borrower.

(d)     In addition Borrower shall:  (a) maintain books and records and bank accounts separate from those of any other person or entity; (b) maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets; (c) hold itself out to creditors and the public as a legal entity separate and distinct from any other entity; (d) hold regular manager and member meetings, as appropriate, to conduct the business of Borrower, and observe all other legal formalities; (e) prepare separate tax returns and financial statements, or if part of a consolidated group, then it will be shown as a separate member of such group; (f) allocate and charge fairly and reasonably any common employee or overhead shared with affiliates; (g) transact all business with affiliates on an arm's-length basis an pursuant to enforceable agreements; (h) conduct business in its own name; (i) not commingle its assets or fund with those of any other person; and (j) not assume, guaranty or pay the debts or obligations or any other person.

(e)     Borrower shall deliver to Lender: (a) copies of its fiscal year end financial statements, which have been reviewed by Borrower's Certified Public Accountant, not later than 120 days after the end of each fiscal year, (b) copies of Borrower's internally prepared monthly financial statements not later than 30 days after the end of each calendar month, and (c) copies of Borrower's annual state and Federal tax returns not later than 30 days after the same are filed. The above described financial statements shall be in a form acceptable to Lender.

(f)     Borrower shall at all times during the Loan term: (a) maintain an average cash monthly deposit account balance with Lender of at least $1,000,000.00 on or after 90 days after the date hereof, (b) maintain a Tangible Net Worth of at least $3,000,000.00, (c) maintain maximum debt in relation to its Tangible Net Worth of 3.00:1, (d) and a Debt Service Coverage Ratio of 1.50:1, and (e) maintain a verified liquidity (when combined with the verified liquidity of one or more Guarantors) of at least $4,600,000.00.   The requirements set forth in the preceding clauses (b), (c) and (d) shall be measured quarterly with the first such measurement being June 30, 2010.  The requirements set forth in the preceding clause (e) shall be measured annually with the first such measurement being January 31, 2011.  As used herein, "**Tangible Net Worth**" means, as of a given date, Borrower's net worth calculated in conformance with

GAAP by subtracting total liabilities from total tangible assets. As used herein, "Debt Service Coverage Ratio" means, as to a specific period, the ratio of (x) cash flow from Borrower's operations available for debt service, to (y) the principal and interest that would be due and payable under the Note based on the then current Applicable Interest Rate and amortization schedule, if applicable, all as determined by Lender in its sole discretion.

(g)    Notwithstanding anything to the contrary herein or in any other Loan Document, provided no Event of Default has occurred hereunder, Borrower shall be permitted to pay a management fee with respect to Borrower's business operations to Renaissance Surgical Arts Management at Newport Harbor, LLC pursuant to that certain Management Services Agreement dated July 9, 2007 (i) in an amount not to exceed $150,000.00 for the first year of the term thereunder, and (ii) six percent (6%) of profits as described therein after the first year however in no event to exceed $500,000.00 in any year after the first year of the term.

SECTION 6.    MISCELLANEOUS.

Section 6.1    Principles of Construction. The following principles of construction shall apply to this Note:

(a)    The titles and headings of the Sections and subsections of this Note have been inserted for convenience of reference only and are not intended so summarize or otherwise describe the subject matter of such Sections and subsections and shall not be given any consideration in the construction of this Note.

(b)    All references to Sections and Exhibits are to Sections and Exhibits in or to this Note unless otherwise specified. Any reference to "this Section" in this Note shall mean the Section in which such reference appears, and shall also be deemed to refer to the subsections contained in such Section.

(c)    Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Note, shall refer to this Note as a whole and not to any particular provisions of this Note.

(d)    The words "includes", "including" and similar terms shall be construed as if followed by the words "without limitation."

(e)    Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

(f)    Definitions contained in this Note or any other Loan Document which identify documents, including this Note or any other Loan Document, shall be deemed to include all amendments thereto.

(g)    Any reference in the Loan Documents to successors or assigns shall not be construed to imply any consent or approval by Lender of any such succession or assignment.

8

(h)    Borrower acknowledges and agrees that this Note and the other Loan Documents shall not be construed more strictly against the Lender because the Lender or its legal counsel was the primary draftsperson of this Note or such other Loan Document, as the case may be.

Section 6.2    <u>Successors and Assigns</u>.  This Note shall inure to the benefit of Lender and its successors and assigns and shall be binding upon Borrower and its successors and assigns.

Section 6.3    <u>Legal Tender of United States</u>.  All payments hereunder shall be made in coin or currency which at the time of payment is legal tender in the United States of America for public and private debts.

Section 6.4    <u>Time is of the Essence</u>. Time is of the essence in the performance by Borrower of its obligations under this Note.

Section 6.5    <u>Notices</u>. Any notice, request, demand, statement, authorization, approval, consent or acceptance made hereunder shall be in writing and shall be given in accordance with the Security Agreement.

Section 6.6    <u>Entire Agreement</u>. This Note, together with the other Loan Documents, constitutes the entire agreement of Borrower for the benefit of the Lender with respect to the subject matter hereof and supersedes any prior agreements with respect to the subject matter hereof.

Section 6.7    <u>No Modification Without Writing</u>. This Note may not be terminated or modified in any way nor can any right of Lender or any obligation of Borrower be waived or modified, except by a writing singed by Lender and Borrower.  In no event shall any course of dealing by Lender, or the failure or delay by Lender in enforcing any provision hereof, or any action or inaction on the part of Lender, be construed or deemed a waiver by Lender of any of its rights and remedies hereunder or at law.

Section 6.8    <u>Severability</u>. Each provision of this Note shall be interpreted so as to be effective an valid under applicable law, but if any provision of this Note shall in any respect be ineffective, unenforceable or invalid under such law, such ineffectiveness, unenforceability or invalidity shall not affect the remainder of such provision or the remaining provisions of this Note.

Section 6.9    <u>Cumulative.</u>  The obligations of Borrower hereunder are in addition to any other obligations Borrower may now or hereafter have to Lender.

Section 6.10    <u>Facsimile and Photocopy</u>.  Lender and Borrower hereby agree that any facsimile or photocopy signature on any Loan Document or on any  notice, document or other certificate delivered pursuant to the Loan Documents shall be deemed to have the same force and effect as an original signature, and to the fullest extent permitted by applicable law may be used in lieu of an original signature to evidence the execution and deliver of the document, certificate or instrument to which such facsimile or photocopy signature is attached.

9

Section 6.11   GOVERNING LAW.  THE LOAN WILL BE MADE BY LENDER IN THE STATE OF CALIFORNIA, AND THE PROCEEDS OF THE LOAN WILL BE DISBURSED FROM THE STATE OF CALIFORNIA, WHICH STATE LENDER AND BORROWER AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (EXCLUDING APPLICATION OF ANY PRINCIPLE OF CONFLICT OF LAWS WHICH WOULD DIRECT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.   TO THE FULLEST EXTENT PERMITTED BY LAW OR NOT PROHIBITED BY LAW, THE UNDERSIGNED HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

Section 6.12   JURISDICTION.

(a)   SUIT BY BORROWER.  BORROWER HEREBY AGREES THAT ANY LEGAL SUIT, ACTION OR PROCEEDING BROUGHT BY BORROWER OR ANY AFFILIATE THEREOF AGAINST LENDER AND/OR SERVICER (OTHER THAN COMPULSORY COUNTERCLAIMS PERMITTED HEREUNDER IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING COMMENCED BY LENDER IN A JURISDICTION OUTSIDE OF CALIFORNIA) ARISING OUT OF OR RELATING TO THE LOAN, THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS OR RELATING TO THE PROJECT SHALL ONLY BE INSTITUTED BY BORROWER OR ANY AFFILIATE THEREOF IN COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF ORANGE, CALIFORNIA OR THE UNITED STATES DISTRICT COURT LOCATED IN THE COUNTY OF ORANGE, CALIFORNIA.  BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED OR NOT PROHIBITED BY APPLICABLE LAW, ANY RIGHT TO BRING ANY LEGAL OR EQUITABLE SUIT, ACTION OR PROCEEDING AGAINST LENDER AND/OR SERVICER ARISING OUT OF OR RELATING TO THE LOAN, THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS OR RELATING TO THE PROJECT IN ANY OTHER COURT OTHER THAN COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF ORANGE, CALIFORNIA, OR THE UNITED STATES DISTRICT COURT LOCATED IN THE COUNTY OF ORANGE, CALIFORNIA.

(b)   SUIT BY LENDER.  WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THE OTHER LOAN DOCUMENTS, BORROWER (I) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA AND THE UNITED STATES DISTRICT COURT LOCATED IN THE COUNTY OF ORANGE, CALIFORNIA, (II) AGREES THAT ALL SUCH CLAIMS OR ACTIONS MAY BE HEARD AND DETERMINED IN SUCH COURTS OF THE STATE OF CALIFORNIA OR, TO THE

EXTEND PERMITTED OR NOT PROHIBITED BY LAW, IN SUCH FEDERAL COURT AND (III) IRREVOCABLY WAIVES ANY (A) OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE BROUGHT IN ANY SUCH COURT AND (B) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS NOTE WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

(c)    PROCESS.  BORROWER WILL MAINTAIN AN AGENT FOR SERVICE OF PROCESS IN THE STATE OF CALIFORNIA AND GIVE PROMPT NOTICE TO LENDER OF THE ADDRESS AND THE NAME THEREOF AND THE NAME AND ADDRESS OF ANY NEW AGENT APPOINTED BY IT.  BORROWER FURTHER AGREES THAT THE FAILURE OF ITS AGENT FOR SERVICE OF PROCESS TO GIVE IT NOTICE OF ANY SERVICE OF PROCESS WILL NOT IMPAIR OR AFFECT THE VALIDITY OF SUCH SERVICE OR OF ANY JUDGMENT BASED THEREON.  IN ADDITION, BORROWER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT ITS ADDRESS GIVEN OR REFERRED TO IN THE SECURITY AGREEMENT.

Section 6.13    USURY LAW.

(a)    ACKNOWLEDGMENT    AND    WAIVER.    BORROWER ACKNOWLEDGES AND AGREES THAT ALL AMOUNTS PAYABLE UNDER THE LOAN DOCUMENTS FORM AN INTEGRAL COMPONENT OF THE DEBT AND PAYMENT OF THE SAME IS A MATERIAL INDUCEMENT TO LENDER TO MAKE THE LOAN AND ENTER INTO THE LOAN DOCUMENTS, AND THAT LENDER WOULD NOT BE WILLING TO MAKE THE LOAN AND ENTER INTO THE LOAN DOCUMENTS BUT FOR BORROWER'S AGREEMENT TO PAY THE ENTIRE DEBT PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.  BORROWER FURTHER ACKNOWLEDGES AND AGREES THAT THE PAYMENT OF THE ENTIRE DEBT IS FAIR AND REASONABLE IN LIGHT OF THE SIZE OF THE RISK TAKEN BY LENDER AND THAT PAYMENT OF THE ENTIRE DEBT OR ANY COMPONENT THEREOF WILL NOT VIOLATE APPLICABLE USURY LAWS. WITHOUT LIMITING THE FOREGOING, BORROWER HERBY WAIVES ANY RIGHT OR DEFENSE IT MAY HAVE TO THE PAYMENT OF THE DEBT OR ANY PORTION THEREOF BASED ON ANY USURY, PENALTY OR OTHER SIMILAR LAWS OR EQUITABLE PRINCIPLES.

(b)    MAXIMUM LAWFUL RATE.    WITHOUT LIMITING THE ABOVE, THIS NOTE AND EACH OF THE OTHER LOAN DOCUMENTS IS SUBJECT TO THE EXPRESS CONDITION THAT AT NO TIME SHALL BORROWER OR ANY OTHER LOAN PARTY BE OBLIGATED OR REQUIRED TO PAY ANY AMOUNT UNDER THE LOAN DOCUMENTS INCLUDING ANY INTEREST ON THE PRINCIPAL BALANCE OF THE LOAN AT A RATE IN EXCESS OF THE MAXIMUM INTEREST RATE WHICH BORROWER OR SUCH LOAN PARTY IS PERMITTED BY APPLICABLE LAW TO CONTRACT OR AGREE TO PAY.  IN DETERMINING WHETHER OR NOT THE

11

INTEREST OR ANY OTHER AMOUNT PAID OR PAYABLE UNDER THE LOAN DOCUMENTS EXCEEDS THE MAXIMUM RATE PERMITTED UNDER APPLICABLE LAW (A) BORROWER OR SUCH LOAN PARTY AND LENDER SHALL TO THE EXTENT PERMITTED UNDER APPLICABLE LAW CHARACTERIZE ANY NON-PRINCIPAL PAYMENT, AS A FEE, PREMIUM OR EXPENSE RATHER THAN INTEREST, AND (B) ALL SUMS PAID OR AGREED TO BE PAID TO LENDER FOR THE USE, FORBEARANCE, OR DETENTION OF THE DEBT, SHALL, TO THE EXTENT PERMITTED BY APPLICABLE LAW, BE AMORTIZED, PRORATED, ALLOCATED, AND SPREAD THROUGHOUT THE FULL STATED TERM OF THE LOAN UNTIL PAYMENT IN FULL SO THAT THE RATE OR AMOUNT OF INTEREST ON ACCOUNT OF THE DEBT DOES NOT EXCEED THE MAXIMUM LAWFUL RATE OF INTEREST.  IF BY THE TERMS OF THE LOAN DOCUMENTS, BORROWER OR SUCH LOAN PARTY IS AT ANY TIME REQUIRED OR OBLIGATED TO PAY ANY AMOUNT UNDER THE LOAN DOCUMENTS INCLUDING INTEREST ON THE PRINCIPAL BALANCE DUE UNDER THE LOAN AT A RATE IN EXCESS OF SUCH MAXIMUM RATE, SUCH INTEREST SHALL BE DEEMED TO BE IMMEDIATELY REDUCED TO SUCH MAXIMUM RATE AND ALL PREVIOUS PAYMENTS IN EXCESS OF THE MAXIMUM RATE SHALL BE DEEMED TO HAVE BEEN PARTIAL PREPAYMENTS (WHETHER OR NOT PERMITTED OR PROHIBITED UNDER THE LOAN DOCUMENTS) IN REDUCTION OF PRINCIPAL AND NOT ON ACCOUNT OF THE INTEREST DUE.

Section 6.14   <u>WAIVER OF JURY TRIAL</u>. EACH   BORROWER   AND   LENDER HERBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THAT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THE PROJECT, THIS NOTE, ANY OF THE OTHER LOAN DOCUMENTS OR THE SENIOR LOAN DOCUMENTS.  BORROWER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE LENDER TO ENTER INTO THIS NOTE AND THE LOAN DOCUMENTS, AND THAT THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF THE OTHER LOAN DOCUMENTS AS   FULLY INCORPORATED THEREIN.

Section 6.15   <u>Absolute Obligations</u>.  Borrower is and shall be obligated to pay principal, interest and any and all other amounts which become payable hereunder or under the other loan documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff.  In the event that at any time any payment received by the holder hereof shall be deemed by a court of competent jurisdiction to have been a voidable preference of fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return of such payment to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

Section 6.16   <u>Modifications</u>.  No extension of the time for the payment of this Note or any installment hereof made by agreement by the holder hereof with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect

12

ELECTRONICALLY FILED

the original liability under this Note, either in whole, or in part, of the Borrower or any successor, transferee or assign of Borrower or any Guarantors or endorsers.

Section 6.17  <u>Attorney's Fees</u>.  If at any time or times hereafter Lender employs counsel for advice with respect to a default by the undersigned, or Guarantor, if any, of this Note, or any other loan documents, or to intervene, file a petition, answer, motion or other pleading in any suit or proceeding relating to this Note, or any other loan documents, or to attempt to collect this Note from or to enforce this Note or any other loan documents against the undersigned or any other person or entity obligated for the payment or performance of this Note, then in any of such events, all of the attorneys' fees arising from such services and all expenses, costs and charges relating thereto, shall be additional indebtedness owing hereunder by the undersigned to the Lender of this Note payable on demand.

Section 6.18  <u>Counsel</u>.   Borrower hereby represents and warrants to Lender that Borrower has had the opportunity to consult and confer with competent legal counsel of its choice before executing this Note.  Borrower further represents and warrants to Lender that Borrower has read and understood the terms of this Note and intends to be bound hereby.

Section 6.19  <u>Consent</u>.  Except as otherwise herein expressly provided, whenever the consent or approval of Lender is required under this Note, the Lender has the right, in its absolute to discretion, to withhold or refuse to give such consent or approval.

Section 6.20  <u>Authority</u>. Borrower, and each person executing this Note on Borrower's behalf, hereby represents and warrants to Lender that:  (a) by its execution below, Borrower has the full power, authority, and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Borrower without exception or limitation, and (b) Borrower is not a "Foreign Person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department Regulations, including temporary regulations.  Borrower represents and warrants that its current tax identification number is 30-0502223.

*[Remainder of page intentionally left blank]*

13

**ELECTRONICALLY FILED**

**IN WITNESS THEREOF,** Borrower has executed and delivered this Note as of the date first above written.

**BORROWER**

RENAISSANCE SURGICAL ARTS AT
NEWPORT HARBOR, LLC, a Delaware limited
liability company


By:_____

Name:_____

Its:_____

14

## <u>SCHEDULE I</u>

### **Disbursement Schedule**

1.  $2,850,000 to Amy Thompson and Steven H. Gardner, Co-Trustees of the Dan/Wil 2003 Irrevocable Trust, John D. Delong and Judith Delong, Trustees of the Delong Family Trust utd May 20, 2005, William E. Broza and Victoria Korporaal.

2.  $512,015.29 to Pacific Coast National Bank or its successor in interest

3.  $155,000  to Plaza Bank Interest Reserve

4.  $57,000 to American Realty Advisors

5.  $27,375 to Plaza Bank for Loan fee

6.  11,318.80 for legal fees

7.  $350 for document fees

8.  $36,940.91 to Borrower.

95965.7

**EXHIBITS - 59**

**ELECTRONICALLY FILED**

# Exhibit "3"

## SUBORDINATION AND STANDSTILL AGREEMENT

**THIS SUBORDINATION AND STANDSTILL AGREEMENT** (this "**Agreement**") is made this _____ day of February, 2010, by and among PLAZA BANK**,** a California corporation (together with its successors and assigns, hereinafter referred to as the "**Senior Lender**"), CONGERO DEVELOPMENT, LLC**,** a Delaware limited liability company, (hereinafter referred to as the "**Junior Lender**"), and RENAISSANCE SURGICAL ARTS AT NEWPORT HARBOR, LLC, a Delaware limited liability company (hereinafter referred to as the "**Borrower**").

## RECITALS

A.      In connection with work performed in the construction of an ambulatory surgical center Borrower is indebted to Junior Lender in the amount of approximately $1,200,000.00. Such amount as may hereafter be increased or decreased shall be referred to herein as the "**Junior Loan**." As of the date hereof, the Junior Loan is not evidenced by a written note. To the extent the Junior Loan is now or hereafter evidenced by a note or other document such shall be referred to herein as the "**Junior Note**", and any other documents and agreements executed or delivered in connection therewith, whether now or hereafter existing are referred to herein, together with the Junior Note, as the "**Junior Loan Documents**").

B.      On or about February \_\_\_, 2010, Borrower executed a Promissory Note (as the same may be from time to time amended, the "**Senior Note**") in the principal sum of $3,650,000.00 dated February \_\_\_, 2010 in favor of Senior Lender, payable with interest and upon the terms and conditions described therein, evidencing, together with all other amounts due and payable under other Senior Loan Documents (as hereinafter defined), a loan (the "**Senior Loan**"), which Senior Note is secured by, among other things, a Security Agreement (as the same may be hereafter amended, extended, restated, supplemented, increased, consolidated, renewed or otherwise modified or replaced from time to time, the "**Senior Security Agreement**") covering the property more particularly described therein, and all other personal and other property described in the Senior Security Agreement (collectively, the "**Property**"), and a certain Loan Guaranty made by  the guarantors named therein ("**Guarantors**") in favor of Senior Lender of even date herewith (the "**Senior Guaranty**").

C.      Senior Lender has agreed to make the Senior Loan only if the Junior Lender agrees to subordinate the Junior Loan and Junior Loan Documents to the Senior Loan and the Senior Loan Documents pursuant to the terms and conditions of this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing true and correct recitals and other good and valuable consideration, Senior Lender, Junior Lender and Borrower hereby covenant and agree as follows:

# ARTICLE 1

## DEFINED TERMS

**Section 1.1    Definitions.**    All terms not defined in this Agreement shall have the meaning as set forth in the Senior Security Agreement. The following terms shall have the meanings herein specified unless the context otherwise requires (such meanings to apply to such terms in both the singular and plural forms):

"**Affiliate**" means any Person directly or indirectly controlling, controlled by or under common control with Borrower or any Guarantor.

"**Agreement**" means this Subordination and Standstill Agreement among the Senior Lender, the Junior Lender and Borrower, as the same may be amended from time to time by the parties.

"**Enforcement Action**" means the commencement of the exercise of any remedies against Borrower and/or any Guarantor, including, without limitation, the commencement of any litigation or proceeding, including the commencement of any foreclosure proceeding, the exercise of any power of sale, the sale by advertisement, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against, or the taking of possession or control of, any of the Property and/or the Junior Collateral.

"**Insolvency Proceeding**" means any proceeding under Title 11 of the United States Code (11 U.S.C. Sec. 101 et. seq.) or any other insolvency, liquidation, reorganization or other similar proceeding concerning Borrower, any action for the dissolution of Borrower, any proceeding (judicial or otherwise) concerning the application of the assets of Borrower, for the benefit of its creditors, the appointment of or any proceeding seeking the appointment of a trustee, receiver or other similar custodian for all or any substantial part of the assets of Borrower or any other action concerning the adjustment of the debts of Borrower, the cessation of business by Borrower, except following a sale, transfer or other disposition of all or substantially all of the assets of Borrower in a transaction permitted under the Senior Loan Documents.

"**Junior Collateral**" shall mean any and all collateral for the Junior Loan.

"**Junior Indebtedness**" shall mean, collectively, all of the indebtedness, liabilities and obligations of the Borrower due or to become due pursuant to the Junior Loan Documents, including interest thereon, all loan fees pertaining thereto, and any other amounts, fees, charges or expenses of any kind payable in respect thereof or in connection therewith (also referred to herein in some instances as the "Junior Loan").

"**Person**" means any individual, corporation, trust, trustee, partnership, unincorporated association, government, governmental agency, or court or other authority, including without limitation, any officer appointed by any court or other authority.

"**Plan Voting Rights**" means, with respect to any Person, the rights of such Person to vote to approve or reject any plan of reorganization in respect of the Borrower in an Insolvency Proceeding.

**"Senior Indebtedness"** shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Note and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, all future advances, fees, charges, attorneys' fees and expenses (also referred to herein in some instances as the "Senior Loan").

**"Senior Loan Documents"** shall mean the Senior Note, the Senior Security Agreement, the Senior Guaranty and any and all other instruments, documents and agreements now or hereafter evidencing, securing or relating to the Senior Indebtedness, as the same may be amended from time to time.

Any other terms defined in the recitals of this Agreement shall have the definitions as set forth in such recitals.

**ARTICLE 2**

**SUBORDINATION: STANDSTILL: PAYMENTS**

**Section 2.1    Subordination.**    The Junior Lender hereby agrees that the Junior Indebtedness is and shall be subordinate, to the extent and in the manner hereinafter set forth, to the prior indefeasible payment in full of the Senior Indebtedness.  The subordination of the Junior Loan to the Senior Loan shall be irrespective of (a) the validity of any security interest or mortgage of either Junior Lender or Senior Lender, (b) whether and in what order the security interests of the Junior Lender and Senior Lender are or were perfected or the timing of recording of any mortgages or the filing of any liens or financing statements, (c) provisions of applicable law, or (d) which of Junior Lender or Senior Lender may have possession of any collateral.

Notwithstanding the foregoing, Junior Lender and Senior Lender agree as follows:

(i)    Prior to the date upon which the Senior Loan is indefeasibly paid in full, Junior Lender may not receive any payments on the Junior Indebtedness.

(ii)    Except with respect to (a) payments of permitted management fees pursuant to the terms of the Senior Note, (b) payments in the ordinary course of business to vendors in which Junior Lender may have an ownership interest, and (c) distributions in the ordinary course of operations of an entity to Junior Lender, or its affiliates, in their capacity as shareholder, partner or member of such entity, in the event Junior Lender receives any payment or other distribution of any kind or character directly or indirectly from the Borrower or the Property prior to the satisfaction in full of the Senior Loan, such payment or other distribution shall be received and shall be held by Junior Lender in trust for Senior Lender and promptly turned over by Junior Lender to Senior Lender.  Junior Lender shall execute such further documents or instruments and take such further action as the Senior Lender may reasonably require from time to time to carry out the intent of this Agreement.

**Section 2.2    Standstill: Limitation on Junior Lender Rights.**

(a)      Notwithstanding Junior Lender's rights under applicable law or any provision of the Junior Loan Documents to the contrary, the Junior Lender hereby acknowledges and agrees that Junior Lender shall <u>not</u> (A) accelerate payment of the Junior Loan or any portion thereof, (B) declare a default under any of the Junior Loan Documents, nor collect default interest thereunder or (C) take any Enforcement Action, regardless of the maturity date of the Junior Loan, until, in any such case ninety-one (91) days following the satisfaction in full of the Senior Indebtedness.  Junior Lender hereby waives any right it may have to require that the Senior Lender marshal any assets of Borrower or any Guarantor in favor of the Junior Lender and the Junior Lender agrees that it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any of the Property, Junior Collateral or the proceeds therefrom that is or may be prior to any of the Senior Loan Documents.

(b)      Until the earlier of (i) ninety-one days following the satisfaction in full of the Senior Indebtedness or (ii) ninety-one days following the acquisition of the Senior Indebtedness by the Junior Lender, the Junior Lender hereby covenants and agrees that it will not acquiesce, petition or otherwise invoke or cause any other Person to invoke the process of the United States of America, any state or other political subdivision thereof or any other jurisdiction, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government for the purpose of commencing or sustaining a case against Borrower or any Guarantor, under a Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Borrower or all or any part of its property or assets or ordering the winding-up or liquidation of the affairs of Borrower.

**Section 2.3     <u>Non-Interference by Junior Lender</u>.**    Until such time as the Junior Lender is permitted to take an Enforcement Action in accordance with the terms of <u>Section 2.2</u>, the Junior Lender shall not institute any judicial or administrative proceeding against Borrower, the Junior Collateral, any Guarantor or the Senior Lender with respect to the Junior Indebtedness which directly or indirectly would interfere with or delay the exercise by the Senior Lender of its rights and remedies in respect of the Property or any part thereof or under the Senior Loan Documents or this Agreement. Without limiting the generality of the foregoing, in the event of a bankruptcy or insolvency of Borrower, the Junior Lender shall not object to or oppose any efforts by the Senior Lender to obtain relief from the automatic stay under Section 362 of the United States Bankruptcy Code or to seek to cause such entity's bankruptcy estate to abandon the Property (or any portion thereof) that is subject to the Senior Security Agreement.

**Section 2.4     <u>Assignment of Voting Rights</u>.**    The Junior Lender hereby absolutely, irrevocably and unconditionally assigns and sets over to the Senior Lender all of the Junior Lender's Plan Voting Rights in any Insolvency Proceeding respecting Borrower.

**Section 2.5     <u>Distributions Held in Trust</u>.**    Except as provided in section 2.1 (ii) above, if the Junior Lender (solely in its capacity as Junior Lender) shall receive any payments on the Junior Loan or any cash distributions in respect of, or other proceeds of, the Property and/or Junior Collateral (including, without limitation, (i) any distribution arising directly or indirectly from any lien of the Senior Lender being avoided, declared to be fraudulent, or otherwise set aside under the provisions of any law governing fraudulent conveyances or transfers, and (ii) any distribution arising directly or indirectly by reason of or in connection with

an Insolvency Proceeding), prior to the indefeasible payment in full of the Senior Loan, the Junior Lender shall hold the same in trust, as trustee, for the benefit of the Senior Lender and shall promptly deliver the same to or at the direction of the Senior Lender, for the benefit of the Senior Lender in precisely the form received (except for the endorsement or assignment thereof by such Junior Lender without recourse or warranty), it being understood that it is the intention of the parties that until the Senior Indebtedness (without regard to any modifications thereof arising by reason of or in connection with an Insolvency Proceeding) is repaid in full, the Senior Lender shall receive all proceeds relating to any realization upon, distribution in respect of or interest in any of the Property and/or Junior Collateral as and to the extent set forth in the Senior Loan Documents. In the event the Junior Lender fails to make any such endorsement or assignment, the Senior Lender, or any of its officers or employees, is hereby irrevocably authorized to make the same.

Section 2.6    **Disposition of Assets of Borrower.**    The Junior Lender agrees that any disposition by the Senior Lender of the assets of Borrower, whether by collection, sale, or other manner of liquidation, after a default by Borrower shall be conclusively presumed to be commercially reasonable and may not be challenged or contested by the Junior Lender on the ground of commercial unreasonableness. In this regard and without limiting the foregoing, the Senior Lender may (a) use such means of collection and exercise such diligence with respect thereto as the Senior Lender, in its discretion, deems appropriate under the circumstances, and (b) enter into such compromise with and give such releases and acquittances to account debtors or other obligors on Borrower's accounts, without obtaining the agreement or concurrence of or giving prior notice to the Junior Lender, and the Junior Lender hereby waives all right to require that its agreement or consent be obtained or that it be given notice.

Section 2.7    **Release of Liens by Junior Lender.**    Junior Lender agrees that in the event of any sale or other disposition of any of the assets of Borrower, whether by Borrower or by the Senior Lender, if the Senior Lender agrees to such sale or other disposition, the Junior Lender shall: (a) have no right to object to the sale or other disposition of such assets or withhold or delay its consent, if such consent is required for the sale or other disposition of such assets; and (b) upon the request of the Senior Lender, provide all necessary releases of security interests and liens held by the Junior Lender necessary in order to accomplish such sale or other disposition free and clear of all security interests and liens of the Junior Lender, all without any consideration or payment to the Junior Lender, unless the proceeds from such sale are applied to repay the Senior Indebtedness in full, in which event any proceeds in excess of the amount used to repay the Senior Indebtedness in full shall be paid to the Junior Lender if the Junior Lender had a security interest or lien in such assets subject only to the prior security interest or lien of the Senior Lender and such proceeds are not required by applicable law to be paid to any other party.

Section 2.8    **Amendments to Loan Documentation.**

(a)    Notwithstanding any provision in the Junior Loan Documents, the Senior Lender shall have the right to enter into, execute and agree to modify, amend, consolidate, spread, restate or waive any provision of the Senior Loan Documents without obtaining the consent of the Junior Lender; provided, however, the maturity date of the Senior Loan may not be extended by more than 24 months.

5

(b)    The Senior Lender shall deliver to the Junior Lender, within five (5) business days of written request by Junior Lender, copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by the Senior Lender).

(c)    Notwithstanding any provision in the Senior Loan Documents, the Junior Lender shall have the right to enter into, execute and agree to modify, amend, consolidate, spread, restate or waive any provision of the Junior Loan Documents without obtaining the consent of the Senior Lender, provided no such modification, amendment, consolidation, spreader, restatement or waiver shall (i) increase the principal amount secured by the Junior Loan, (ii) increase the interest rate payable under the Junior Loan, (iii) provide for the payment of any additional interest, kicker or similar equity feature, (iv) modify the maturity date of the Junior Loan, (v) spread the lien of the Junior Loan to encumber any additional collateral, or (vi) cross-default the Junior Loan with any other indebtedness. Notwithstanding the foregoing, any amounts funded by the Junior Lender under the Junior Loan Documents as a result of (A) the making of any protective advances or other advances by Junior Lender expressly permitted by the terms of the Junior Loan Documents and this Agreement, or (B) interest accruals or accretions and any compounding thereof (including default interest) shall not at any time be deemed to contravene this <u>Section 2.8(c)</u>.

(d)    The Junior Lender shall deliver to the Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Junior Loan Documents, respectively (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by the Junior Lender) within five (5) business days after any of such applicable instruments have been executed by the Junior Lender, as applicable.

**Section 2.9    <u>Insurance Proceeds and Condemnation Awards</u>**.  In the event of a casualty to the buildings or improvements constructed on any portion of the Property or a condemnation or taking under a power of eminent domain of all or any portion of the Property, the buildings or improvements thereon, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "Award").   Awards made available to Borrower for the repair or restoration of the Property shall not be subject to attachment by Junior Lender.

**Section 2.10    <u>Bankruptcy of Borrower.</u>**  In the event of any dissolution, winding-up, liquidation, readjustment, reorganization or other similar proceedings relating to Borrower, Borrower's creditors, or to Borrower's property (whether voluntary or involuntary, partial or complete, and whether in bankruptcy, insolvency or receivership, or upon an assignment to benefit creditors, or any other marshaling of the assets and liabilities of Borrower, or any sale of all or substantially all of the assets of Borrower, or otherwise), the Senior Loan shall first be paid in full before Junior Lender shall be entitled to receive and to retain any payment or distribution with respect to the Junior Note.

## ARTICLE 3

## NOTICE OF DEFAULT;
## SUBSTITUTE PERFORMANCE CONSENT

**Section 3.1   Notice of Default.**  In the event of a default by Borrower under any of the Junior Loan Documents, Junior Lender shall give Senior Lender notice of any Junior Event of Default and, simultaneously with giving such notices to Borrower, copies of notices given to Borrower of events that with the passage of time and failure to cure, would result in the occurrence of a "Default" or "Event of Default" under the Junior Loan Documents and such notice shall be sent to the Senior Lender in the manner provided for in Section 5.1.  In the event of a default by Borrower under any of the Senior Loan Documents, the Senior Lender will provide to the Junior Lender a copy of any related notice of default delivered to Borrower, and such notice shall be sent to the Junior Lender in the manner provided for in Section 5.1.  Junior Lender agrees that the failure of Borrower to make payment of any interest due on the Junior Loan as a result of the provisions set forth in this Agreement shall not be a default allowing the acceleration of the Junior Loan prior to the date on which the Senior Loan is paid in full.

**Section 3.2   Consent by the Junior Lender.**  Junior Lender (in its capacity as junior lender) hereby consents and agrees that any lawful action taken by or on behalf of the Senior Lender in the exercise of the Senior Lender's rights and/or remedies under the Senior Loan Documents (including, without limitation, any foreclosure or acquisition of title to the Property or any part thereof by deed in lieu of foreclosure or otherwise) are hereby deemed to be consented to and approved by the Junior Lender in all respects.

**Section 3.3   Waivers.**  Borrower and Junior Lender each hereby waives any defense based on the adequacy of a remedy at law which might be asserted as a bar to the remedy of specific performance of this Agreement in any action brought therefor by Senior Lender.  To the fullest extent permitted by law, Borrower and Junior Lender each hereby further waives: presentment, demand, protest, notice of protest, notice of default or dishonor, notice of payment or nonpayment and any and all other notices and demands of any kind in connection with all negotiable instruments evidencing all or any portion of the Senior Loan or the Junior Loan to which Borrower or Junior Lender may be a party; notice of the acceptance of this Agreement by Lender; notice of any loans made, extensions granted or other action taken in reliance hereon; and all other demands and notices of every kind in connection with this Agreement, the Senior Loan or the Junior Loan.

## ARTICLE 4

## ADDITIONAL REPRESENTATIONS AND COVENANTS
## OF THE JUNIOR LENDER

**Section 4.1   Representations and Covenants.**  Junior Lender (in its capacity as junior lender) hereby further represents, warrants, covenants and agrees with the Senior Lender as follows:

(a)    Without limiting the generality of any other provisions of this Agreement and except as set forth elsewhere herein, the Senior Lender may at any time and from time to time without the consent of, or notice to the Junior Lender, and without incurring responsibility to the Junior Lender, upon or without any terms or conditions and in whole or in part:

(1)    change the manner, place or terms of payment or performance of, and/or change or extend the time of payment or performance of, renew or alter, any portion of the Senior Indebtedness or any other obligations of any Person evidenced or secured by the Senior Loan Documents, any security therefor, or any liability incurred directly or indirectly in respect thereof;

(2)    sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Senior Indebtedness or any other obligations of any Person evidenced or secured by the Senior Loan Documents, or any liabilities incurred directly or indirectly in respect thereof, and/or any offset thereagainst;

(3)    exercise or refrain from exercising any rights against Borrower, any Guarantor, or others or otherwise act or refrain from acting;

(4)    settle or compromise any portion of the Senior Indebtedness or any other obligations of any Person evidenced or secured by the Senior Loan Documents, any security therefor or any liability incurred directly or indirectly in respect thereto;

(5)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of Borrower to the Senior Lender regardless of what liability or liabilities of Borrower remain unpaid or unperformed; and/or

(6)    consent to or waive any breach of, or any act, omission or default under, any of the Senior Loan Documents, or otherwise amend, modify or supplement any of the Senior Loan Documents or any other instruments or agreements executed and delivered in connection therewith or otherwise relating thereto.

(b)    The Junior Lender hereby makes the following representations and warranties to the Senior Lender as of the date hereof:

(1)    The Junior Lender has the power, authority and legal right to execute, deliver and perform this Agreement. This Agreement has been duly authorized by all necessary corporate action of Junior Lender, duly executed and delivered by Junior Lender and constitutes valid and binding obligations of Junior Lender enforceable against Junior Lender in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

ELECTRONICALLY FILED

(2)    Neither the execution, delivery or performance by Junior Lender of this Agreement nor compliance by it with the terms and provisions hereof, (i) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality, (ii) will conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any lien upon any of the property or assets of the Junior Lender pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement, loan agreement, partnership agreement or any other agreement, contract or instrument to which the Junior Lender is a party or by which it or any of its property or assets is bound or to which it may be subject or (iii) will violate any provision of the organizational documents of the Junior Lender.

(3)    No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made prior to the date hereof), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance by the Junior Lender of this Agreement or (ii) the legality, validity, binding effect or enforceability of this Agreement with respect to the Junior Lender.

(4)    The Junior Lender entered into the transactions contemplated by the Junior Loan Documents and made the Junior Loan to Borrower without reliance upon any information or advice from the Senior Lender. The Junior Lender made its own underwriting analysis in connection with the Junior Loan, its own credit review of Borrower and investigated all matters pertinent, in the Junior Lender's judgment, to its determination to make the Junior Loan to Borrower and to execute and deliver the Junior Loan Documents.  Junior Lender has reviewed this Agreement with counsel of its own choosing.

## ARTICLE 5

## MISCELLANEOUS

**Section 5.1    Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder shall be in writing sent by telefax (with answer back acknowledged and a copy by reputable overnight courier) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Agreement.  Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed, (b) on the date of sending by telefax if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

ELECTRONICALLY FILED

If to Senior Lender:     Plaza Bank
                         19900 MacArthur Boulevard, Suite 110
                         Irvine, California 92612-8430
                         Attention: Robert Forsythe

If to Junior Lender:     Congero Development, LLC
                         1640 Newport Boulevard, Suite 260
                         Costa Mesa, California 92627
                         Attention: Bruce Wallace

Any party hereto may change the address at which notices hereunder are required to be given to such party by notice to the other parties in accordance herewith.

   **Section 5.2    Modification.**  No provision of this Agreement may be changed, waived, discharged or terminated orally, by telephone or by any other means except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

   **Section 5.3    WAIVER OF JURY TRIAL.    THE SENIOR LENDER AND THE JUNIOR LENDER EACH EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, ANY AND EVERY RIGHT IT MAY HAVE TO A TRIAL BY JURY.**

   **Section 5.4    Governing Law.**

          (a)    This Agreement shall be governed by and construed according to the laws, from time to time in effect, of the state of California and the Laws of the United States of America. To the fullest extent permitted by law, the Junior Lender hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement

          (b)    Any legal suit, action or proceeding against the Junior Lender or the Senior Lender arising out of or relating to this Agreement shall be instituted in any Federal or state court in the State of California, County of Orange, and the Junior Lender waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and the Junior Lender hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

   **Section 5.5    Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original. Such counterparts shall constitute but one and the same instrument and shall be binding upon, and shall inure to the benefit of, each of the undersigned individually as fully and completely as if all had signed one instrument.

   **Section 5.6    Successors and Assigns.**  This Agreement shall be binding upon Junior Lender and Senior Lender and their respective successors and assigns, whether immediate or remote.  The Senior Lender and the Junior Lender agree, and as a condition to assignment of the

Senior Loan or the Junior Loan their assignees shall agree, that this Agreement will be assigned to all future assignees of the Senior Loan or the Junior Loan.

Section 5.7   **No Waiver by Senior Lender or Junior Lender**. Senior Lender shall not be prejudiced in its rights under this Agreement by any act or failure to act by Borrower or Junior Lender, or any non-compliance of Borrower or Junior Lender with any agreement or obligation, regardless of any knowledge thereof which Senior Lender may have or with which Senior Lender may be charged; and no action of Senior Lender permitted hereunder shall in any way affect or impair the rights of Senior Lender and the obligations of Junior Lender under this Agreement. No delay on the part of Senior Lender in the exercise of any rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Senior Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Agreement be binding upon Senior Lender except as expressly set forth in a writing duly signed and delivered on behalf of Senior Lender. Junior Lender shall not be prejudiced in its rights under this Agreement by any act or failure to act by Borrower or Senior Lender, or any non-compliance of Borrower or Senior Lender with any agreement or obligation, regardless of any knowledge thereof which Junior Lender may have or with which Junior Lender may be charged; and no action of Junior Lender permitted hereunder shall in any way affect or impair the rights of Junior Lender and the obligations of Senior Lender under this Agreement. No delay on the part of Junior Lender in the exercise of any rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Junior Lender of any right or remedy shall preclude other right or remedy; nor shall any modification or waiver of any of the provisions of this Agreement be binding upon Junior Lender except as expressly set forth in a writing duly signed and delivered on behalf of Junior Lender.

Section 5.8   **No Third Party Beneficiaries.**   Nothing contained in this Agreement shall be deemed to indicate that this Agreement has been entered into for the benefit of any Person other than the Senior Lender and the Junior Lender.

Section 5.9   **Severability.**   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 5.10   **No Waiver.**

(a)   No waiver shall be deemed to be made by the Senior Lender of any of its rights hereunder, or under the Senior Loan Documents, unless the same shall be in writing and signed by the Senior Lender, and each waiver, if any, shall be a waiver only with respect to the specific instances involved and shall in no way impair the rights of the Senior Lender in any other respect or at any other time.

(b)   No waiver shall be deemed to be made by the Junior Lender of any of its rights hereunder, or under the Junior Loan Documents, unless the same shall be in writing and signed by the Junior Lender, and each waiver, if any, shall be a waiver only with respect to the

ELECTRONICALLY FILED

specific instances involved and shall in no way impair the rights of the Junior Lender in any other respect or at any other time.

**Section 5.11    Agreement by Borrower.**  By its execution of this Agreement, Borrower agrees to be bound by the terms hereof, to observe the lien priorities and the priorities of payments set forth herein and to conduct its affairs consistently with the terms hereof.

**Section 5.12    Expenses.**  Borrower agrees to pay Senior Lender on demand all expenses of every kind, including, without limitation, reasonable attorney's fees, that Senior Lender may incur in enforcing any of its rights under this Agreement.

**Section 5.13    Further Assurances.**  Each of the parties hereto shall execute and deliver to the other parties hereto such further instruments and shall take such further action at any time or times as may be required in order to carry out the provisions and intent of this Agreement.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

**SENIOR LENDER:**

PLAZA BANK**,** a California corporation

Name:_____

Print Name:_____

Title:_____

**JUNIOR LENDER:**

CONGERO DEVELOPMENT, LLC**,** a Delaware limited liability company

Name:_____

Print Name:_____

Title:_____

**BORROWER:**

RENAISSANCE SURGICAL ARTS AT NEWPORT HARBOR, LLC, a Delaware limited liability company

Name:_____

Print Name:_____

Title:_____

**ELECTRONICALLY FILED**

14

**EXHIBITS - 74**

ELECTRONICALLY FILED

# Exhibit "4"

ELECTRONICALLY FILED

## GUARANTY AND SURETYSHIP AGREEMENT

This **GUARANTY AND SURETYSHIP AGREEMENT** (this "**Guaranty**"), dated _____ __, 2010, made by Renaissance Surgical Arts of Newport Harbor Holdings, LLC, a Delaware limited liability company ("**Renaissance**"), BSM Holdings, LLC, a California limited liability company ("**BSM**"), Joseph G. Brown, individually, and Joseph G. Brown as Trustee of the Joseph G. Brown Revocable Trust, dated October 22, 1997 (collectively, "**Brown**"), Donna M. Snider, individually and Donna M. Snider as Trustee of the Donna M. Snider Revocable Trust, dated June 15, 1998 (collectively, "**Snider**"), Deborah A. Marheine, individually and Deborah A. Marheine as Trustee of the Deborah A. Marheine Revocable Trust dated June 15, 1998 (collectively, "**Marheine**"), Harvinder Sahni, M.D. ("**Sahni**"), Anthony C. Pings ("**Pings**"), Michael J. Sundine, M.D., individually, Michael J. Sundine, M.D. as Trustee of The Sundine Family Trust dated July 16, 2008 and Kay Antoinette Sundine as Trustee of The Sundine Family Trust dated July 16, 2008 (collectively, "**Sundine**") Richard C. Agnew, M.D. ("**Agnew**"), Gary S. Reiter, M.D.("**Reiter**") and Hisham M. Seify, M.D. ("**Seify**"), Michael A. Arata ("**Arata**"), Henry B. Bikhazi ("**Bikhazi**"), Cory Brame ("**Brame**"), Rodrigo A. Covarrubias ("**Covarrubias**"), Uday Devgan ("**Devgan**"), Charles Eifrig ("**Eifrig**"), John Joseph Hewett ("**Hewett**"), Desmond McGuire ("**McGuire**"), Sneh Mehtani ("**Mehtani**"), John F. Petraglia ("**Petraglia**"), Shahla Rahmatullah ("**Rahmatullah**"), Kevin S. Sadati ("**Sadati**"), Dan B. Tran ("**Tran**") (collectively, the "**Guarantors**" and individually as "**Guarantor**"), in favor of  Plaza Bank, a California corporation ("**Lender**").

## RECITALS

A.    Renaissance Surgical Arts at Newport Harbor, LLC, a Delaware limited liability company ("**Company**"), has delivered to Lender its Promissory Note, dated February ___, 2010 (the "**Note**"); terms defined therein and not otherwise defined herein being used herein as therein defined).

B.    The Guarantors (i) as owners of direct and indirect interests in outstanding shares of stock of the Company, and/or (ii) based upon business relationships with the Company, will each derive substantial direct and indirect benefit from the extension of credit made in connection with the Note.

C.    It is a condition precedent to the extension of credit under the Note that the Guarantors execute and deliver this Guaranty.  This Guaranty is made by the Guarantors among other things to induce the Lender to extend credit under the Note.

D.    The Guarantors acknowledge that Lender has relied and will rely on this Guaranty in extending credit under the Note.  The Guarantors further acknowledge that each Guarantor has, independently and without reliance upon Lender or any representation by or other information from Lender, made its own credit analysis and decision to enter into this Guaranty.

1

ELECTRONICALLY FILED

**NOW, THEREFORE**, in consideration of the premises, and intending to be legally bound, the Guarantors hereby agree as follows:

1.     The Guarantors hereby jointly and severally, irrevocably and unconditionally guaranty, as primary obligors and not merely as sureties, the due and punctual payment in full of all Obligations (as hereinafter defined) when the same shall become due, whether at stated maturity, by acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)).    Each Guarantor's liability hereunder shall be unlimited.   The Obligations of Guarantors hereunder shall be and remain, in all events, joint and several, such that Lender may proceed against, and collect from, any one or more Guarantors, without proceeding against or collecting from any one or more other Guarantors.   It specifically being acknowledged and agreed by each Guarantor that such Guarantor shall have no right to require Lender to proceed against, or collect from, any other Guarantor or claim that such Guarantor is liable for an amount under this Guaranty less than the full amount of all Obligations.

2.     The term "**Obligations**" is used herein in its most comprehensive sense and includes any and all obligations of Company now or hereafter made, incurred or created, whether absolute or contingent, liquidated or unliquidated, whether due or not due, and however arising under or in connection with the Note, including those arising under successive borrowing transactions under the Note which shall either continue such obligations of Company or from time to time renew them after they have been satisfied.

3.     Guarantors acknowledge that the Obligations being incurred will inure to the benefit of Guarantors.

4.     Any interest on any portion of the Obligations that accrues after the commencement of any proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or similar arrangement of Company (or, if interest on any portion of the Obligations ceases to accrue by operation of law by reason of the commencement of said proceeding, such interest as would have accrued on such portion of the Obligations if said proceeding had not been commenced) shall be included in the Obligations because it is the intention of Guarantors and Lender that the Obligations should be determined without regard to any rule of law or order that may relieve Company of any portion of such Obligations.

5.     In the event that all or any portion of the Obligations is paid by Company, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) is rescinded or recovered directly or indirectly from Lender as a preference, fraudulent transfer or otherwise, and any such payments that are so rescinded or recovered shall constitute Obligations.

6.     Upon the failure of Company to pay any of the Obligations when and as the same shall become due, each Guarantor shall be jointly and severally liable for, and will upon demand pay, or cause to be paid, in cash, to Lender an amount equal to the aggregate of the unpaid Obligations.

#95942.5

7.      Anything contained in this Guaranty to the contrary notwithstanding, the obligations of each Guarantor under this Guaranty shall be limited to a maximum aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any applicable provisions of comparable state law (collectively, the **"Fraudulent Transfer Laws"**), in each case after giving effect to all other liabilities of Guarantors, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of any Guarantor (a) in respect of intercompany indebtedness to Company or other affiliates of Company to the extent that such indebtedness would be discharged in an amount equal to the amount paid by any Guarantor hereunder and (b) under any guaranty of indebtedness subordinated in right of payment to the Obligations, which guaranty contains a limitation as to maximum amount similar to that set forth in the paragraph, pursuant to which the liability of such Guarantor pursuant to applicable law or pursuant to the terms of any agreement.

8.      Each Guarantor under this Guaranty hereby agrees that within thirty (30) days of filing their return or extension, such Guarantor shall deliver to Lender an executed copy of such Guarantor's Federal and State tax return.  Additionally, each Guarantor shall deliver to Lender no later than January 31, of each calendar year during the Loan term an updated personal financial statement which includes verification of such Guarantors then current Liquid Assets.  Each Guarantor hereby represents and warrants to Lender that except as may be explicitly identified as a "contingent liability" on financial reports and statements previously delivered to Lender with respect to such Guarantor, such Guarantor does not have any contingent liabilities owed to third parties including, without limitation, any (i) pending lawsuit which may adversely affect the cash position or assets of such Guarantor, or (ii) other guaranty executed buy such Guarantor in connection with the obligations of a third party.  For purposes of this Guaranty "**Liquid Assets**" means immediately available cash and unencumbered marketable securities.

9.      Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:  (a) this Guaranty is a guaranty of payment when due and not of collectability; (b) Lender may enforce this Guaranty upon the occurrence of an Event of Default under the Note notwithstanding the existence of any dispute between Company and Lender with respect to the existence of such event; (c) the obligations of each Guarantor hereunder are independent of the obligations of Company under the Note and the obligations of any other Guarantor hereunder or other guarantor under a separate guaranty of the obligations of Company under the Note and a separate action or actions may be brought and prosecuted against each Guarantor whether or not any action is brought against Company or any of such other Guarantors or guarantors and whether or not Company is joined in any such action or actions; (d) a Guarantor's payment of a portion, but not all, of the Obligations shall in no way limit, affect, modify or abridge such Guarantor's or any other Guarantor's liability for any portion of the Obligations that has not been paid; (e) Lender may from time to time, without notice or demand and without affecting the validity or enforceability of this Guaranty or giving rise to any

limitation, impairment or discharge of any Guarantor's liability hereunder, (i) renew, extend, accelerate or otherwise change the time, place, manner or terms of payment of the Obligations, (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations, (iii) request and accept other guaranties of the Obligations and take and hold security for the payment of this Guaranty or the Obligations, (iv) release, exchange, compromise, subordinate or modify, with or without consideration, any security for payment of the Obligations, any other guaranties of the Obligations, or any other obligation of any Person (including any other Guarantor hereunder or a guarantor under a separate guaranty) with respect to the Obligations, (v) enforce and apply any security now or hereafter held by or for the benefit of Lender in respect of this Guaranty or the Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that Lender may have against any such security, as Lender in its discretion may determine consistent with any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and (vi) exercise any other rights available to it under the Note, at law or in equity; and (f) this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any limitation, impairment or discharge for any reason (other than payment in full of the Obligations), including without limitation the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure to assert or enforce or agreement not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy with respect to the Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Obligations, (ii) any waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including without limitation provisions relating to events of default) of the Note or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Obligations, (iii) the Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect, (iv) the application of payments received from any source to the payment of indebtedness other than the Obligations, even though Lender might have elected to apply such payment to any part or all of the Obligations, (v) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Obligations, (vi) any defenses, set-offs or counterclaims which Company may allege or assert against Lender in respect of the Obligations, including but not limited to failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury, (vii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Obligations, or (viii) any failure of any Guarantor named herein to execute this Guaranty or any failure of the Guaranty to be enforceable as to any one or more Guarantors.  This Guaranty is a continuing guaranty and shall be binding upon each Guarantor and its respective successors and assigns, and each Guarantor irrevocably waives any right (including any such right arising under California Civil Code Section 2815) to revoke this Guaranty as to future transactions giving rise to any Obligations.

#95942.5

10.     Each Guarantor hereby waives, for the benefit of Lender:  (a) any right to require Lender, as a condition of payment or performance by such Guarantor, to (i) proceed against Company, any other guarantor (including any other Guarantor) of the Obligations or any other Person, (ii) proceed against or exhaust any security held from Company, any other guarantor (including any other Guarantor) of the Obligations or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of Lender in favor of Company or any other Person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Company including, without limitation, any defense based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Company from any cause other than payment in full of the Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon Lender's errors or omissions in the administration of the Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance of this Guaranty, notices of default under the Note or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Obligations or any agreement related thereto, notices of any extension of credit to Company and notices of any of the matters referred to in the preceding paragraph and any right to consent to any thereof; and (g) to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of this Guaranty.

11.     As used in this paragraph, any reference to "the principal" includes Company, and any reference to "the creditor" includes Lender.  In accordance with Section 2856 of the California Civil Code each Guarantor waives any and all rights and defenses available to such Guarantor by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code, including without limitation any and all rights or defenses such Guarantor may have if the Obligations are secured by real property.  This means, among other things (a) the creditor may collect from such Guarantor without first foreclosing on any real or personal property collateral pledged by the principal, and (b) if the creditor forecloses on any real property collateral pledged by the principal:  (i) the amount of the Obligations may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (ii) the creditor may collect from such Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right such Guarantor may have to collect from the principal.  This is an unconditional and irrevocable waiver of any right and defenses such Guarantor may have because the Obligations are secured by real property.  These rights and defenses include, but are not limited to, any rights and defenses based upon Section 580a, 580b,

ELECTRONICALLY FILED

580d, or 726 of the California Code of Civil Procedure. Each Guarantor also waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the Code of Civil Procedure or otherwise; and even though that election of remedies by the creditor, such as nonjudicial foreclosure with respect to security for an obligation of any other guarantor of any of the Obligations, has destroyed such Guarantor's rights of contribution against such other guarantor.

12.    No other provision of this Guaranty shall be construed as limiting the generality of any of the covenants and waivers set forth in this paragraph. As provided below, this Guaranty shall be governed by and shall be construed and enforced in accordance with, the internal laws of the State of California, without regard to conflicts of laws principles.

13.    Until the Obligations shall have been paid in full, each Guarantor shall withhold exercise of (a) any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Company or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute (including without limitation under California Civil Code Section 2847, 2848 or 2849), under common law or otherwise and including without limitation (i) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Company, (ii) any right to enforce, or to participate in, any claim, right or remedy that Lender now has or may hereafter have against Company, and (iii) any benefit of, and any right to participate in, any collateral or security now or hereafter held by Lender, and (b) any right of contribution such Guarantor now has or may hereafter have against any other guarantor of any of the Obligations. Each Guarantor further agrees that, to the extent the agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights Lender may have against Company, to all right, title and interest Lender may have in any such collateral or security, and to any right Lender may have against such other guarantor.

14.    Any indebtedness of Company now or hereafter held by any Guarantor is hereby subordinated in right of payment to the Obligations, and any such indebtedness of Company to such Guarantor collected or received by such Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied against the Obligations.

15.    Guarantors jointly and severally agree to pay, or cause to be paid, on demand, and to save Lender harmless against liability for, any and all costs and expenses (including fees and disbursements of counsel and allocated costs of internal counsel) incurred or expended by Lender in connection with the enforcement of or preservation of any rights under this Guaranty.

ELECTRONICALLY FILED

16.    It is not necessary for Lender to inquire into the capacity or powers of any Guarantor or Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

17.    Lender shall have no obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Company.  Each Guarantor has adequate means to obtain information from Company on a continuing basis concerning the financial condition of Company and its ability to perform its obligations under the Note, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Company and of all circumstances bearing upon the risk of nonpayment of the Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of Lender to disclose any matter, fact or thing relating to the business, operations or conditions of Company now known or hereafter known by Lender.

18.    The rights, powers and remedies given to Lender by this Guaranty are cumulative and shall be in addition to and independent of all rights, powers and remedies given to Lender by virtue of any statute or rule of law or in the Note or any agreement between any Guarantor and Lender or between Company and Lender.  Any forbearance or failure to exercise, and any delay by Lender in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

19.    Each Guarantor hereby represents and warrants to Lender that: (a) such Guarantor is duly organized, validly existing and in good standing or subsisting under the laws of the state of its incorporation; (b) such Guarantor has the corporate power and authority under its organizational documents to own and operate its properties, to transact the business in which it is now engaged and to execute and deliver this Guaranty; (c) has taken all necessary corporate action to authorize its execution, delivery and performance of this Guaranty; (d) this Guaranty has been duly executed and delivered by a duly authorized officer of such Guarantor, and this Guaranty constitutes the legally valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws or equitable principles relating to or limiting creditors' rights generally; (e) the execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or the organizational documents of such Guarantor or any securities issued by such Guarantor, or any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of such Guarantor and its Subsidiaries, taken as a whole, and will not result in, or require, the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking, and (f) such Guarantor is a sophisticated business person or entity, as applicable, and has reviewed this Guaranty and the terms, risks and structure of the underlying loan transaction and business of Borrower with its

legal counsel and that it knowingly and voluntarily has entered into this Guaranty following consultation with legal counsel.

20.     This Guaranty shall inure to the benefit of Lender and its successors and assigns. In case any provision in or obligation under this Guaranty shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**21.     THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF GUARANTORS AND LENDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

**22.     ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF CALIFORNIA, AND BY EXECUTION AND DELIVERY OF THIS GUARANTY EACH GUARANTOR ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS GUARANTY.**  Each Guarantor hereby agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to such Guarantor at its address set forth opposite its signature hereto, such service being hereby acknowledged by such Guarantor to be sufficient for personal jurisdiction in any action against such Guarantor in any such court and to be otherwise effective and binding service in every respect.   Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of Lender to bring proceedings against any Guarantor in the courts of any other jurisdiction.

**23.     EACH GUARANTOR AND, BY THEIR ACCEPTANCE OF THE BENEFITS OF THIS GUARANTY, PAYEE AND ANY SUBSEQUENT HOLDER OF THE NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS GUARANTY OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS GUARANTY AND THE GUARANTOR/BENEFICIARY RELATIONSHIP THAT IS BEING ESTABLISHED.** The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.   Each Guarantor and, by their acceptance of the benefits of this Guaranty, Lender and any subsequent holder of the Note, each (a) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this

8

ELECTRONICALLY FILED

waiver in entering into this Guaranty or making the loan evidenced by the Note, as the case may be, and that each will continue to rely on this waiver in their related future dealings, and (b) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS GUARANTY.**  In the event of litigation, this provision may be filed as a written consent to a trial by the court.

24.    This Guaranty may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original for all purposes; but all such counterparts together shall constitute but one and the same instrument.  This Guaranty shall become effective as to each Guarantor upon the execution of a counterpart hereof by such Guarantor (whether or not a counterpart hereof shall have been, or ever be, executed by any other Guarantor) and receipt by Lender of written or telephonic notification of such execution and authorization of delivery thereof.

*[Remainder of page intentionally left blank]*

#95942.5

**EXHIBITS - 84**

**IN WITNESS WHEREOF**, each Guarantor has executed this Guaranty and Suretyship Agreement as of the date set forth below.

**Renaissance Surgical Arts of Newport Harbor Holdings, LLC, a Delaware limited liability company**

By:_____          Address: _____
Title:_____                     _____
Name: _____                      _____
                                                        Telephone:_____
Dated: _____          Fax: _____
                                                        Email:_____

**BSM Holdings, LLC, a California limited liability company**

By:_____          Address: _____
Title:_____                     _____
Name: _____                      _____
                                                        Telephone:_____
Dated: _____          Fax: _____
                                                        Email:_____

_____          Address: _____
**Joseph G. Brown, individually and as**                     _____
**Trustee of the Joseph G. Brown Revocable**                      _____
**Trust, dated October 22, 1997**          Telephone:_____
                                                        Fax: _____
                                                        Email:_____

[Signatures Continue]

10

**ELECTRONICALLY FILED**

_____

**Donna M. Snider, individually and as
Trustee of the Donna M. Snider Revocable
Trust, dated June 15, 1998**

Address: _____

_____

Telephone:_____

Fax:_____

Email:_____

_____

**Deborah A. Marheine, individually and as
Trustee of the Deborah A. Marheine
Revocable Trust dated June 15, 1998**

Address: _____

_____

Telephone:_____

Fax:_____

Email:_____

_____

**Harvinder Sahni, M.D.**

Address: _____

_____

Telephone:_____

Fax:_____

Email:_____

_____

**Anthony C. Pings**

Address: _____

_____

Telephone:_____

Fax:_____

Email:_____

_____

**Michael J. Sundine, M.D., individually and
as Trustee of the Sundine Family Trust
dated July 16, 2008**

Address: _____

_____

Telephone:_____

Fax:_____

Email:_____

[Signatures Continue]

11

**Kay Antoinette Sundine, as Truastee of the
the Sundine Family Trust dated July 16,
2008**

Address:_____
_____
_____
Telephone:_____
Fax:_____
Email:_____

**Richard C. Agnew, M.D.**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

**Gary S. Reiter, M.D.**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

**Hisham M. Seify, M.D.**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

**Michael A. Arata**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

[Signatures Continue]

#95942.5

**EXHIBITS - 87**

**ELECTRONICALLY FILED**

_____    Address: _____
**Henry B. Bikhazi**                           _____
                                               _____
                                     Telephone:_____
                                     Fax:_____
                                     Email:_____


_____    Address: _____
**Cory Brame**                                 _____
                                               _____
                                     Telephone:_____
                                     Fax:_____
                                     Email:_____


_____    Address: _____
**Rodrigo A. Covarrubias**                     _____
                                               _____
                                     Telephone:_____
                                     Fax:_____
                                     Email:_____


_____    Address: _____
**Uday Devgan**                                _____
                                               _____
                                     Telephone:_____
                                     Fax:_____
                                     Email:_____


_____    Address: _____
**Charles Eifrig**                             _____
                                               _____
                                     Telephone:_____
                                     Fax:_____
                                     Email:_____


[Signatures Continue]

13

_____

**John Joseph Hewett**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____


_____

**Desmond McGuire**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____


_____

**Sneh Mehtani**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____


_____

**John F. Petraglia**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____


_____

**Shahla Rahmatullah**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____


[Signatures Continue]

14

_____
**Kevin S. Sadati**

Address: _____
          _____
          _____
Telephone:_____
Fax:_____
Email:_____


_____
**Dan B. Tran**

Address: _____
          _____
          _____
Telephone:_____
Fax:_____
Email:_____


15

**ELECTRONICALLY FILED**

16

ELECTRONICALLY FILED

# Exhibit "5"

## INDEMNITY AGREEMENT

This **INDEMNITY AGREEMENT** (this "Agreement"), dated February 17, 2010, made by and among Joseph G. Brown, individually, and Joseph G. Brown as Trustee of the Joseph G. Brown Revocable Trust, dated October 22, 1997 (collectively, "**Brown**"), Donna M. Snider, individually and Donna M. Snider as Trustee of the Donna M. Snider Revocable Trust, dated June 15, 1998 (collectively, "**Snider**"), Deborah A. Marheine, individually and Deborah A. Marheine as Trustee of the Deborah A. Marheine Revocable Trust dated June 15, 1998 (collectively, "**Marheine**", together with **Brown** and **Snider**, the "**Indemnitors**") and Cory Brame ("**Brame**"), Charles Eifrig ("**Eifrig**"), Desmond McGuire ("**McGuire**"), and Dan B. Tran ("**Tran**" together with **Brame, Eifrig, McGuire** and **Tran**, the "**Indemnitees**")

## RECITALS

A.    Renaissance Surgical Arts at Newport Harbor, LLC, a Delaware limited liability company ("**Company**"), has delivered to Plaza Bank (the "Lender") its Promissory Note in the amount of $3,650,000 (the "**Note**");.

B.    As a condition precedent to the extension of credit under the Note, the Lender has required the Indemnitees deliver the Guaranty and Suretyship Agreement attached hereto as Exhibit A (the "Guaranty"). The Guaranty provides for joint and several liability among the guarantors ("Guarantors");

C.    Section 3.4 of the operating agreement of the Company requires that "[e]ach Member (and its Designated Principals) shall, if required by the banking facility or any other lending facility or third party lender, execute such personal guarantees and assume personal liability on a Pro Rata basis on any bank loan or any other lending facility loan obtained hereunder;" and

D.    In order to induce the Indemnitees to execute the Guaranty, Indemnitors have agreed to indemnify the Indemnitees should they be required to make payments under the Guaranty in excess of their obligations under the Company's operating agreement.

**NOW, THEREFORE**, in consideration of the premises, and intending to be legally bound, the parties hereby agree as follows:

1.    **Defense and Indemnification**.  To the extent the Indemnitees are required to make payments in excess of their obligations under Section 3.4 of the operating agreement of the Company under the terms of the Guaranty, Indemnitors shall defend, indemnify, and hold harmless Indemnitees and their respective successors, and assigns (collectively, the "Indemnified Parties"), from and against all suits, claims, injuries,

liabilities, losses, damages, judgments, settlements, expenses, and costs (including, without limitation, reasonable attorneys' fees billed to one or more Indemnitees by counsel of their choice) as a result of any litigation and or demand of the Lender to enforce the terms of the Guaranty with respect to any of the Indemnitees (hereinafter a "Claim").

**2.    Delivery of Guaranty**.    In consideration for the obligations of Indemnitors under paragraph 1 hereof, Indemnitees shall execute and deliver to Lender the Guaranty on date hereof.

3.    **Authority and Consent.**    The parties represent and warrant that each has the right, legal capacity and authority to enter into, and perform its respective obligations under this Agreement, and that no approvals or consents of any other person, other than the respective party, are necessary.

4.    **Confidentiality**.    Indemnitees specifically understand and agree that the terms and conditions of this Agreement are strictly confidential and no Indemnitee shall communicate, display, publish, or otherwise reveal any of its contents or its existence to any third party except by written consent of the Indemnitors; provided, however, that this provision shall not apply to any action to enforce or to seek redress for the breach of this Agreement, nor shall this provision prevent any disclosure of the terms or contents of this Agreement as otherwise required by law.

The Indemnitees understand and acknowledge that any disclosure of the terms of this Agreement may cause the Indemnitors irreparable harm, the amount of which may be difficult to ascertain and, therefore, agrees that the Indemnitors shall have the right to apply to a court of competent jurisdiction for an order restraining any such violation and for such other relief as the Indemnitors and each of them shall deem appropriate. The right of the Indemnitors to enjoin a violation of this Agreement is to be in addition to the remedies otherwise available to the Indemnitors at law or in equity.

Notwithstanding anything to the contrary in this Agreement, each Indemnitee shall be permitted to disclose the existence of this agreement and its terms to any lending institution(s) which require a personal financial statement from the Indemnitee as a condition of obtaining or maintaining any loan or credit facility.

5.    **Other Rights**.    In addition to the various rights of Indemnitees as specified in this Agreement, Indemnitees shall be deemed to have the same rights under this Agreement against Indemnitors as Lender has against the various Guarantors under the Guaranty, except that such rights of Indemnitees vis a vis Indemnitors shall be subordinate to Lender's rights against Indemnitors.

6.    **Counterparts.**    This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original for all purposes; but all such counterparts together shall constitute but one and the same instrument.

7.    **Invalid Provisions**.  In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein and the same shall be enforceable to the fullest extent permitted by law.

8.    **Attorney's Fees**.  In the event of any litigation between the parties hereto to enforce any provision of this agreement or any right of any party hereto, the unsuccessful party to such litigation agrees to pay to the successful party, all costs and expenses, including reasonable attorney's fees and costs incurred herein.

9.    **Captions and Headings**.  The headings of the articles of this Agreement are inserted solely for convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction of any term or provision hereof.

10.    **Entire Agreement**.  This Agreement contains the entire Agreement of the parties.  It supersedes any and all other agreements, either oral or in writing, between the parties.    Each party to this Agreement acknowledges that no representations, inducements, promises or agreements, or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement or promise not contained in this Agreement shall be valid or binding.  This Agreement may not be modified or amended by oral agreement, but only by an agreement in writing.    To the extent that there is any conflict between this Agreement and that certain Member Guarantor Contribution Agreement being signed by the parties, this Agreement shall control.

11.    **Governing Law.** This Agreement shall be governed as to validity, interpretations, enforcement and effect by the laws of the State of California without giving effect to conflicts of law principles thereunder. All actions or proceedings in any way, manner or respect, arising out of or from or related to this Agreement shall be litigated in courts having sites within the County of Orange of the State of California. Each of the Parties hereby consents and submits to the jurisdiction of any local, state or federal courts located within said county and state and waives any right it may have to transfer or change the venue of any litigation brought by any Party hereto.

12.    **Time of Essence**.  Time is of the essence in the performance by the parties hereto of each obligation to be performed hereunder.

ELECTRONICALLY FILED

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date set forth above.

_____

**Joseph G. Brown, individually and as Trustee of the Joseph G. Brown Revocable Trust, dated October 22, 1997**

Address: _____
          _____
          _____
Telephone:_____
Fax:_____
Email:_____

_____

**Donna M. Snider, individually and as Trustee of the Donna M. Snider Revocable Trust, dated June 15, 1998**

Address: _____
          _____
          _____
Telephone:_____
Fax:_____
Email:_____

_____

**Deborah A. Marheine, individually and as Trustee of the Deborah A. Marheine Revocable Trust dated June 15, 1998**

Address: _____
          _____
          _____
Telephone:_____
Fax:_____
Email:_____

_____

**Cory Brame**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

_____

**Charles Eifrig**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

_____

**Desmond McGuire**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

_____

**Dan B. Tran**

Address: _____
_____
_____
Telephone:_____
Fax:_____
Email:_____

**ELECTRONICALLY FILED**

# Exhibit "6"

May 25, 2011

Bruce Wallace
Chief Executive Officer
Renaissance Surgical Arts of Newport Harbor, LLC
1640 Newport Blvd. Suite 260
Costa Mesa, CA 92627

Dear Mr. Wallace:

Gary Savlov ("Purchaser") approves the following Accounts Receivable Purchasing Proposal (the "Financing") to Renaissance Surgical Arts at Newport Harbor, LLC ("Seller").

As presently constructed, the Seller wishes to sell to the Purchaser individual accounts receivables (the Purchase or Purchases) with the following terms and conditions:

I.   ACCOUNTS RECEIVABLES PURCHASING TERMS

    **A.**   **Seller:**

    Renaissance Surgical Arts at Newport Harbor, LLC

    **B.**   **Purchaser:**

    Gary Savlov

    **C.**   **Total Purchasing Amount:**

    $352,941.18 net receivables figured at 85% availability of Seller's stated Purchases.

    **D.**   **Purpose:**

    Provide working capital to Seller.

    **E.**   **Maturity Date:**

    The Seller shall guarantee the total purchasing amount in payment to Purchaser no later than 60 days from the purchase date of the individual accounts receivable or as per this agreement terms in the event of default.

    **F.**   **Purchaser's Fees:**

    The fees on the financing for Purchaser shall be the overage between 85% of the net collectable value of the accounts receivables, and 100% of the net collectable value of the receivables. This includes an administrative fee for the processing and administration of the receivables. "Net Collectable Value" is defined as the net receivable anticipated being collected via the Mednet system and GHN. Any amount collected over 100% of the net collectable value of the receivables will be remitted back to Seller, reconciled at Maturity Date. The Seller warrants that the net receivables are true, accurate and has been confirmed with the insurance company (if applicable) of the legitimacy of the claim and coverage. Any amounts that are less than the amount submitted will be reimbursed to the Purchaser in cash or with additional invoices that will be charged against any shortfall at the Purchaser's sole discretion.

    **G.**   **Repayment:**

All obligations under the Purchases shall be due and payable in full by Seller to Purchaser upon the earlier of (1) the Maturity Date; (2) acceleration after the occurrence of an Event of Default or at the election of Seller at will; and (3) termination.  This agreement will succeed in the event of the death of Purchaser(s), with any debts of Seller due Purchaser(s) remaining in full.  In addition, this agreement is assignable by the Purchaser(s).

**H.  Availability:**

Availability to Seller for accounts receivables purchases shall be an amount of 85% of the "net collectable value" of the accounts receivable or Purchase.  The amount of the aggregate of all Purchases advanced to Seller by Purchaser minus any collections shall be added to the interest due and any fees associated with this contract as the total obligation at any one time.

II.  PRIORITY AND SECURITY

**A.  Collateral**

The financing shall be secured by a security interest in all existing and future accounts receivable and proceeds thereof that are purchased by Purchaser.  The proceeds of the purchases received under the terms of this agreement shall be subordinate to the lien of Plaza Bank. Notwithstanding, this is a purchase of accounts receivables and the Seller acknowledges that once the batch of invoices/receivables are sold, they are the property of the Purchaser. Seller further warrants that no entity has any rights to receivables once they are sold and the property of Purchaser.  Once the accounts are sold to the Purchaser, they are now the property of the Purchaser, which is not subject to a subordinate position to any entity, including Plaza Bank.

B.  **Guaranties**

The Seller is providing a guaranty agreement which shall provide for pro rata liability on the part of each member under the terms of its Operating Agreement.

This agreement is also guaranteed by a corporate guarantee of Renaissance Surgical Arts at Newport Harbor, LLC.

III.  REPORTING

Seller shall provide any reports reasonably requested by Purchaser, including but not limited to periodic aging reports, dilution analyses, origination reports and default/charge-off reports with the following reports:

1.  monthly financial statements, including balance sheet and income statement, each within 30 days of each month end and certified as correct by Borrower's CEO or CFO;

2.  annual compiled financial statements and tax returns, prepared by Sellers accounting firm, within 120 days of each fiscal year end;

IV.  CONDITIONS PRECEDENT

**A.  Basic Conditions**

Consummation of the Financing shall be contingent upon all items included in Agreement, including the execution of any documents necessary by Seller to

demonstrate proper transfer by Purchaser of the receivables in Seller's account under the terms of this agreement.

**B.**    **Signatory**

Bruce Wallace is the designated signatory to execute documents on behalf of Seller.

We look forward to our continued working relationship.

Sincerely,

**GARY SAVLOV**

_____

Date

_____

**ACKNOWLEDGED AND AGREED TO:**

Renaissance Surgical Arts of Newport Harbor, LLC

_____
signature

By: _____
print name

Its: _____
title

Date: _____

**EXHIBITS - 101**

**ELECTRONICALLY FILED**

# PROMISSORY NOTE

$352,941.18                                          May 25, 2011


      **FOR VALUE RECEIVED**, RENAISSANCE SURGICAL ARTS AT NEWPORT HARBOR, LLC, a Delaware Limited Liability Company (the "*Company*"), promises to pay to Gary Savlov. ("*Lender*") the principal sum of $352,941.18 with all payable in sixty days (60) days from the date of this note.


Nothing in this Note, express or implied, is intended to confer upon any party other than the parties hereto any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note.

This Note shall be construed in accordance with the laws of the State of California.  If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provisions were so excluded, and the remainder of this Note shall be enforceable in accordance with its terms.  No right, power or remedy conferred by the Note upon Lender shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute or otherwise.

This Note is not transferable by Lender, whether by assignment, operation of law or otherwise without the prior written consent of the Company.

The Company hereby waives demand, notice, presentment, protest and notice of dishonor.


                       RENAISSANCE SURGICAL ARTS AT
                       NEWPORT HARBOR, LLC,


                  By:    _____
                       Bruce Wallace, CEO


                  GARY SAVLOV


                  By:    _____
                       Gary Savlov

ELECTRONICALLY FILED

<u>SECURITY and GUARANTEE AGREEMENT</u>

This Agreement, dated as of May 26, 2011, is by and between Renaissance Surgical Arts at Newport Harbor, LLC (herein referred to as "Debtor"), and Gary Savlov, an individual, (herein referred to as "Secured Party").

In consideration of the mutual covenants and promises herein contained, Debtor and Secured Party agree:

I
<u>CREATION OF SECURITY INTEREST</u>

1.01     For valuable consideration, receipt of which is hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all present and future rights of Debtor to payment for goods sold or leased or for services rendered, including, without limitation, those which are not evidenced by instruments or chattel paper, and whether or not they have been earned by performance; accounts; proceeds of letters of credit of which Debtor is named beneficiary; contract rights; chattel paper; instruments; documents; insurance proceeds; and all other indebtedness and obligations whatsoever owing to or owned or acquired by Debtor, together with all instruments and all documents in title representing any of the foregoing, all rights in any merchandise or goods which any of the same may represent, and all right, title, security and guaranties with respect to each of the foregoing, including, without limitation, any right of stoppage in transit ("Accounts Receivable") together with all books and records in respect to the foregoing, whether now existing or hereafter acquired or arising (collectively the "Collateral") to secure the payment of amounts owed pursuant to that certain Promissory Note in the stated amount of Three Hundred Thousand Dollars ("Note") of even date herewith executed by Debtor, and the guaranty obligation set forth in Section 1.03 below (hereinafter called "Obligations").

1.02     Notwithstanding anything to the contrary contained in this Agreement, the security interest of Secured Party is subordinate to any security interest granted in the Collateral prior to the date hereto including to the security interest of Plaza Bank.

1.03     As additional consideration for the making of the loan, Debtor guaranties to Secured Party that Secured Party will have a total return on Note in an amount not less than the amount of any increase in the value of the Securities as shown on Exhibit A attached hereto from the date hereof until the repayment of the Note and all interest thereunder.

II

1

ELECTRONICALLY FILED

RIGHTS OF DEBTOR IN COLLATERAL

2.01      Except for the security interest granted prior hereto,
Debtor is the owner of Collateral free from any adverse lien,
security interest, or encumbrance.  Debtor shall defend
Collateral against all claims and demands of any or all persons
claiming Collateral or any interest therein.

III
USE OF COLLATERAL

3.01     Collateral shall be used solely for business purposes
of Debtor.

IV
FURTHER ASSURANCES

4.01     As long as Debtor is indebted to the Secured Party,
Debtor will execute and deliver to the Secured Party such
assignments, notices, financing statements, and such other
documents and papers as Secured Party or its counsel may require
in order to affirm, effectuate, or further assure the grant to
Secured Party of a security interest in the Collateral or to give
any third party notice of Secured Party's interest therein.

V
AFFIRMATIVE COVENANTS

5.01 Debtor shall (a) furnish Secured Party from time to time
with such financial statements and information as Secured Party
may reasonably request; (b) inform Secured Party in writing
immediately upon the occurrence of any material adverse change in
Debtor's financial condition or any event that might foreseeably
materially adversely affect the Collateral or Secured Party's
security interest therein; and (c) inform the Secured Party in
writing immediately upon the occurrence of any material change in
the medical practice or method of doing business of Debtor which
might reduce the value of the Collateral.

VI
DEFAULT

6.01 Debtor shall be in default under this Agreement on the
happening of any of the following events or conditions (an "Event
of Default"):

         (a)  Default in the payment or performance of any
provision, obligation, covenant, or liability contained or
referred to herein or in the Note.

2

ELECTRONICALLY FILED

(b) Falsity in any material respect when made or furnished to Secured Party by or on behalf of Debtor concerning any warranty, representation, or statement.

6.02 Upon the occurrence of an Event of Default by Debtor and in connection with Collateral consisting of accounts receivable due and owing from Medicare or Medi-Cal, Debtor hereby appoints Secured Party as its billing agent and agrees to take such actions and execute such documents as may be required by Medicare or Medi-Cal to accomplish such appointment.

VII

REMEDIES

7.01 Upon the occurrence of an Event of Default hereunder and at any time thereafter, Secured Party may declare all of the Obligations secured by this Agreement immediately due and payable and shall have the remedies of a Secured Party under Section 9503, Article IX of the Commercial Code of the State of California.  Secured Party may require Debtor to assemble Collateral and make it available to Secured Party at a place to be designated by Secured Party that is reasonably convenient to both parties.  Expenses of retaking, holding, preparing for sale, selling, or the like shall include reasonable attorneys' fees and legal expenses incurred by Secured Party.

VIII

TIME OF ESSENCE

8.01 Time is hereby expressly declared to be of the essence of this Agreement.

IX

EFFECT OF AGREEMENT

9.01 All rights of Secured Party hereunder shall inure to the benefit of its successors and assigns, and all obligations of Debtor shall bind the heirs, executors, administrators, successors, or assigns of Debtor.

3

**EXHIBITS - 105**

ELECTRONICALLY FILED

9.02 This Agreement shall become effective when signed by Debtor and shall be governed by the laws of the State of California.

In witness whereof, the parties have executed this Agreement on the date first written above.


SECURED PARTY:

_____
Gary Savlov, an individual


DEBTOR:

Renaissance Surgical Arts at Newport Harbor, LLC

By:_____

Its:_____

4

**ELECTRONICALLY FILED**

EXHBIT A

<u>NAME OF SECURITY</u>     <u>NO. OF SHARES</u>     <u>PRICE PER SHARE</u>

5

July 1, 2011

Bruce Wallace
Chief Executive Officer
Renaissance Surgical Arts of Newport Harbor, LLC
1640 Newport Blvd. Suite 260
Costa Mesa, CA 92627

Dear Mr. Wallace:

Harvinder Sahni, MD ("Purchaser") approves the following Accounts Receivable Purchasing
Proposal (the "Financing") to Renaissance Surgical Arts at Newport Harbor, LLC ("Seller").

As presently constructed, the Seller wishes to sell to the Purchaser individual accounts
receivables (the Purchase or Purchases) with the following terms and conditions:

I.    ACCOUNTS RECEIVABLES PURCHASING TERMS

    **A.**    **Seller:**

    Renaissance Surgical Arts at Newport Harbor, LLC

    **B.**    **Purchaser:**

    Harvinder Sahni, MD

    **C.**    **Total Purchasing Amount:**

    $115,000 net receivables figured at 85% availability of Seller's stated Purchases.

    **D.**    **Purpose:**

    Provide working capital to Seller.

    **E.**    **Maturity Date:**

    The Seller shall guarantee the total purchasing amount in payment to Purchaser no
    later than 90 days from the purchase date of the individual accounts receivable or as
    per this agreement terms in the event of default.

    **F.**    **Purchaser's Fees:**

    The fees on the financing for Purchaser shall be the overage between 85% of the net
    collectable value of the accounts receivables, and 100% of the net collectable value
    of the receivables. This includes an administrative fee for the processing and
    administration of the receivables. "Net Collectable Value" is defined as the net
    receivable anticipated being collected via the Mednet system and GHN.  Any amount
    collected over 100% of the net collectable value of the receivables will be remitted
    back to Seller, reconciled at Maturity Date. The Seller warrants that the net
    receivables are true, accurate and has been confirmed with the insurance company (if
    applicable) of the legitimacy of the claim and coverage. Any amounts that are less
    than the amount submitted will be reimbursed to the Purchaser in cash or with
    additional invoices that will be charged against any shortfall at the Purchaser's sole
    discretion.

    **G.**    **Repayment:**

All obligations under the Purchases shall be due and payable in full by Seller to Purchaser upon the earlier of (1) the Maturity Date; (2) acceleration after the occurrence of an Event of Default or at the election of Seller at will; and (3) termination.  This agreement will succeed in the event of the death of Purchaser(s), with any debts of Seller due Purchaser(s) remaining in full.  In addition, this agreement is assignable by the Purchaser(s).

### H.    Availability:

Availability to Seller for accounts receivables purchases shall be an amount of 85% of the "net collectable value" of the accounts receivable or Purchase.  The amount of the aggregate of all Purchases advanced to Seller by Purchaser minus any collections shall be added to the interest due and any fees associated with this contract as the total obligation at any one time.

## II.    PRIORITY AND SECURITY

### A.    Collateral

. This is a purchase of accounts receivables and the Seller acknowledges that once the batch of invoices/receivables are sold, they are the property of the Purchaser.  Seller further warrants that no entity has any rights to receivables once they are sold and the property of Purchaser.  .

### B.    Guaranties

The Seller is providing a guaranty agreement which shall provide for pro rata liability on the part of each member under the terms of its Operating Agreement.

This agreement is also guaranteed by a corporate guarantee of Renaissance Surgical Arts at Newport Harbor, LLC.

## III.    REPORTING

Seller shall provide any reports reasonably requested by Purchaser, including but not limited to periodic aging reports, dilution analyses, origination reports and default/charge-off reports with the following reports:

1.    monthly financial statements, including balance sheet and income statement, each within 30 days of each month end and certified as correct by Borrower's CEO or CFO;

2.    annual compiled financial statements and tax returns, prepared by Sellers accounting firm, within 120 days of each fiscal year end;

## IV.    CONDITIONS PRECEDENT

### A.    Basic Conditions

Consummation of the Financing shall be contingent upon all items included in Agreement, including the execution of any documents necessary by Seller to demonstrate proper transfer by Purchaser of the receivables in Seller's account under the terms of this agreement.

### B.    Signatory

Bruce Wallace is the designated signatory to execute documents on behalf of Seller.

**ELECTRONICALLY FILED**

We look forward to our continued working relationship.

Sincerely,

**HARVINDER SAHNI, MD**

_____

Date

_____

**ACKNOWLEDGED AND AGREED TO:**

Renaissance Surgical Arts of Newport Harbor, LLC

_____
  signature

By: _____
  print name

Its: _____
  title

Date: _____

**EXHIBITS - 110**

May 1, 2011

Bruce Wallace
Chief Executive Officer
Renaissance Surgical Arts of Newport Harbor, LLC
1640 Newport Blvd. Suite 260
Costa Mesa, CA 92627

Dear Mr. Wallace:

Earl Lanter, M.D. ("Purchaser") proposes the following Accounts Receivable Purchasing Proposal (the "Financing") to Renaissance Surgical Arts at Newport Harbor, LLC ("Seller").

As presently constructed, the Seller wishes to sell to the Purchaser individual accounts receivables (the Purchase or Purchases) with the following terms and conditions:

I.   ACCOUNTS RECEIVABLES PURCHASING TERMS

    **A.   Seller:**

    Renaissance Surgical Arts at Newport Harbor, LLC

    **B.   Purchaser:**

    Earl Lanter, M.D.

    **C.   Total Purchasing Amount:**

    $118,000 net receivables figured at 85% availability of Seller's stated Purchases.

    **D.   Purpose:**

    Provide working capital to Seller.

    **E.   Maturity Date:**

    The purchase to occur up to 6 months from first purchase or as per this agreement terms in the event of default.

    **F.   Purchaser's Fees:**

    The fees on the financing for Purchaser shall be the overage between 85% of the net collectable value of the accounts receivables, and 100% of the net collectable value of the receivables. This includes an administrative fee for the processing and administration of the receivables. "Net Collectable Value" is defined as the net receivable anticipated to be collected via the Mednet system and GHN.  Any amount collected over 100% of the net collectable value of the receivables will be remitted back to Seller, reconciled every three months. The seller warrants that the net receivables are true, accurate and has been confirmed with the insurance company of the legitimacy of the charges and receipts. Any amounts that are less than the amount submitted will be reimbursed to the purchaser either in cash or with additional invoices that will be charged against any shortfall.

    **G.   Repayment:**

    All obligations under the Purchases shall be due and payable in full by Seller to Purchaser upon the earlier of (1) the Maturity Date; (2) acceleration after the occurrence of an Event of Default or at the election of Seller at will; and (3)

termination.  This agreement will succeed in the event of the death of Purchaser(s), with any debts of Seller due Purchaser(s) remaining in full.  In addition, this agreement is assignable by the Purchaser(s).

**H.    Availability:**

Availability to Seller for accounts receivables purchases shall be an amount of 85% of the "net collectable value" of the accounts receivable or Purchase, but must be submitted within 150 days from the date of service.  The amount of the aggregate of all Purchases advanced to Seller by Purchaser minus any collections shall be added to the interest due and any fees associated with this contract as the total obligation at any one time.

II.    PRIORITY AND SECURITY

**A.    Collateral**

The financing shall be secured by a security interest in all existing and future accounts receivable and proceeds thereof that are purchased by Purchaser.  The proceeds of the purchases received under the terms of this agreement shall be subordinate to the lien of Plaza Bank. Notwithstanding, this is a purchase of accounts receivables and the Seller acknowledges that once the batch of invoices/receivables are sold, they are the property of the Purchaser. Seller further warrants that no entity has any rights to receivables once they are sold and the property of Purchaser.  Once the accounts are sold to the Purchaser, they are now the property of the Purchaser, which is not subject to a subordinate position to any entity, including Plaza Bank.

**B.    Guaranties**

The Seller shall enter into a guaranty agreement which shall provide for pro rata liability on the part of each member under the terms of its Operating Agreement.  The pro rata guarantee shall include Bruce Wallace, notwithstanding the provisions of the operating agreement wherein Bruce Wallace is not required to provide guarantees.

This agreement is also guaranteed by a corporate guarantee of Renaissance Surgical Arts at Newport Harbor, LLC.

III.    LOCKBOX AND CASH MANAGEMENT

Seller shall maintain a lockbox account with which Purchaser is hereby authorized until full satisfaction under this agreement is rendered to "sweep" all receivables purchased into Purchaser's separate account maintained for this purpose only. Purchaser shall have free access to such funds but must provide on a weekly basis statements to Seller's satisfaction to provide for proper accounting practices. Purchaser shall turn over this account to Seller upon termination of this agreement within 7 business days.

IV.    REPORTING

Seller shall provide any reports reasonably requested by Purchaser, including but not limited to periodic aging reports, dilution analyses, origination reports and default/charge-off reports with the following reports:

1.  monthly financial statements, including balance sheet and income statement, each within 30 days of each month end and certified as correct by Borrower's CEO or CFO;

2.  annual compiled financial statements and tax returns, prepared by Sellers accounting firm, within 120 days of each fiscal year end;

V.  CONDITIONS PRECEDENT

   **A.   Basic Conditions**

   Consummation of the Financing shall be contingent upon all items included in Agreement, including the execution of any documents necessary by Seller to demonstrate to its lock box facility the proper transfer by Purchaser of the receivables in Seller's account under the terms of this agreement.

   **B.   Signatory**

   Bruce Wallace is the designated signatory to execute documents on behalf of Seller.

We look forward to our continued working relationship.

Sincerely,

**EARL LANTER, M.D.**

**ACKNOWLEDGED AND AGREED TO:**

Renaissance Surgical Arts of Newport Harbor, LLC

_____
   signature

By: _____
   print name

Its: _____
   title

Date: _____

**EXHIBITS - 113**

September 30th, 2010

Bruce Wallace
Chief Executive Officer
Renaissance Surgical Arts of Newport Harbor, LLC
1640 Newport Blvd. Suite 260
Costa Mesa, CA 92627

Dear Mr. Wallace:

Anil Shah, M.D., Amer Zarka, M.D. and affiliated entities ("Purchaser") are pleased to propose the following Accounts Receivable Purchasing Proposal (the Loan) to Renaissance Surgical Arts at Newport Harbor, LLC ("Seller").

As presently constructed, the Purchaser wishes to acquire Seller's individual accounts receivables (the Purchase or Purchases) with the following terms and conditions:

I.   ACCOUNTS RECEIVABLES PURCHASING TERMS

   **A.   Seller:**

   Renaissance Surgical Arts of Newport Harbor, LLC

   **B.   Purchaser:**

   Anil Shah, M.D., Amer Zarka, M.D., and affiliated entities

   **C.   Total Purchasing Amount:**

   Purchases not to exceed $1,500,000 in net receivables figured at .85 times Sellers stated Purchases.

   **D.   Purpose:**

   Provide working capital to Seller.

   **E.   Maturity Date:**

   The earlier to occur of (a) 24 months from first Purchase or as per this Agreement terms in the event of default.

   **F.   Interest:**

   The Interest Rate on the financing shall be 12% per annum.  Interest on the outstanding balance of the financing shall be payable monthly in arrears and calculated on the basis of the actual number of days elapsed in a 360-day year. Collections of cash by Purchaser under the Loan shall be credited to Seller's obligations thereunder on a daily basis, net of fees and interest as solely under this Agreement and subject to a three business day clearance allowance to the benefit of the Purchaser.

   **G.   Repayment:**

   All obligations under the Purchases shall be due and payable in full by Seller to Purchaser upon the earlier of (1) the Maturity Date; (2) acceleration after the occurrence of an Event of Default or at the election of Seller at will; and (3) termination.

   **H.   Availability:**

**EXHIBITS - 114**

Availability to Seller for accounts receivables purchases shall be an amount of 85% of the "net collectable value" of the accounts receivable or Purchase, but must be submitted within 150 days from the date of service. The amount of the aggregate of all Purchases advanced to Seller by Purchaser minus any collections shall be added to the interest due and any fees associated with this contract as the total obligation at any one time.

II.    PRIORITY AND SECURITY

    **A.    Collateral**

The financing shall be secured by a security interest in all existing and future accounts receivable and proceeds thereof. The security interest granted hereunder shall be subordinate to the lien of Plaza Bank.

    B.    **Guaranties**

The Seller shall enter into a guaranty agreement which shall provide for pro rata liability on the part of each member under the terms of its Operating Agreement.

III.    LOCKBOX AND CASH MANAGEMENT

Seller shall maintain a lockbox account from which Purchaser is hereby authorized until full satisfaction under this agreement is rendered to "sweep" all receivables into Purchaser's separate account maintained for this purpose only. Purchaser shall have free access to such funds but must provide on a weekly basis statements to Sellers satisfaction to provide for proper accounting practices. Purchaser shall turn over this account to Seller upon termination of this agreement within 3 business days.

IV.    REPORTING

Seller shall provide any reports reasonably requested by Purchaser, including but not limited to periodic aging reports, dilution analyses, origination reports and default/charge-off reports with the following reports:

1.    monthly financial statements, including balance sheet and income statement, each within 30 days of each month end and certified as correct by Borrower's CEO or CFO;

2.    annual compiled financial statements and tax returns, prepared by Sellers accounting firm, within 120 days of each fiscal year end;

V.    CONDITIONS PRECEDENT

    **A.    Basic Conditions**

Consummation of the Financing shall be contingent upon all items included in Agreement, including the execution of any documents necessary by Seller to demonstrate to its lock box facility the proper transfer by Purchaser of the receivables in Seller's account under the terms of this agreement.

A fee of 2% shall be payable to Maximum Healthcare at every funding of a Purchase equal to the individual Purchase multiplied by 2%.

We look forward to our continued working relationship.

Sincerely,

**ANIL SHAH, M.D.**

Anil Shah, M.D.

**ACKNOWLEDGED AND AGREED TO:**

Renaissance Surgical Arts of Newport Harbor, LLC

_____
　signature
By: _____
　print name
Its: _____
　title
Date: _____

**EXHIBITS - 116**

**ELECTRONICALLY FILED**

# Exhibit "7"

**Renaissance Surgical Arts**
**Cash Flow Projection**

| Forecast Week | 1 | 2 | 3 | 4 | Total | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 7-Aug | 14-Aug | 21-Aug | 28-Aug | 4 Weeks | 4-Sep | 11-Sep | 18-Sep | 25-Sep | 2-Oct | 9-Oct | 16-Oct | 23-Oct | 30-Oct | 13 Weeks |
| Beginning Book Cash Balance | $ 953 | $ 10,812 | $ 17,872 | $ 57,520 | $ 953 | $ 293,496 | $ (1,995) | $ 89,515 | $ 173,774 | $ 350,800 | $ 74,240 | $ 36,549 | $ 68,689 | $ 379,162 | $ 953 |
| Receipts | 135,002 | 161,410 | 143,727 | 305,461 | 745,599 | 206,859 | 205,830 | 209,805 | 213,347 | 228,654 | 250,607 | 338,429 | 339,475 | 340,922 | 3,079,527 |
| **Operating Costs:** | | | | | | | | | | | | | | | |
| Vendor Disbursements | 22,075 | 25,277 | 51,339 | 23,597 | 122,287 | 45,762 | 25,970 | 25,970 | 25,970 | 80,970 | 49,868 | 28,652 | 28,652 | 83,652 | 517,753 |
| Equipment Leasing | 2,917 | 57,345 | 17,516 | - | 77,777 | 77,272 | - | - | - | - | 77,272 | - | - | - | 232,321 |
| Payroll/Taxes/Benefits | 99,210 | 89,000 | 23,440 | 13,440 | 225,090 | 80,882 | - | 74,227 | - | 90,222 | 1,000 | 74,227 | - | 289,938 | 835,586 |
| Management Fee | - | - | - | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 | 75,000 |
| Rent | - | - | - | - | - | - | - | - | - | 98,060 | 98,060 | 98,060 | - | - | 294,181 |
| G&A | 48,441 | 2,728 | 11,785 | 17,448 | 80,402 | 77,822 | 350 | 350 | 350 | 10,350 | 62,097 | 350 | 350 | 10,350 | 242,772 |
| **Financing:** | - | - | - | - | - | | | | | | | | | | |
| Plaza - TI Loan | - | - | - | - | - | 58,026 | - | - | - | 58,026 | - | - | - | 58,026 | 174,079 |
| Wells Fargo - Equip Loan | - | - | - | - | - | 134,585 | - | - | - | 134,585 | - | - | - | 134,585 | 403,756 |
| Bank Fees | - | - | - | - | - | 3,000 | - | - | - | 3,000 | - | - | - | 3,000 | 9,000 |
| DIP Loan Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 | 25,000 |
| Financing Costs | - | - | - | - | - | 195,612 | - | - | - | 195,612 | - | - | - | 220,612 | 611,835 |
| Admin. Prof. & Legal Fees | - | - | - | 15,000 | 15,000 | - | 88,000 | 25,000 | 10,000 | 5,000 | - | 105,000 | - | 15,000 | 263,000 |
| Total Disbursements | 172,643 | 174,349 | 104,080 | 69,485 | 520,557 | 502,350 | 114,320 | 125,547 | 36,320 | 505,214 | 288,297 | 306,289 | 29,002 | 644,552 | 3,072,449 |
| Net Cash Flow | $ (37,641) | $ (12,940) | $ 39,647 | $ 235,976 | $ 225,043 | $ (295,491) | $ 91,510 | $ 84,259 | $ 177,026 | $ (276,560) | $ (37,691) | $ 32,139 | $ 310,473 | $ (303,631) | $ 7,078 |
| Member DIP Loan | $ 47,500 | 20,000 | - | - | $ 67,500 | - | - | - | - | - | - | - | - | - | 67,500 |
| Ending Book Cash Balance | $ 10,812 | $ 17,872 | $ 57,520 | $ 293,496 | $ 293,496 | $ (1,995) | $ 89,515 | $ 173,774 | $ 350,800 | $ 74,240 | $ 36,549 | $ 68,689 | $ 379,162 | $ 75,531 | $ 75,531 |

**ELECTRONICALLY FILED**

# Exhibit "8"

## PROMISSORY NOTE

Date: August 4, 2011                                                    $10,000.00

     Renaissance Surgical Arts at Newport Harbor, LLC, a Delaware limited liability company, Debtor and Debtor-in-Possession in a case pending in the United States Bankruptcy Court, Central District of California, Santa Ana Division, under Consolidated Case No. 8:11-bk-19749-ES ("Borrower"), for good and valuable consideration, receipt of which is hereby acknowledged, promises to pay to the undersigned (together with his successors, assigns, heirs and personal representatives "Lender(s)"), or order, the sum of **Ten Thousand Dollars** ($10,000.00 (the "Principal"), under the terms and conditions set forth herein:

**Summary of Terms.**

| | |
|---|---|
| Facility: | Revolving credit facility to be held for the benefit of Borrower. |
| Term: | 180 days with optional 60 day extensions not to exceed 360 days. |
| Interest Rate on Drawn Funds: | 10% per annum during first 180 days. |
| | +1% per annum, for each additional 60 day extension. |
| | Interest will be paid quarterly; provided, that Borrower can elect to pay interest in kind (by adding to the principal balance) in any particular period subject to a 2.5% premium (i.e. 12.5% per annum, if during the first 180 days). |
| Interest Rate on Un-Drawn Funds: | 2% per annum. |
| Proposed Ranking: | Administrative priority, pursuant to 11 U.S.C. § 364(b), subject to approval by the United States Bankruptcy Court. |

    **Facility.** The Principal will be held in a segregated account for the benefit of the Borrower, and will be drawn as needed for the Borrower's business operations, at the Borrower's sole discretion.

    **Term.**  The full, then-outstanding utilized Principal amount together with any accrued and unpaid interest thereon owing under this Note shall become due and payable on the Maturity Date, which shall be one hundred eighty (180) days following the date hereof, provided that at the Borrower's election, the Maturity Date may be extended in increments of sixty (60) days ("Maturity Date Extension"), and provided further that the Maturity Date shall in no event exceed three hundred sixty (360) days following the date hereof.

    **Interest Rate on Drawn Funds.** The Principal shall bear interest at a rate of ten percent (10%) per annum ("Base Rate"), and the Base Rate shall be increased by one percent (1%) per

annum for each Maturity Date Extension elected by the Borrower.

**Interest Rate on Un-Drawn Funds.** Un-drawn funds will bear interest at a rate of two percent (2%) per annum.

Interest on drawn and un-drawn funds shall be payable quarterly from the date hereof. All payments of Principal and interest hereunder shall be made in lawful money of the United States of America in immediately available funds to such account or in such other manner as the holder of this note shall designate from time to time in writing to Borrower, provided that at the Borrower's election, Borrower may pay interest in kind, subject to a two and one-half percent (2.5%) premium above the applicable rate then in effect.

The failure of Borrower to pay the full amount of any payment due hereunder on the date such payment is due shall constitute an event of default hereunder. In the event an installment payment is not timely made, Lender, at his, her or its option may declare the entire then existing outstanding amount owing to be all due and payable.

The acceptance by Lender of any payments due hereunder after the date such payment is due shall not constitute a waiver of the right to require prompt payment when due of future or succeeding payments or to declare a default as herein provided for any failure to so pay.

Borrower expressly waives presentment, demand, protest, notice of dishonor, notice of non-payment, notice of maturity, notice of protest, and/or presentment for the purpose of accelerating maturity or diligence in collection.

Borrower may, at any time, prepay the full Principal amount at any time outstanding, or any portion thereof, without any penalty or premium whatsoever.

In the event any action is instituted to collect this Note, or any portion thereof, Borrower promises to pay all costs of collection, including, but not limited to, reasonable attorney's fees, court costs, and such other sums as the court may establish.

This Note and the transaction evidenced thereby is subject to the authorization of the United States Bankruptcy Court, Central District of California, Santa Ana Division, under Case No. 8:11-bk-19749-ES for this borrowing, with the security for the Borrower's performance that which is described in the Court's Order referencing the same. The holder of this Note is entitled to the benefits and security, which is described in the Court's Order referencing the same.

This Note and all transactions hereunder and/or evidenced herein shall be governed by, construed, and enforced in accordance with the laws of the State of California under the jurisdiction of the United States Bankruptcy Court, Central District of California, Santa Ana Division, under Consolidated Case No. 8:11-bk-19749-ES.

**ELECTRONICALLY FILED**

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed on the day and year first above written.

BORROWER:

**RENAISSANCE SURGICAL ARTS AT NEWPORT HARBOR, LLC**

By: _____

Name: _____

Title: _____

LENDER:

By: _____

Name: <u>Dr. David Sacks</u>

Title: _____

3

**EXHIBITS - 121**

**ELECTRONICALLY FILED**

# Exhibit "9"

ELECTRONICALLY FILED



## Palmetto GBA™
PARTNERS IN EXCELLENCE™

A/B MAC Jurisdiction 1

California, Nevada, Hawaii,
Guam, American Samoa,
Northern Mariana Islands

June 07, 2011

Bruce B. Wallace
1640 Newport Blvd Suite 100
Costa Mesa, CA  92627

CCN:  11138002001558-001
PTAN:  F1947
NPI:  1659685881

Dear Bruce B. Wallace:

Our office has received a tie-in notice for Renaissance Surgical Arts at Newport Harbor LLC, dba Renaissance Surgical Arts at Newport Harbor LLC from the State Agency/CMS Regional Office.  The State Agency/CMS Regional Office has approved a(n) initial enrollment for your facility, with an effective date of March 15, 2011.  Your office may begin billing for Medicare services.

Questions related to the survey and certification process should be directed to the State Agency/CMS Regional Office.

Please ensure the National Plan and Provider Enumeration System (NPPES) is notified of any changes in enrollment information.

Sincerely,

Kristen Hayden
Medicare Provider Enrollment

www.palmettogba.com/J1    Post Office Box 1508
ISO 9001:2000    Augusta, GA 30903-1508    A CMS-Contracted Medicare Administrative Contractor    CMS

EXHIBITS - 123

# FAX

To :19496291500                          Date :06/07/11

From :Hayden, Kristen

Subject :Renaissance Surgical Arts at Newport Harbor LLC

Total number of pages :2

PRIVILEGED AND CONFIDENTIAL

THIS FAX AND ANY FILES TRANSMITTED WITH IT MAY BE CONFIDENTIAL AND INTENDED
SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. THIS
COMMUNICATION MAY CONTAIN MATERIAL THAT IS PRIVILEGED, ATTORNEY WORK PRODUCT,
OR PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU HAVE RECEIVED THIS
MESSAGE IN ERROR, OR ARE NOT THE NAMED RECIPIENT, PLEASE (1) BE ADVISED THAT ANY
USE, DISSEMINATION, FORWARDING, PRINTING, OR COPYING OF THIS FAX IS STRICTLY
PROHIBITED; AND (2) IMMEDIATELY DESTROY THIS FAX AND NOTIFY ME BY TELEPHONE AT
(904) 791-6036.  THANK YOU.

**ELECTRONICALLY FILED**

# Exhibit "10"


**Monarch HealthCare®**
A Medical Group, Inc

July 20, 2011

Renaissance Surgical Arts at Newport Harbor
Attn: Kathy Wallace
1640 Newport Blvd., Ste. 260
Costa Mesa, CA 92627

RE: CREDENTIALING APPLICATION APPROVED

Dear Kathy:

This is to inform you that the Credentialing Committee of Monarch HealthCare approved
your credentials as a Health Deliver Organization provider for a period of three (3) years.
Your initial approval will expire on 07/20/2014.

As a Monarch HealthCare Delivery Organization, your organization will be
recredentialed every three years. Please note that any license, accreditation certification,
insurance change or update, ownership or executive staff changes must be reported and
submitted on a timely basis to the following address:

Monarch HealthCare
Attn: Credentialing Department
7 Technology Dr.
Irvine, CA 92618
Fax: 949-923-3595

If you have any questions you may contact me at the number listed below.

Sincerely,


David Santoro
Credentialing Coordinator
Monarch HealthCare
Phone: 949-923-3201, ext. 2964
Fax: 949-923-3595


cc: Credentialing file

| In re: Renaissance Surgical Arts at Newport Harbor, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 8:11-bk-19749-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document described **DECLARATION OF BRUCE WALLACE IN SUPPORT OF DEBTOR'S OMNIBUS EMERGENCY MOTION FOR ORDER (1) AUTHORIZING USE OF CASH COLLATERAL AND SETTING INTERIM AND FINAL HEARINGS RE: SAME; (2) AUTHORIZING THE DEBTOR TO INCUR UNSECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364(b) (3) EXCUSING PERFORMANCE OF OBLIGATIONS ARISING UNDER 11 U.S.C. § 365(d)(3); (4) ESTABLISHING ADEQUATE ASSURANCE PAYMENTS WITH RESPECT TO UTILITIES;  (5) EXTENDING THE TIME IN WHICH TO FILE SCHEDULES, STATEMENTS, AND LISTS PURSUANT TO FED.R.BANKR.P. 1007(c); AND (6) LIMITING NOTICE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>August 9, 2011</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Steven Casselberry     scasselberry@mrllp.com, fbaig@mrllp.com;jjacobs@mrllp.com
- Caroline Djang     cdjang@rutan.com
- Mark S Faulkner     mfaulkner@mrllp.com, fbaig@mrllp.com;jjacobs@mrllp.com
- Robert P Goe     kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Michael D Good     mgood@southbaylawfirm.com
- Michael J Hauser     michael.hauser@usdoj.gov
- Thomas E Shuck     malvarado@pmcos.com, malvarado@pmcos.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- William J Wall     wwall@wall-law.com, goceguera@wall-law.com

☐ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On <u>August 9, 2011</u>, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

Hon. Erithe A. Smith
United States Bankruptcy Court - Central District of California
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                     **F 9013-3.1**

| In re: Renaissance Surgical Arts at Newport Harbor, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER  8:11-bk-19749-ES |

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 9, 2011 | Michael D. Good | /S/ |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 9013-3.1**